IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| BOB BROWN, HAILEY SINOFF, and DONALD SEIFERT,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State,<br><br>Defendant. | CV 21–92–H–PJW–DWM–BMM<br><br>ORDER |

Plaintiffs Bob Brown, Hailey Sinoff, and Donald Seifert (collectively "Plaintiffs")[1] bring this action against Defendant Christi Jacobsen, in her official capacity as Montana Secretary of State, alleging that the districts established for Montana's Public Service Commission ("the Commission") are malapportioned in violation of the Fourteenth Amendment of the United States Constitution. (Doc. 1.) According to Plaintiffs, the Commission's five districts based on the existing map do not reflect the realities of Montana's population distributions, and these distortions run afoul of the one person, one vote principle. (*Id.* ¶¶ 4, 42–46.) Plaintiffs ask for a declaration that the "current configurations of Montana's Public

---

[1] Plaintiff Brown is a resident of District 5, while Defendants Sinoff and Seifert are residents of District 3. (Doc. 1 at ¶¶ 13–15.)

1

Service Commission districts . . . violate the Fourteenth Amendment." (*Id.* at 16.) Plaintiffs sought appointment of a three-judge panel pursuant to 28 U.S.C. § 2284(a) to resolve these issues. (*Id.*) The Chief Judge of the Ninth Circuit accordingly appointed a panel composed of the Honorable Donald W. Molloy, presiding judge, the Honorable Brian M. Morris, Chief Judge of the United States District Court for the District of Montana, and the Honorable Paul J. Watford of the Ninth Circuit Court of Appeals. (Doc. 3.)

Plaintiffs then filed a motion for a temporary restraining order and/or a preliminary injunction, seeking to enjoin the candidate certification process only in Districts 1 and 5, which are scheduled to hold elections in 2022. (Doc. 5 at 2.) Plaintiffs' request for a temporary restraining order was granted, and Jacobsen was temporarily restrained from implementing the candidate certification process in Districts 1 and 5. (Doc. 7 at 9.) That same order set a hearing on Plaintiffs' request for a preliminary injunction for January 7, 2022, before the three-judge panel. (*Id.*)

Between the issuance of the temporary restraining order and the January 7 hearing, Jacobsen filed a response in opposition to the request for a preliminary injunction. (Doc. 8.) In a reply to that response, Plaintiffs noted that Jacobsen did not file an answer or other responsive pleading as required by Federal Rule of Civil Procedure 12. (*See* Doc. 9 at 12 n.3.) At the January 7 hearing the parties

acknowledged they had agreed to construe Jacobsen's response in opposition to Plaintiffs' request for injunctive relief as a free-standing motion to dismiss or stay the case. Following oral argument, the Court entered an order clarifying that the temporary restraining order would continue in effect until January 18, 2022, or until an order issued on the request for a preliminary injunction, whichever was earlier. (Doc. 11.) For the reasons set forth below, Plaintiffs' request for a preliminary injunction is granted. A final determination of the merits and any remedy is yet to be resolved.

## I. Justiciability

As a preliminary matter, Jacobsen disputes the justiciability of Plaintiffs' claims. In particular, Jacobsen argues that Plaintiffs' claim is unripe because the Montana Legislature has not had an opportunity to respond to the 2020 United States Census data, (Doc. 8 at 10), as the data was only released in August 2021, (Doc. 1 at ¶ 26). In support of the argument that the current lawsuit is premature, Jacobsen points to "ample evidence that current legislators and holdover legislators will address this issue through the 2021–22 interim and in the 2023 regular session." (Doc. 8 at 14.) This evidence consists of a letter from Representative Katie Zolnikov, (*id.* at 36), and an email from Senator Greg Hertz, (*id.* at 38), each submitted after this case was filed, appearing to demonstrate interest from those

3

legislators in addressing reapportionment of the Commission's districts during the 2023 session. Even so, Jacobsen's argument on ripeness is unavailing.

"In determining whether a dispute is ripe, the court looks to the situation as of the time suit was filed." *Democratic Nat'l Comm. v. Watada*, 198 F. Supp. 2d 1193, 1197 (D. Haw. 2002). Events that occur after a suit is filed may moot the action, but the doctrine of ripeness is not affected by such subsequent events. *Id.* Plaintiffs filed this suit on December 6, 2021, (Doc. 1), and the communications from Hertz and Zolnikov are dated December 22 and December 30, 2021, (Doc. 8 at 36, 38). While the communications from Zolnikov and Hertz—or any like action from other state legislators—may be the impetus for future events that have the potential to render Plaintiffs' present action moot, those communications and the Legislators' purported intent have no effect on the ripeness of this action.

Moreover, ripeness is contingent on whether the facts of a case demonstrate that there is yet any need for the court to act. *See Narouz v. Charter Comms., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010). Here, the communication from state legislators supports the proposition that some action is necessary to redistrict the Commission's district map, and the essential issue is whether the redrawn five district map should derive from the Montana Legislature or the federal judiciary in advance of the 2022 election cycle. That question goes beyond the ripeness

inquiry and strikes at the merits of this case. In sum, the present case is ripe for adjudication.

## II. *Winter* Evaluation

To succeed on their motion for a preliminary injunction, Plaintiffs "must establish that [they] are likely to succeed on the merits, that [they] are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). At this point considering the legal briefing and oral argument, Plaintiffs have met their initial burden.

### A. Likelihood of Success on the Merits

Plaintiffs must show they are likely to succeed on the merits of their challenge that the Commission's districts, based on the data from the 2020 United States Census, are malapportioned. Plaintiffs make the case that the Commission's districts are unconstitutional because they deny every voter his "constitutional right to have his vote counted with substantially the same weight as that of any other voter." (Doc. 1 at ¶ 42 (quoting *Hadley v. Junior Coll. Dist. of Met. Kansas City*, 397 U.S. 50, 53 (1970).) The Supreme Court's emphasis that "[s]tates must draw congressional districts with populations as close to perfect equality as possible," *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016), means that when a state

> decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment

5

> requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials.

*Hadley*, 397 U.S. at 56. "Where the maximum population deviation between the largest and smallest district is less than 10% . . . a state or local legislative map presumptively complies with the one-person, one-vote rule." *Evenwel*, 578 U.S. at 60. Put in the inverse, where the difference between the deviation in the largest district and the deviation in the smallest district exceeds 10%, the map at issue may only be constitutional if the state shows that the districts accommodate for some type of "traditional districting objective[]" such as "preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." *Id.* at 59.

Here, Plaintiffs have included evidence from the 2020 Census pertaining to Montana, (Doc. 6-1), to calculate each district's respective deviation from the ideal population based on the data from that census utilizing the formula from *Evenwel*. Considering the 2020 Census, the ideal population for each district in Montana would be 216,845. (Doc. 1 at ¶ 28.) This figure is achieved by dividing Montana's total population of 1,084,225, (*id.* ¶ 27), by five. *See Evenwel*, 578 U.S. at 59. Relying on the 2020 Census data, the population of the smallest district, District 1, downwardly deviates approximately 14% from the ideal population

6

while the population of the largest district, District 3, upwardly deviates approximately 10%. (Doc. 6 at 24.) Under the *Evenwel* formula, the maximum population deviation is roughly 24%, which exceeds the presumptively reasonable 10% deviation. *See* 578 U.S. at 60. Jacobsen concedes that the 2020 Census data indicates a shift in Montana's population that has "result[ed] in large deviations across representative political districts." (Doc. 8 at 21–22; *see also id.* at 22 n.3.)

However, at the January 7 hearing, Jacobsen argued that the 2020 Census data is inapposite to the current challenge because, despite the 2022 election cycle, the Montana Legislature will not have an opportunity to respond to the 2020 Census data until it convenes in 2023. (*See* Doc. 8 at 10.) Based on this theory, Jacobsen argues that Plaintiffs cannot succeed on the merits because their claims are essentially time-barred by *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (per curiam), which emphasized that "a party requesting a preliminary injunction must generally show reasonable diligence." *Id.* at 1944. Accordingly, Jacobsen argues that any viable challenge to the 2022 election cycle must be premised on the 2010 Census data, and such a challenge would fail under *Benisek* because of the time lapse between that data and the present action. Jacobsen also argues that Plaintiffs are unlikely to succeed on the merits of their challenge because the law requires that the Legislature, not the courts, take the first run at redistricting. Neither argument is persuasive at this point.

7

The argument that Plaintiffs' challenge is time-barred is unpersuasive for several reasons. First, Plaintiffs' challenge is measured by data from the 2020 Census and seeks to compel redistricting of *all* the districts. Thus, assuming *arguendo* that Jacobsen's time bar argument holds water, it would be inapplicable to Plaintiffs' challenge. Plaintiffs protest the boundaries of all the Commission's districts, and three of the five of those districts will be subject to the 2024 election cycle, (*cf.* Doc. 1 at ¶ 40), in which the parties agree the 2020 Census data will be relevant. Notably, the parties agree the current districts exhibit significant deviations based on the 2020 Census. (*See*, e.g., Doc. 8 at 19–20.) Thus, the breadth of Plaintiffs' challenge and the parties' agreement that the current districts do not reflect the realities of Montana's population distributions means that Plaintiffs are likely to succeed on the merits of their claim. While the parties disagree about the appropriate remedy, that dispute is independent of any time-bar argument Jacobsen raises.

Second, the emphasis on diligence in *Benisek* does not preclude Plaintiffs' challenge. In *Benisek*, the plaintiffs challenged an allegedly politically gerrymandered political map and sought a preliminary injunction six years, or three general election cycles, after the map was adopted. 138 S. Ct. at 1944. The Supreme Court characterized this six-year period as an "unnecessary, years-long delay" that weighed against granting the preliminary injunction. *Id.* Such a

characterization does not give rise to an *in essentia* statute of limitations. Even if it did, the difference between alleged constitutional injuries between *Benisek* and this case casts doubt on the applicability of the *Benisek* reasoning. Unlike in *Benisek*, Plaintiffs' challenge here is not rooted in the release of a districting map that created unconstitutional districts based on malapportioned political groupings; rather, Plaintiffs challenge a stale map on the basis that new data demonstrates the districts—which were once presumptively constitutional—are no longer so. The fundamental distinction between the nature of the *Benisek* plaintiffs' claims and the current Plaintiffs' claims frays the tether Jacobsen seeks to establish between the *Benisek* diligence rule and this case.

Additionally, there is no statutory or constitutional requirement that the Montana Legislature act at certain intervals to redistrict the Commission's districts. (*Cf.* Doc. 8 at 9 (stating the Montana Constitutional requirement that legislative districts be reapportioned in the third year after a decennial census but there is no authority stating an analogous timeline for reapportionment of the Commission's districts).) Consequently, it is difficult to reconcile how—under Jacobsen's theory—Plaintiffs have acted both prematurely and belatedly in bringing this challenge because there is no requirement that the Legislature consider or change the Commission's districts on a specific timeline. At this stage in the litigation, Plaintiffs have shown a likelihood of success on the merits.

## B. Irreparable Harm

Plaintiffs must establish that the prospect of irreparable harm is not merely possible but that it is "likely." *Winter*, 555 U.S. at 22. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 837 (9th Cir. 2020) (quotation marks omitted). Moreover, the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Cf. Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (determining irreparable harm in the context of a First Amendment violation). The parties disagree about the nature and scope of the injury: according to Plaintiffs, the 2020 Census data indicates that the five districts are constitutionally malapportioned, which will necessarily result in a violation of the one person, one vote principle if it is not corrected before the 2022 election cycle. Jacobsen agrees that, based on the 2020 Census, the current districts exhibit significant deviations, (Doc. 8 at 21–22), but Jacobsen argues that any viable challenge to the 2022 election cycle must be based on data from the 2010 Census and—in addition to the argument that such a challenge would be untimely—Jacobsen argues there remains at least a colorable dispute of fact as to whether the deviations based on 2010 data are unconstitutional. At this stage in the litigation, Plaintiffs have the more persuasive argument.

As noted, the parties agree that data from the 2020 Census shows that the populations in the Commission's districts substantially deviate from the ideal population. Thus, viewing the issue as Plaintiffs frame it, there exists a presumption of unconstitutionality because the maximum deviation is above 10%. *See Evenwel*, 578 U.S. at 60. If the 2022 election cycle proceeds on the current Commission Districts, the 2020 Census data shows, (*see* Doc. 6 at 24), that the voters in that election will be precluded from exercising their Fourteenth Amendment right to have their votes counted with substantially the same degree of weight as other votes, *see Hadley*, 397 U.S. at 53. The fact that such a violation might be limited only to the districts up for election in 2022 does not eliminate the presently occurring harm because even temporally limited constitutional deprivations represent irreparable harm. *See Otter*, 682 F.3d at 826.

Moreover, Jacobsen may yet show that the deviations of the current map based on the 2020 Census data accommodate a recognized interest such as maintaining the integrity of political subdivisions. *See Mahan v. Howell*, 410 U.S. 315, 329 (1973). But at this stage, the presumption of unconstitutionality that attaches at this point gives rise to the requisite likelihood of irreparable harm because the malapportionment appears to improperly distribute the weight carried by each vote in the Commission's districts in contravention of the Fourteenth Amendment. The concern here is Jacobsen's timing argument regarding the

11

challenge but Plaintiff notes it is the stale district mapping when measured by the 2020 Census that proves the point.

Similarly, even if the issue is viewed as Jacobsen frames it, Plaintiffs nonetheless show a likelihood of irreparable harm. At the January 7 hearing, Jacobsen noted there may be issues of fact as to whether the current districts, under the 2010 Census, are unconstitutional because the deviation hews somewhat closely to the 16% maximum deviation that was found permissible in *Mahan*. However, in *Mahan* the presumption of unconstitutionality attached, but the State succeeded in rebutting it by pointing to permissible legislative intent in drawing districts so as to preserve political subdivisions. *See* 410 U.S. at 326. Plaintiffs show that the State could have drawn a map in 2010 that preserved county boundaries while reducing the maximum deviation below 3%. (Doc. 6 at 26.) Therefore, at this juncture the presumption of unconstitutionality exists as to the existing map of the Commission's districts, even based on the 2010 Census data.

### C. Balance of the Equities

In balancing the equities, both parties invoke considerations of confusion—on behalf of both voters and candidates for the Commission—and comity. As a threshold matter, the concern that any change to the Commission's current maps will significantly disrupt and add confusion to the 2022 election cycle may be somewhat mitigated by the expeditious resolution of this case. To that effect, as

indicated below, the case will be set on an expedited trial or summary judgment briefing schedule so that the merits of this case may be resolved prior to the March 14, 2022 candidate filing deadline.

In addition, Jacobsen argues that Plaintiffs' requested relief is "unprecedented" and would likely exacerbate voter confusion. (*See* Doc. 8 at 27–28.) While the remedy imposed if Plaintiffs succeed on the merits of their ultimate challenge is reasonably subject to dispute, Jacobsen's concerns about the appropriateness of Plaintiffs' requested remedy do not tip the scales in her favor. The preliminary injunction is narrower in scope than the relief Plaintiffs request on their overall challenge, and Jacobsen's concerns that some voters might be shuffled throughout districts is speculative and does not diminish the reality that, at this stage, Plaintiffs have established a likelihood that a constitutional injury is presently occurring. Highlighting the possibility that confusion or other challenges may arise in connection with remedying the presumed constitutional injury does not obviate the injury itself.

Concerning comity, Jacobsen's argument that the Montana Legislature should have the opportunity to respond to the 2020 Census data has merit. But, at the same time, the limited record shows that the Montana Legislature has consistently failed to remedy malapportioned districts. Importantly, unlike the redistricting process for legislative districts, whereby the Montana Constitution

imposes a timeline for the process to occur, Mont. Const. art. IV, § 14, there is no timeline governing the redistricting process for the Commission's districts. Left unresolved, there are likely significant violations of the constitutional principle of one person, one vote. Plaintiffs' showing of a likelihood of irreparable harm, which falls in the shadow of the Legislature's inaction, and the lack of a constitutional impetus to guarantee a legislative remedy diminishes the persuasiveness of Jacobsen's argument that deference to the Legislature is appropriate at the preliminary injunction stage.

Accordingly, this factor, too, tips in Plaintiffs' favor.

## D. Public Interest

To the extent the fourth factor remains an independent consideration in this context, *cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (stating that third and fourth factors merge when the government is the opposing party in the context of a stay), the public continues to have an interest in the principles recognized in the previous temporary restraining order. The public has an interest in "fair and effective representation," *see Evenwel*, 578 U.S. at 73; the public has an interest in "orderly elections" that may be furthered by temporarily restraining the candidate certification process while the Commission's districts are under review, *see Benisek*, 138 S. Ct. at 1944; and the public has an interest in "equal voting strength for each voter," *Hadley*, 397 U.S. at 58. Jacobsen does not dispute that the public

possesses these interests but emphasizes that "[t]he public interest inquiry primarily addresses impact on non-parties rather than parties." (Doc. 8 at 30 (quoting *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003).) Consequently, Jacobsen argues that the Legislature's interest in maintaining control over the redistricting process is owed deference until the "Legislature fails to timely act after having an adequate opportunity to do so." (*Id.*)

As explained above, the Legislature has had opportunities to act—and it has failed to do so. Although the 2020 Census data was released in August 2021, (Doc. 1 at ¶ 26), the Legislature has not acted since 2003 to redistrict the Commission's districts, (*see id.* ¶ 1), despite the proposed legislative bills to address the concern. The current census data confirms what the 2010 census data seems to show: that the current districts are malapportioned.[2] Thus, on balance, though the Legislature has an interest in involvement in the redistricting process, the public's interest in effective representation and equal voting strength outweighs that interest right now. And the Legislature is not precluded from acting in advance of the 2024 elections—or even the 2022 elections if a special session is

---

[2] Jacobsen argues that, had the Legislature confirmed SB 153 in 2013, the Commission's districts would have nonetheless required adjustment considering the 2020 Census. (Doc. 8 at 19–20.) This argument does not diminish the fact that the districts remain problematic; rather, it illustrates that redistricting is a dynamic process that should necessarily respond to real-world developments at regular intervals.

15

called. "The legislature may be convened in special session by the governor or at the written request of a majority of the members." Mont. Code Ann. § 5–3–101(1). The party calling the special session may limit the special session to certain subjects. *Id.* Granting Plaintiffs' requested preliminary relief does not eliminate the option for the Montana Legislature or the governor to call a special session specifically focused on redistricting. The option for a special session called by either the legislative or executive branches remains on the table.[3] This option undercuts Jacobsen's argument that the public interest favors waiting until 2023 for the Legislature to act: § 5–3–101(1) preserves the opportunity for the State to provide the remedy, regardless of whether the preliminary injunction is granted.

Jacobsen's focus on the Legislature as a harmed non-party also emphasizes the need for public input and comment in the redistricting process during the next legislative session. (Doc. 8 at 21.) Public participation is undoubtedly an important consideration. At the same time, however, to allow the candidate

---

[3] Since 1903, the governor or the legislature has called 33 special sessions. *See* MONTANA STATE LEGISLATURE, SPECIAL SESSIONS 1889 – PRESENT, https://leg.mt.gov/civic-education/facts/special-sessions/ (last visited Jan. 12, 2022). These sessions have focused on issues ranging from topics as broad as "miscellaneous appropriations," (*see* 40th Leg., 1st Spec. Sess. (Mont. 1967)) to those as narrow as "to correct action on vehicle fees," (*see* 49th Leg., 1st Spec. Sess. (Mont. 1985)). *See* Fed. R. Evid. 201(b), (c). The issue of redistricting the map for the Commission's districts seems to fall within these confines.

16

certification to proceed based on a presumptively unconstitutional map— and despite Plaintiffs' showing that irreparable harm is likely occurring—for the sake of legislative public comment without assured action would teeter close to elevating form over substance. The opportunity for public input is a mechanism that helps advance noted public interests in fair and effective representation; asking the public to endure a present injury to those interests so that it may have an opportunity to weigh-in during a prospective legislative undertaking ignores the ubiquitous nature of the one-person, one-vote right under the Fourteenth Amendment.

## III. Conclusion

As indicated, candidate filing in Districts 1 and 5 would ordinarily begin on January 13, 2022, and close on March 14, 2022. Mont. Code Ann. § 13–10–201(7). To minimize disruption, an expedited summary judgment briefing schedule shall be set by separate order so that this action is resolved prior to the March 14, 2022 filing deadline. Accordingly,

IT IS ORDERED that Plaintiffs' motion for a preliminary injunction, (Doc. 5), is GRANTED. Consistent with the above, Jacobsen is preliminarily enjoined from certifying candidates for Commissioner in Districts 1 and 5, pending a final disposition on the merits.

IT IS FURTHER ORDERED that the temporary restraining order, (Doc. 7), is MOOTED in light of the preliminary injunction.

DATED this 13th day of January, 2022 at 12:10 p.m..

_____
Donald W. Molloy, District Judge
United States District Court


\_\_/s/\_*Paul J. Watford*\_\_\_\_\_
Paul J. Watford, Circuit Judge
Ninth Circuit Court of Appeals


\_\_\_/s/ *Brian M. Morris*\_\_\_\_
Brian M. Morris, Chief Judge
United States District Court