Constance Van Kley
Rylee Sommers-Flanagan
  Upper Seven Law
  P.O. Box 31
  Helena, MT 59624
  (406) 306-0330
  constance@uppersevenlaw.com
  rylee@uppersevenlaw.com

Joel G. Krautter
  Netzer Law Office P.C.
  1060 S. Central Ave. Ste. 2
  Sidney, MT 59270
  (406) 433-5511
  joelkrautternlo@midrivers.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT, DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| BOB BROWN; HAILEY SINOFF; and DONALD SEIFERT, | |
| *Plaintiffs*, | Cause No. 6:21-cv-92-PJW-DWM-BMM |
| vs. | |
| CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State, | **Plaintiffs' Brief in Support of Motion for Summary Judgment** |
| *Defendant.* | |

## <u>Table of Contents</u>

Table of Authorities  ....................................................................i

Introduction  ........................................................................1

Background  .........................................................................2

I.    Nearly 20 years after the last redistricting, the maximum population deviation between Montana Public Service Commission districts exceeds 24%  ..............................................2

    A. The legislature rejected multiple proposals to redistrict or restructure the Commission after 2003  ......................................3

    B. As a result of the legislature's failure to act, the current maximum population deviation equals 24.5%............................6

II.    The legislature has neither provided for regular reapportionment nor set standards for redistricting the Commission ....................................................................8

    A. No legal mechanism guarantees regular redistricting ..............8

    B. The legislature does not regularly redistrict popularly elected bodies, and it has not established criteria for redistricting the Commission  ....................................................................9

Legal Standards  ....................................................................12

I.    Summary Judgment ....................................................................12

II.    Remedy  ....................................................................13

Argument ....................................................................13

I.    The current Commission map violates the Fourteenth Amendment's one-person, one-vote rule  ....................................13

*Brief in Support of Motion for Summary Judgment*          i

A. As a districted, popularly elected body that exercises general governmental functions, the Commission is subject to the one-person, one-vote rule ........................................................... 15

B. The current Commission map violates the one-person, one-vote rule because the maximum population deviation exceeds 24%, and no justification excuses the State's failure to redistrict ................................................................. 17

C. The State cannot, as a matter of law, rebut the presumption of unconstitutionality .......................................................... 17

II.   Plaintiffs ask that the Court redistrict the Commission to preserve Plaintiffs' Fourteenth Amendment rights in time for the 2022 election ...................................................................... 19

A. An appropriate remedy will comply with the Fourteenth Amendment and the Voting Rights Act ............................. 21

    1. The map must comply with the Fourteenth Amendment's one-person, one-vote rule ................ 21

    2. The map must comply with the Voting Rights Act ............................................................................23

B. An appropriate map likely will incorporate state-recognized redistricting criteria to the degree possible while still minimizing population deviations ....................................... 24

    1. The districts should be reasonably compact and contiguous ........................................................... 25

    2. The districts should preserve political boundaries to the degree possible without sacrificing the one-person, one-vote principle ...................................... 25

3. The Court may consider communities of interest in selecting or drawing a map ................................... 26

C. An appropriate map will reflect the equities and minimize disruption in the 2022 and future elections ....................... 27

D. Plaintiffs offer as examples three proposed maps that satisfy legal requirements, incorporate traditional redistricting criteria, and appropriately balance the equities ................ 28

Conclusion ............................................................................. 32

<u>Table of Authorities</u>

<u>Cases</u>

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) .................................................. 23

*Abrams v. Johnson*, 521 U.S. 74 (1997) .................................................. 23

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) .................. 12

*Avery v. Midland Cty.*, 390 U.S. 474 (1968) ......................................... 17

*Bd. of Estimate of City of N.Y. v. Morris*, 489 U.S. 688 (1989) ............ 16

*Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 795
     (2017) ................................................................................25, 26

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ............. 23

*Brown v. Thomson*, 462 U.S. 835, 943 (1983) ....................................... 19

*Chapman v. Meier*, 420 U.S. 1, 26–27 (1975) ....................................... 21

*Connor v. Finch*, 431 U.S. 407, 414 (1977) .......................................... 22

*DeJulio v. Georgia*, 290 F.3d 1291, 1295 (11th Cir. 2002) ................... 15

*Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (2020) ...................... 23

*Durst v. Idaho Comm'n for Reapportionment*, __ P.3d __, 2022 WL
     247798, at *16 (Idaho 2022) ...................................................18, 26

*Evenwel v. Abbott*, 578 U.S. 54, 56–60 (2016) .......................1, 14, 17, 22

*Hadley v. Junior Coll. Dist. of Met. Kansas City*, 397 U.S. 50, 56
     (1970) ................................................................................15, 17

*Mahan v. Howell*, 410 U.S. 315 (1973) .............................................14, 18

*North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) ............21, 27

*Old Person v. Cooney*, 230 F.3d 1113, 1129 (9th Cir. 2000) .................26

*Perry v. Perez*, 565 U.S. 388, 396 (2012) .........................................20, 21

*Reynolds v. Sims*, 377 U.S. 533 (1964) .......................................13, 19, 27

*Shaw v. Reno*, 509 U.S. 630 (1993) .....................................................11, 24

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................23, 24

*Upham v. Seamon*, 456 U.S. 37, 42 (1982) .....................................13, 20

*Vander Linden v. Hodges*, 193 F.3d 268, 273 (4th Cir. 1999) ...............15

## Constitutional Provisions

Mont. Const. art. V, § 14.................................................................10, 11, 25

Mont. Const. art. V, § 15(2) ...................................................................11

U.S. Const. amend. XIV.............................................................................11

## Rules

Admin. R. Mont. tit. 38 ............................................................................16

Fed. R. Civ. P. 56(a) ........................................................................12, 14

Fed. R. Evid. 201 .......................................................................14, 27

Local Rule 7.1(2)(E) ................................................................................ 34

*Brief in Support of Motion for Summary Judgment*                                v

## Statutes

52 U.S.C. § 10101 ............................................................................11, 23

Mont. Code Ann. § 2-15-102(11) .............................................................16

Mont. Code Ann. § 69-1-102 ....................................................................1

Mont. Code Ann. § 69-1-103 ...............................................................1, 15

Mont. Code Ann. § 69-1-104 .........................................................2, 13, 32

Mont. Code Ann. § 69-2-101 ...................................................................16

Mont. Code Ann. § 69-3-102 ...................................................................16

Mont. Code Ann. § 69-3-110 ...................................................................16

Mont. Code Ann. § 69-3-301 ...................................................................16

Mont. Code Ann. § 69-3-310 ...................................................................16

Mont. Code Ann. § 69-3-321 ...................................................................16

Mont. Code Ann. § 69-3-1405 .................................................................16

Mont. Code Ann. § 69-12-209 .................................................................16

Mont. Code Ann. § 69-12-314 .................................................................16

Mont. Code Ann. § 69-13-203 .................................................................16

## Legislative History Materials

H.J. 41, 66th Leg., Reg. Sess. (Mont. 2019) ...............................................5

S.B. 153, 58th Leg., Reg. Sess. (Mont. 2013) ....................................3, 4, 5

S.B. 160, 67th Leg., Reg. Sess. (Mont. 2021) ....................................2, 6, 8

S.B. 210, 65th Leg., Reg. Sess. (Mont. 2017) .............................................5

S.B. 220, 58th Leg., Reg. Sess. (Mont. 2003) .............................................2

S.B. 246, 66th Leg., Reg. Sess. (Mont. 2019) .............................................5

S.B. 309, 66th Leg., Reg. Sess. (Mont. 2019) .............................................5

## Other Authorities

2010 Mont. Districting & Apportionment Comm'n, Final Legislative
    Redistricting Plan Based on the 2010 Census 13–14 (Feb. 12,
    2013) ....................................................................................11, 12

2020 Mont. Districting & Apportionment Comm'n, Criteria & Goals for
    State Leg. Districts (July 2021) ...............................................11, 12

Caitlin Boland Aarab & the Honorable Jim Regnier, *Mapping the
    Treasure State: What States Can Learn from Redistricting in
    Montana*, 76 Mont. L. Rev. 257, 260–62 (2015) ...........................10

*Mont. Const. Convention Verbatim Trans.* Vol. IV 682 (1981) .............10

## INTRODUCTION

Nearly 50 years ago, the Montana legislature chose to create a districted, popularly elected Public Service Commission (the "Commission").  Mont. Code Ann. §§ 69-1-102 through 69-1-103.  But it failed to create a legal mechanism to ensure rough equivalency between districts over time.  And even when faced with clear evidence of unconstitutional population disparities between districts, the legislature chose not to reapportion.

As a result, the maximum population deviation between Commission districts now exceeds 24%.  There can be no viable justification for this deviation because it is caused by legislative inaction, not legislative policy.  The current Commission map violates the one-person, one-vote rule of the Fourteenth Amendment's Equal Protection Clause, which requires sufficient justification for populations deviations greater than 10%.  *Evenwel v. Abbott*, 578 U.S. 54, 56–60 (2016).

Plaintiffs therefore ask the Court to: declare the current Commission districting plan unconstitutional and enjoin its further use; reapportion the Commission districts consistent with one-person, one-vote principles in time for the 2022 election; and order Defendant

Secretary of State Christi Jacobsen (the "State") to immediately implement the Court's redistricting plan. Plaintiffs propose three maps as options, but the Court's discretion to craft an appropriate remedy is broad, and Plaintiffs' proposals are merely examples intended to assist the Court.

## BACKGROUND

I. **Nearly 20 years after the last redistricting, the maximum population deviation between Montana Public Service Commission districts exceeds 24%.**

The legislature drew the current Commission districts in 2003. Mont. Code Ann. § 69-1-104, S.B. 220, 58th Leg., Reg. Sess. (Mont. 2003) ("An Act Revising the Public Service Commission Districts for the Purpose of Population Equality . . . ."). Before 2003, the Commission districts had remained unchanged since 1974, when the legislature reconfigured the Commission into its current, five-member districted form from a body with three members elected at large. *See* Sen. Comm. on Energy & Telecomm., Hrg. on S.B. 153 at 15:20, 58th Leg., Reg. Sess. (Feb. 19, 2013).

## A. The legislature rejected multiple proposals to redistrict or restructure the Commission after 2003.

Since the last redistricting, the United States Census Bureau has conducted two federal censuses.  The 2010 Census revealed a maximum population deviation of 13.79% between districts.  Sen. Comm. on State Admin., Hrg. on S.B. 153, 58th Leg., Reg. Sess. (Jan. 25, 2013).[1] Recognizing that the deviation was a problem, then-Senator Fred Thomas—the same legislator who introduced the 2003 redistricting bill— introduced a measure that, if adopted, would have equalized the districts and preserved county lines.  S.B. 153, 58th Leg., Reg. Sess. (Mont. 2013).[2] An amendment to the 2013 bill would have allowed relatively more disparity between districts, but it nonetheless would have brought the maximum population deviation to well under 10%.  *Id.*[3]

---

[1] Audio of the hearing is available at http://sg001-harmony.sliq.net/ 00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/- 1/18226?agendaId=74640.  A map showing the deviation as of the 2010 Census was presented as an exhibit to the January 25, 2013, hearing and is available at https://leg.mt.gov/bills/2013/Minutes/Senate/ Exhibits/ sts16a01.pdf.

[2] Senate Bill 153, as introduced, is available at https://leg.mt.gov/bills/ 2013/SB0199//SB0153_1.pdf.    The proposed map is available at https://leg.mt.gov/bills/2013/Minutes/Senate/Exhibits/ sts16a02.pdf.

[3] The amended bill is available at https://leg.mt.gov/bills/2013/SB0199// SB0153_2.pdf.  A map showing the proposed districts under the amended

Initially, the Commission supported the 2013 bill, writing that it recognized the population disparity issue and agreed with the proposal to equalize districts. Sen. Comm. on State Admin., Hrg. on S.B. 153, 58th Leg., Reg. Sess., Letter from Comm'n Chairman Bill Gallagher to Sen. State Admin. Comm. (Jan. 25, 2013).[4]  At some point during the 2013 legislative session, however, the Commission changed its mind.  In a letter dated March 12, 2013, then-chair Bill Gallagher wrote that "the complexity of the issues raised by this legislation require more time, research and deliberation than can be sufficiently addressed by the Montana State Legislature at this time."

> We strongly believe that now is not the time to be addressing this matter.  There are no clearly demonstrated, current population discrepancies existing between the districts.  The explosive growth in the eastern (Bakken) regions of the state renders the 2010 census figures upon which this bill is based of very little value.  By the time of the next elections, these census numbers will be 6 years old, and will not take into account any population shifts that . . . have, or are likely to occur.  In an effort to correct perceived inequities, SB 153 may in fact create new and larger inequities.
>
> Therefore, the PSC respectfully recommends that the House Judiciary Committee lay this legislation on the table.

---

bill is available at https://leg.mt.gov/bills/2013/Minutes/House/Exhibits/juh61a07.pdf.

[4] Chairman Gallagher's January 25, 2013, letter is available at https://leg.mt.gov/bills/2013/Minutes/Senate/Exhibits/sts16a04.pdf.

This is an issue that requires long and careful study, using
population data that is known to be timely and accurate.[5]

The bill died.  S.B. 153, 58th Leg., Reg. Sess. (Mont. 2013).

Since 2013, several legislators introduced bills that, if adopted,
would have prevented the current malapportionment.  Each died.  *See*
S.B. 210, 65th Leg., Reg. Sess. (Mont. 2017) (seeking to change method
of selecting commissioners to appointment);[6] S.B. 246, 66th Leg., Reg.
Sess. (Mont. 2019) (seeking to establish interim committee to propose
redistricting following publication of 2020 Census data and ensure
ongoing reapportionment);[7] S.B. 309, 66th Leg., Reg. Sess. (Mont. 2019)
(same);[8] H.J. 41, 66th Leg., Reg. Sess. (Mont. 2019) (seeking to establish
interim study for purposes of proposing redistricting legislation).[9]

In the last legislative session—the 2021 regular session—Senator
Doug Kary introduced a bill to appoint commissioners, who would be
required to have relevant experience, consistent with the practice of the

---

[5]  Chairman Gallagher's March 12, 2013, letter is available at
https://leg.mt.gov/bills/2013/Minutes/House/Exhibits/juh61a05.pdf
[6] Available at https://leg.mt.gov/bills/2017/billpdf/SB0210.pdf.
[7] Available at https://leg.mt.gov/bills/2019/billpdf/SB0246.pdf.
[8] Available at https://leg.mt.gov/bills/2019/billpdf/SB0309.pdf.
[9] Available at https://leg.mt.gov/bills/2019/billpdf/HJ0041.pdf.

majority of states.  S.B. 160, 67th Leg., Reg. Sess. (Mont. 2021);[10] *see also* Pls.' Br. in Supp. of Mot. for Prelim. Inj., (Doc. 6 at 15–16), (39 states select commissioners by appointment).   Appearing on behalf of the Commission, Commissioner Tony O'Donnell testified in opposition, explaining that, in contrast to appointed commissioners, elected commissioners demonstrate "the nerve and the gumption to run for public office and stand before the public."  Sen. Comm. on Energy, Hrg. on S.B. 160, Testimony of Comm'r Tony O'Donnell, 67th Leg., Reg. Sess. (Feb. 2, 2021).[11]  That bill, too, died.

### B. As a result of the legislature's failure to act, the current maximum population deviation equals 24.5%.

Now, nearly two decades after the last redistricting, the Commission districts are grossly malapportioned.  As of the 2020 Census, Montana's total population is 1,084,225.  Pls.' Statement of Undisputed Facts ("SUF") ¶ 1.  If Montanans were divided into five equal districts, each would have 216,845 residents. Montana's population has grown

---

[10] Available at https://leg.mt.gov/bills/2021/billpdf/SB0160.pdf.

[11] A video of the hearing is available at http://sg001-harmony.sliq.net/ 00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/ 42109?agendaId=221484#info_.   Commissioner O'Donnell's testimony begins at 15:58:49.

significantly over the last 18 years, and most of the population is concentrated in the western half of the state, as demonstrated in the map below:



SUF ¶ 2.

When current Census data is applied to the Commission map, the problem immediately becomes clear. The map below includes a text box showing total district populations, numerical deviations, and percent deviations, demonstrating a population deviation of 24.5% between District 1 and District 3:



District 1: 186,616 (-30,229, -13.94%)
District 2: 216,532 (-313, -0.14)
District 3: 239,748 (+22,903, +10.56%)
District 4: 208,963 (-7,882, -3.36%)
District 5: 232,366 (+15,521, +7.16%)

SUF ¶ 3.

## II. The legislature has neither provided for regular reapportionment nor set standards for redistricting the Commission.

### A. No legal mechanism guarantees regular redistricting.

As Senator Thomas explained during a hearing on the rejected 2013 redistricting bill, the legislature failed to create a mechanism to ensure regular reapportionment when it created a districted Commission in 1974 and again when it redistricted in 2003.  Sen. Comm. on Energy &

Telecomm., Hrg. on S.B. 153, 58th Leg., Reg. Sess. (Feb. 19, 2013).[12] When the legislature rejected the 2013 proposal, it not only failed to redistrict the map but also refused the opportunity to create a mechanism for ongoing, regular reapportionment.

In this respect, Montana is an extreme outlier—one of only two states with a districted public service commission and no legal mechanism ensuring regular reapportionment. Pls.' Br. in Supp. of Mot. for Prelim. Inj., (Doc. 6 at 15–18).

### B. The legislature does not regularly redistrict popularly elected bodies, and it has not established criteria for redistricting the Commission.

Not only has the Montana legislature failed to redistrict and to ensure a mechanism for regular reapportionment, redistricting does not fall within its wheelhouse. Thus, the legislature has not outlined pertinent legislative findings or statements of policy to govern redistricting.

---

[12] Audio of the hearing is available at http://sg001-harmony.sliq.net/ 00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/- 1/20225?agendaId=92094. Senator Thomas's testimony begins at 15:19:15.

The Montana Constitution generally assigns the task of redistricting to an independent entity, the Districting and Apportionment Commission (the "Districting Commission"). Mont. Const. art. V, § 14. The Districting Commission was created pursuant to the 1972 Montana Constitution due to concerns about the legislature's ability to redistrict. Consistent with the legislative history relevant to this case, the Montana legislature historically had failed to redistrict adequately—and, at times, to redistrict at all. *Mont. Const. Convention Verbatim Trans.* Vol. IV, 682 (1981); *see also* Caitlin Boland Aarab & the Honorable Jim Regnier, *Mapping the Treasure State: What States Can Learn from Redistricting in Montana*, 76 Mont. L. Rev. 257, 260–62 (2015).

Accordingly, the legislature is responsible for reapportioning only one districted, popularly elected government body—the Public Service Commission. Because the legislature has established no standards for redistricting, to the degree that criteria for redistricting exist, they have been set by the Districting Commission. The membership of the Districting Commission changes each decennial census cycle. Mont. Const. art. V, § 15(2). Each Districting Commission sets criteria for

redistricting the state legislature following a period of public comment. SUF ¶ 4.

The current and most recent former Districting Commissions recognized the same four mandatory criteria: (1) compliance with the one-person, one-vote rule, U.S. Const. amend. XIV; (2) compliance with § 2 of the Voting Rights Act, 52 U.S.C. § 10101; (3) compactness and contiguity, Mont. Const., art. V, § 14(1); and (4) compliance with *Shaw v. Reno*, 509 U.S. 630 (1993), under which racial considerations may not subsume all other traditional redistricting criteria.  SUF ¶ 4; 2010 Mont. Districting & Apportionment Comm'n, *Final Legislative Redistricting Plan Based on the 2010 Census*, 13–14 (Feb. 12, 2013);[13] 2020 Mont. Districting & Apportionment Comm'n, *Criteria & Goals for State Leg. Districts* (July 2021).[14]

The current and most recent former Districting Commissions recognized similar discretionary criteria.  Both the 2010 and 2020 commissions adopted the goals of maintaining political subdivision boundaries and keeping communities of interest intact.   SUF  ¶ 4;

---

[13] Available at http://perma.cc/2H5X-PLGK.
[14] Available at https://leg.mt.gov/content/Districting/2020/Topics/ Criteria/adopted-criteria-state-legislative-dac-july-2021.pdf.

2010 Mont. Districting & Apportionment Comm'n, *Final Legislative Redistricting Plan*, 13–14; 2020 Mont. Districting & Apportionment Comm'n, *Criteria & Goals for State Leg. Districts*. The 2010 Districting Commission also strove to follow geographic boundaries, while the 2020 Districting Commission has provided that plans cannot be drawn to "unduly favor a political party" but that the Districting Commission "may consider competitiveness." SUF ¶ 4; 2010 Mont. Districting & Apportionment Comm'n, *Final Legislative Redistricting Plan*, 13–14; 2020 Mont. Districting & Apportionment Comm'n, *Criteria & Goals for State Leg. Districts*.

## LEGAL STANDARDS

### I.   Summary Judgment

Summary judgment must be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law . . . identif[ies] which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.    Remedy

The Court has discretion to create an appropriate remedy according to "the circumstances of the challenged apportionment and a variety of local conditions." *Reynolds v. Sims*, 377 U.S. 533 (1964).  But the Court must defer to "state policy choices" that are not in conflict with "the substantive constitutional and statutory standards to which . . . state plans are subject." *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (per curium).

## ARGUMENT

Because the maximum population deviation exceeds 10% and no legitimate rationale justifies the deviation, the current Commission map violates the Fourteenth Amendment.  Plaintiffs ask that the Court declare the map unconstitutional and enjoin its continued use.  In place of the current map, Plaintiffs ask the Court to draw or adopt a new map and to order Defendant to implement the map in time for the 2022 election.

## I.    The current Commission map violates the Fourteenth Amendment's one-person, one-vote rule.

Plaintiffs ask the Court to declare the current Commission map and the statute creating the current districts, Mont. Code Ann. § 69-1-104,

unconstitutional.   The Commission districts are "presumptively impermissible" because the maximum population deviation grossly exceeds 10%.  *Evenwel*, 578 U.S. at 60.  The remaining question is strictly whether the State can justify adequately the deviation.  *Id.*; *see Mahan v. Howell*, 410 U.S. 315 (1973).  It cannot.  The only explanation offered to date, that the map preserves county boundaries, is not "legitimate" because it remains possible to preserve county lines without violating one-person, one-vote principles.  *Mahan*, 410 U.S. at 325.

No material factual dispute precludes summary judgment, and Plaintiffs are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  All material facts in this case are subject to judicial notice and, by definition, "not subject to reasonable dispute."  Fed. R. Evid. 201.

As to Plaintiffs' claim that the current district map is unconstitutionally malapportioned, the only material facts comprise population data, which is published by the United States Census Bureau.  These facts therefore "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Further, the State has conceded that the Court should look to Census data to establish population figures.  (Doc. 12 ¶ 2.)  Similarly, the

online tool Plaintiffs have used to create proposed maps and present data in a user-friendly format, davesredistricting.org, has been used and recommended by the State in this case.  (Doc. 8 at 44–49, 52 ¶ 3.)

Plaintiffs ask the Court to declare the current Commission map unconstitutional.

### A. As a districted, popularly elected body that exercises general governmental functions, the Commission is subject to the one-person, one-vote rule.

The one-person, one-vote rule applies "whenever a state or local government decides to select persons by popular election to perform governmental functions."  *Hadley v. Junior Coll. Dist. of Met. Kan. City*, 397 U.S. 50, 56 (1970).  *Hadley* created a two-part test for determining whether the one-person, one-vote principle applies: the official must (1) be popularly elected and (2) perform "governmental functions."  *Id.* at 56; *see DeJulio v. Georgia*, 290 F.3d 1291, 1295 (11th Cir. 2002); *Vander Linden v. Hodges*, 193 F.3d 268, 273 (4th Cir. 1999).  There is no question here that Commissioners are popularly elected.  *See* Mont. Code Ann. § 69-1-103.

The remaining question, then, is whether the Commission performs "governmental functions."  *Hadley*, 397 U.S. at 56.  The answer is yes.

The Commission exercises its jurisdiction throughout the state, performing duties defined by law as "quasi-legislative." Mont. Code Ann. § 2-15-102(11) ("'Quasi-legislative function' generally means making or having the power to make rules or set rates and all other acts connected with or essential to the proper exercise of a quasi-legislative function.").

The Commission is tasked with a variety of government functions, including but not limited to: setting rates for utilities, Mont. Code Ann. § 69-3-301, *et seq.*; promulgating rules to govern rate-setting, Mont. Code Ann. §§ 69-2-101, 69-3-310; promulgating rules to regulate natural gas and electric companies, railroads, waste hauling companies, passenger transportation companies, investor-owned water companies, telecommunications companies, and intrastate pipelines, Mont. Code Ann. § 69-3-102; *see generally* Admin. R. Mont. tit. 38; licensing regulated entities, *see, e.g.*, Mont. Code Ann. §§ 69-3-1405, 69-12-314; exercising enforcement authority over regulated entities, *see, e.g.*, Mont. Code Ann. §§ 69-3-110, 69-12-209, 69-13-203; and investigating consumer complaints against regulated entities, Mont. Code Ann. § 69-3-321.

The Commission's duties are not different in kind from others deemed "governmental" by the Supreme Court. *See Bd. of Estimate of*

*City of N.Y. v. Morris*, 489 U.S. 688 (1989) (members of the New York City Board of Estimate are subject to the one-person, one-vote rule); *Hadley*, 397 U.S. at 53–54 (junior college trustees); *Avery v. Midland Cty.*, 390 U.S. 474 (1968) (county commissioners); (*see also* Doc. 6 at 30–33). Because the Commission's "powers are general enough and have sufficient impact throughout the [state]," the one-person, one-vote rule applies. *Hadley*, 397 U.S. at 54.

### B. The current Commission map violates the one-person, one-vote rule because the maximum population deviation exceeds 24%, and no justification excuses the State's failure to redistrict.

"Maximum population deviation is the sum of the percentage deviations from perfect population equality of the most- and least-populated districts." *Evenwel*, 136 S. Ct. at 1125 n.2. "Maximum deviations above 10% are presumptively impermissible." *Id.* at 1124. The current commission map contains a maximum population deviation of over 24% and is therefore "presumptively impermissible." *Id.*

### C. The State cannot, as a matter of law, rebut the presumption of unconstitutionality.

Presumptive impermissibility does not necessarily translate to a finding of unconstitutionality. Under the right circumstances, a state may be able to rebut the presumption by pointing to "legitimate

considerations incident to the effectuation of a rational state policy."
*Mahan*, 410 U.S. at 325. Here, though, rebuttal is impossible as a matter
of law.

To date, the only justification for the disparity offered by the State
is the preservation of county boundaries. But the legislature rejected the
opportunity to redistrict the Commission in 2013, even when faced with
a proposal that would have preserved county boundaries. *See supra* p. 4.
Further, the current map splits the Flathead Indian Reservation, which
is undeniably a political unit and, particularly in the absence of a
contrary legislative finding, should be entitled to consideration at least
equal to that afforded to counties. *But see Durst v. Idaho Comm'n for
Reapportionment*, __ P.3d __, 2022 WL 247798, at *16 (Idaho 2022)
(rejecting districting challenge brought under state law that alleged, in
part, that tribal interests were subordinated to counties' interests
because "that is not how the [Idaho] law is written"). Further, the State
cannot show that it is "impossible to draft district lines to overcome
unconstitutional dispar[i]ties and still maintain [county] integrity"
because it is not, in fact, impossible. *Mahan*, 410 U.S. at 319–20.

Finally, there can be no "rational state policy" when the problem is the legislature's abdication of its duty to redistrict.  *Id.* at 325; *see also Brown v. Thomson*, 462 U.S. 835, 943 (1983) (States may exceed presumptively impermissible deviations in pursuit of legitimate policies "applied . . . in a manner free from any taint of arbitrariness or discrimination." (cleaned up)).  The State has not chosen to prioritize a policy interest over population equality.  Instead, it has failed to act entirely.  The current map is arbitrary and irrational.  It is unconstitutional as a matter of law, and the Court should enjoin its use.

## II.   Plaintiffs ask that the Court redistrict the Commission to preserve Plaintiffs' Fourteenth Amendment rights in time for the 2022 election.

Because the 2022 election is impending and the Montana Legislature is not in session and has not called a special session, the Court is the only authority that may act to prevent imminent constitutional harm.  Plaintiff Bob Brown, a voter in District 5, is scheduled to vote in the 2022 election cycle.  (Doc. 6-8.)  Under the current map, his vote will be diluted unconstitutionally.  *Reynolds*, 377 U.S. at 568 ("[A]n individual's right to vote for State legislators is unconstitutionally impaired when its weight is in a substantial fashion

diluted when compared with votes of citizens living in other parts of the State.").

Thus, Plaintiffs ask the Court to redistrict the Commission.  The Court "must defer to [state] legislative judgments . . . , even under circumstances in which a court order is required" to redistrict a map. *Upham*, 456 U.S. at 40–41.  Where, however, "there [is] no recently enacted state plan to which the [Court may] turn," and "without the benefit of legislative guidance in making distinctly legislative policy judgments," the court may be "perhaps compelled to design an interim map based on its own notion of the public good." *Perry v. Perez*, 565 U.S. 388, 396 (2012).

Because there is no legal mechanism for reapportioning the Commission, there are no express "legislative judgments" to which the Court must "defer." *Upham*, 456 U.S. at 40–41.  But an appropriate remedy will incorporate all federal and state requirements.  The Court also may consider the discretionary redistricting criteria generally applied by the Montana Districting and Apportionment Commission to state legislative districting.  Finally, the Court "must undertake an equitable weighing process to select a fitting remedy for the legal

violations it has identified, taking account of what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curium) (cleaned up).

Plaintiffs submit three proposed maps that are lawful, deferential to state policy, and equitable.  Plaintiffs ask the Court to adopt one of these maps or to draw its own.

### A. An appropriate remedy will comply with the Fourteenth Amendment and the Voting Rights Act.

"A district court making such use of a State's plan must, of course, take care not to incorporate into the interim plan any legal defects in the state plan." *Perry*, 565 U.S. at 394.  The remedy must comply with the Fourteenth Amendment and the Voting Rights Act.   Under the circumstances, compliance is not challenging.

### 1. The map must comply with the Fourteenth Amendment's one-person, one-vote rule.

A Court-ordered map must, of course, satisfy the one-person, one-vote requirement.  "[U]nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature . . . must ordinarily achieve the goal of population equality with little more than de minimis variation." *Chapman v. Meier*, 420 U.S. 1, 26–27 (1975).  Indeed, the

Supreme Court has "made clear" that courts are "held to stricter standards" than legislatures for equalizing population deviations, "reflect[ing] the unusual position of federal courts as draftsmen of reapportionment plans." *Connor v. Finch*, 431 U.S. 407, 414 (1977) (district court's apportionment plan unlawful when it resulted in maximum population deviations exceeding 10% in both state legislative chambers).

"[J]urisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." *Evenwel*, 578 U.S. at 59. Even so, "[m]aximum deviations above 10% are presumptively impermissible." *Id.* at 60; *see also Connor*, 431 U.S. at 414.

In sum, a Court-ordered remedy in this matter should not create a deviation in excess of 10%, given that no legitimate rationale justifies something greater. Instead, the Court should endeavor to minimize the deviation to the greatest degree possible while considering discretionary redistricting criteria and the equities.

## 2. The map must comply with the Voting Rights Act.

Often, court-ordered redistricting cases are complicated by the requirements of the Voting Rights Act. *See, e.g.*, *Abrams v. Johnson*, 521 U.S. 74 (1997) (considering whether court-ordered remedy for violation of the Voting Rights Act itself complies with the Act and *Shaw*). In the absence of discriminatory intent, challenges under § 2 of the Voting Rights Act, 52 U.S.C. § 10101, generally fall under two general categories: vote dilution, *see Thornburg v. Gingles*, 478 U.S. 30 (1986); and vote deprivation or denial in contexts other than districting, *see Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (2020), *reversed sub nom. by Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021).

Here, there is no possibility that a court-ordered redistricting plan would violate the Voting Rights Act. A vote dilution claim requires a showing that a "districting plan provides less opportunity for racial minorities to elect representatives of their choice." *Abbott v. Perez*, 138 S. Ct. 2305 (2018) (cleaned up). A plaintiff must establish three elements: (1) "a geographically compact minority population sufficient to constitute a majority in a single-member district"; (2) "political cohesion among the members of the minority group"; and (3) "bloc voting by the

majority to defeat the minority's preferred candidate." *Id.* at 2330–31 (citing *Gingles*, 478 U.S. at 48–51).

The largest racial minority group in Montana—American Indian and Alaska Native—makes up 6.7% of Montana's population.  SUF ¶ 1. Assuming that this group composes a single "politically cohesi[ve]" minority group with a "geographically compact" population, there is no possibility of vote dilution under *Gingles. Id.*  The ideal Commission district includes 20% of Montanans and the largest minority group is not large enough to "constitute a majority in a single-member district." *Id.* The Voting Rights Act does not complicate the process of creating a constitutional remedy.[15]

### B. An appropriate map likely will incorporate state-recognized redistricting criteria to the degree possible while still minimizing population deviations.

Because Montana law does not set standards or policies for redistricting the Commission, there are no clear legislative priorities to

---

[15] Because it is impossible to create a majority-minority district, *Shaw v. Reno* likewise has no application.   509 U.S. at 649 ("[A] plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.").

which the Court *must* defer.  But the Court may consider the factors generally applicable to redistricting in Montana, including: compactness and contiguity, preservation of political boundaries, and respect for communities of interest.

### 1. The districts should be reasonably compact and contiguous.

The Court may analogize to Article V, § 14(1) of the Montana Constitution, which requires state house and senate districts to "consist of compact and contiguous territory" while still "be[ing] as nearly equal in population as is practicable."  Although there are no express standards for Commission districting, compactness and contiguity often are recognized as legitimate redistricting criteria. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 795 (2017).

### 2. The districts should preserve political boundaries to the degree possible without sacrificing the one-person, one-vote principle.

The current and most recent former Districting Commissions both adopted as a criterion the preservation of political boundaries.  The 2020 Districting Commission defined the political units to be preserved as cities, towns, counties, and federal reservations.  2020 Mont. Districting & Apportionment Comm'n, *Criteria & Goals for State Leg. Districts* Like

*Brief in Support of Motion for Summary Judgment*                    25

compactness and contiguity, states commonly strive to preserve political unit boundaries in redistricting.  *See Bethune-Hill*, 137 S. Ct. at 795.

The current Commission map preserves county boundaries at the expense of federal reservation boundaries.  Given tribal sovereignty interests and the history of discrimination against American Indians by the United States and Montana, *Old Person v. Cooney*, 230 F.3d 1113, 1129 (9th Cir. 2000), reservation boundaries should not be subordinated to county boundaries.  Moreover, although a recent legal challenge along similar lines was denied by the Idaho Supreme Court, *Durst*, __ P.3d __, 2022 WL 247798, there may be viable legal challenges to discrimination against reservations at the expense of state political subunits under the Montana and federal constitutions' Equal Protection clauses.

### 3. The Court may consider communities of interest in selecting or drawing a map.

Montana's Districting Commission likewise seeks to advance "respect for communities of interest," a criterion applied commonly among states.  *Bethune-Hill*, 137 S. Ct. at 795.  To the degree that the Court decides to consider this criterion, it may be approached in at least two ways: (1) the Court may view the boundaries in the 2003 map as demonstrating the legislature's findings regarding communities of

interest; or (2) the Court may take judicial notice of Montana's geographical and cultural features as facts "generally known within the trial court's territorial jurisdiction," Fed. R. Evid. 201(b)(1).

### C. An appropriate map will reflect the equities and minimize disruption in the 2022 and future elections.

The final remedy must be "fashioned in the light of well-known principles of equity." *Reynolds*, 377 U.S. at 585. "[A] court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Id.* For example, the Supreme Court recently reversed a redistricting order when the district court, providing minimal reasoning, ordered a special election, truncated legislative terms, and "suspended provisions of the North Carolina Constitution requiring prospective legislators to reside within a district for one year before they may be elected to represent it." *Covington*, 137 S. Ct. at 1625.

Here, the equities likely require consideration of: (1) the risk of disenfranchisement in this and future elections; (2) the possibility of retaining incumbent and current Commissioners within their districts; and (3) the general workability of any proposed plan.

**D. Plaintiffs offer as examples three proposed maps that satisfy legal requirements, incorporate traditional redistricting criteria, and appropriately balance the equities.**

Plaintiffs submit three proposed maps as examples to assist the Court in creating an appropriate remedy.  These maps may be adopted as is, modified to reflect the Court's judgment of the appropriate considerations, or rejected in favor of an alternative solution.

Each of Plaintiffs' proposed maps brings the population deviation to well within tolerable limits and avoids violation of the Voting Rights Act, *see supra* p. 23–24.  Each map also avoids redistricting current and incumbent commissioners and minimizes or prevents entirely moving Montanans out of the districts scheduled to vote in 2022.  SUF ¶¶ 5–7. The maps show the boundaries of each federal reservation and the current Commission district lines.  SUF ¶¶ 5–7.  There is no perfect map, but the remedy does not need to be perfect—it simply needs to be lawful and equitable.  Each of Plaintiffs' proposed maps meets that standard.

**Proposed Map 1**



District 1: 219,130 (+2,285, +1.05%)
District 2: 217,948 (+1,103, +0.51%)
District 3: 216,073 (-772, -0.36%)
District 4: 215,226 (-1,619, -0.75%)
District 5: 215,848 (-997, -0.46%)

SUF ¶ 5.

Plaintiffs' Proposed Map 1 is the least disruptive of the options submitted. The maximum population deviation under this map is 1.8%. If this map is adopted, all voters currently scheduled to vote in 2022 will vote in 2022. Additionally, District 1 holds four reservations (in addition to the Little Shell Band of Chippewa Indians, headquartered in Great Falls, (SUF ¶ 8), and a great deal of land held in trust for the Turtle Mountain Band of Chippewa Indians, (SUF ¶ 9), potentially increasing tribal members' opportunities to participate in and influence District 1

elections. In order to balance the populations between districts, preserve reservation boundaries, and prevent disenfranchisement, the districts in Map 1 lose some compactness. Additionally, the map compromises some communities of interest by, for example, assigning Deer Lodge and Silver Bow counties to different districts and dividing the far northwest into separate districts.

**Proposed Map 2**



District 1: 216,686 (-159, -0.07%)
District 2: 218,722 (+1,877, +0.87%)
District 3: 217,558 (+713, +0.33%)
District 4: 214,893 (-1,952, -0.90%)
District 5: 216,366 (-479 -0.22%)

Plaintiffs' Proposed Map 2 brings the maximum deviation even lower, to 1.77%. Although it would district voters in Lake County and far southwest Flathead County out of District 5 (rendering them

ineligible to vote in 2022), Map 2 promotes respect for communities of interest by bringing Lincoln County into District 5 and districting the Flathead Indian Reservation with Missoula County.  While Map 2 makes Districts 3 and 4 compact and regular, it sacrifices compactness to some degree in the remaining districts.

**Proposed Map 3.**



District 1: 215,533 (-1,312, -0.61%)
District 2: 220,174 (+3,329, +1.54%)
District 3: 214,232 (-2,613, -1.21%)
District 4: 214,893 (-1,952, -0.90%)
District 5: 219,393 (+2,548, +1.18%)

Plaintiffs' Proposed Map 3 creates the largest deviation among Plaintiffs' maps—2.75%.  This sacrifice to population equality allows for the creation of more compact districts and better preservation of communities of interest.  Like Map 1, Map 3 districts much of Montana's

Indian country into District 1.  Like Map 2, Map 3 does not draw a line between Lincoln and Flathead counties, Lake and Missoula counties, or Deer Lodge and Silver Bow counties.

If adopted, any one of Plaintiffs' proposed maps would remedy the current constitutional problem created by decades of legislative inaction. The Court would act well within its discretion to adopt any of these maps or to create a similarly lawful and equitable solution.

## CONCLUSION

Plaintiffs have demonstrated that the current Commission map is unconstitutional and that an appropriate remedy is available.  Plaintiffs therefore respectfully ask the Court to: grant their motion for summary judgment; declare unconstitutional and enjoin further application of the current Commission districting plan and Montana Code Annotated § 69-1-104; devise an equitable constitutional remedy; and order Defendant to incorporate the Court's remedy ahead of the 2022 election.

Respectfully submitted this 7th day of February, 2022.

/s/ *Constance Van Kley*
Constance Van Kley
Rylee Sommers-Flanagan
Upper Seven Law


/s/ *Joel G. Krautter*
Joel G. Krautter
Netzer Law Office P.C.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(2)(E), I hereby certify that this brief includes 5,423 words, excluding caption, certificates, tables, and exhibit index.  The word count was calculated using Microsoft Word.

/s/ *Constance Van Kley*
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed in CM/ECF on February 7, 2022, and served upon all registered users.

/s/ *Constance Van Kley*
Attorney for Plaintiffs