**Exhibit A**
**Expert Report of Mr. Fred Thomas & Exhibits**

**Defendant's Trial**
**Exhibit 26**

AUSTIN KNUDSEN
Montana Attorney General
KRISTIN HANSEN
  *Lieutenant General*
DAVID M.S. DEWHIRST
  *Solicitor General*
BRENT MEAD
  *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
david.dewhirst@mt.gov
brent.mead2@mt.gov

EMILY JONES
  *Special Assistant Attorney General*
115 N. Broadway, Suite 410
Billings, MT  59101
Phone:  406-384-7990
emily@joneslawmt.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| BOB BROWN; HAILEY SINOFF; AND DONALD SIEFERT, | Case No. 6:21-cv-00092 |
| Plaintiffs, | **DEFENDANT'S EXPERT WITNESS DISCLOSURE** |
| v. | |
| CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State, | |
| Defendant. | |

Pursuant to the Court's January 13, 2022, Scheduling Order, the joint agreement of the parties, and Fed. R. Civ. P. 26(a)(2)(B), Defendant Secretary of State Christi Jacobsen provides the following expert witness disclosure:

1. Fred Thomas
   Former Montana Legislator
   1000 S Burnt Fork Road
   Stevensville, MT 59870
   406-370-4001

Mr. Thomas served 24 years in the Montana Legislature. Mr. Thomas's curriculum vitae is attached as **Exhibit A** and sets forth his qualifications as an expert. Mr. Thomas's opinions are based on his knowledge and expertise as set forth in his CV, his experience leading efforts to reapportion Public Service Commission districts, as well as his review of the pleadings and all discovery responses and documents produced during discovery in this matter. To the extent any documents relied upon have not been produced during discovery in this matter, they are attached as **Exhibit B.** Mr. Thomas's opinions and conclusions are set forth in his report dated February 7, 2022 which is attached as **Exhibit C**. Defendant reserves the right to supplement this expert

**Defendant's Trial
Exhibit 26**

disclosure based on any new information produced during the course of discovery.

Mr. Thomas has not testified as an expert in the past four years in any case.

Mr. Thomas has not published any works beyond the legislation he sponsored in 2003 and 2013.

Mr. Thomas is not receiving compensation for his study and testimony.

DATED this 7th day of February, 2022.

> AUSTIN KNUDSEN
> Montana Attorney General
>
> KRISTIN HANSEN
> *Lieutenant General*
>
> DAVID M.S. DEWHIRST
> *Solicitor General*
>
> Emily Jones
> *Special Assistant Attorney General*

 /s/ Brent Mead
BRENT MEAD
  *Assistant Attorney General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
brent.mead2@mt.gov

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically by email on registered counsel.

Dated: <u>February 7, 2022</u>      /s/    *Brent Mead*
                                    BRENT MEAD

# Exhibit A

**Defendant's Trial
Exhibit 26**

# FRED THOMAS

1000 S Burnt Fork Road, Stevensville, Mt 59870 · 406-370-4001
Email · sfredthomas@yahoo.com

---

I have served in the Montana Legislature for 24 years during the last 4 decades beginning in 1984. Having done so, I am very familiar with generally all the issues of substance during this timeframe. In addition, I served in leadership positions for 12 of the 24 years. 8 years served as the Senate Majority Leader.

## EXPERIENCE

**1984 – 1992**
**MONTANA HOUSE OF REPRESENTATIVES,** SERVED AS CAUCUS LIASON, ON THE HOUSE COMMITTEES: TAXATION, BUSINESS, EDUCATION, LABOR, SEVERAL INTERIM COMMITTEES, SUCH AS REVENUE OVERSIGHT.

**1996 – 2004**
**MONTANA STATE:  MAJORITY LEADER 2000-2004,** MAJORITY WHIP 98-00
SERVED ON SENATE COMMITTEES: CHAIR OF RULES, TAXATION, STATE ADMINISTRATION, LABOR, SEVERAL INTERIM COMMITTEES, SUCH AS REVENUE & TRANSPORTATION, CHAIR OF LEGISLATIVE COUNCIL. SERVED ON 2003 LEGISLATIVE APPORTIONMENT AD-HOC COMMITTEE. SPONSORED 2003 APPORTIONMENT LEGISLATION DEFINING CONSTITUTIONAL TERMS OF COMPACT, CONTIGUOUS, AS EQUAL AS PRACTICABLE; CLARIFIED THAT THE LEGISLATURE WOULD ASSIGN SENATE HOLDOVER SEATS.
-2003 sponsored legislation re-apportioning the PSC districts. Process was to have LC expert develop three optional plans, then pick the one that seems to fit the constitutional requirements, propose to legislature, review by PSC, they offered small changed to the districts which were adopted and the legislation then passed the legislature and was signed by the Governor.

**2012 – 2020**
**MONTANA STATE:  MAJORITY LEADER 2016-2020,**
SERVED ON SENATE COMMITTEES: CHAIR OF RULES, TAXATION, FISH & GAME, SEVERAL INTERIM COMMITTEES, SUCH AS CHAIR OF LEGISLATIVE COUNCIL, REVENUE & TRANSPORTATION. SERVED AS SENATE LIAISON TO THE BOARD OF INVESTMENTS.
-2013 SPONSORED LEGISLATION UPDATING THE APPORTIONMENT OF THE PSC DISTRICTS. PASSED SENATE, PSC - REVIEW BUT HOUSE FAILED TO APPROVE THE NEW DISTRICTS.

**2021**
**MEMBER OF MONTANA TAX APPEALS BOARD**

**JUNE 1981 – CURRENT**
**SALES EXECUTIVE: BONDS & INSURANCE,** PAYNEWEST INSURANCE
Started in 1981 with family business, bought, merged, sold some, bought back and then sold agencies to Western States in 2001, became PayneWest in 2012. For many years now, I primarily bond and insure contractors and handle business insurance.

Page 007
**Defendant's Trial Exhibit 26**

# EDUCATION

**JUNE 1981**
**BA IN FINANCE,** MONTANA STATE UNIVERSITY

**JUNE 1976**
**HIGH SCHOOL,** STEVENSVILLE, MT

# ACTIVITIES

Over the years, my passions in this life have been my family, my business livelihood and my service to the state primarily as a legislator. In the legislature, one of my key passions was my grasp and handle of the legislative rules, process and procedure.

**Page 008**
**Defendant's Trial**
**Exhibit 26**

# Exhibit B

Presented only as a starting point for commissioner
discussion at the June 10, 2021, meeting

# Legislative Redistricting Criteria Considerations

The Districting and Apportionment Commission wants input on the criteria that will be used to draw new legislative districts. The criteria form the basis on which the commission will evaluate each district. There are several traditional and constitutional criteria that Montana and other states may use to draw legislative district boundaries.

The commission needs your thoughts on the bolded questions and other comments related to criteria.

**Population Equality** - Often referred to as "one person, one vote," meaning each district would have the exact same number of residents. But districts often deviate from the "ideal" number due to a variety of factors, including those listed below. **What should the deviation be?**

**Compactness** - This is an appearance test measuring the distance between boundaries. A circle or square is very compact. But districts are rarely circles or squares. Mountain divides and rivers as boundaries, or declining populations, can make a district less compact. **How should a district look?**

**Contiguity** - This means the district must be in one piece connected at some point. But districts rarely are a uniform size and shape. **What should be considered contiguous?**

**Existing Political Boundaries** - Consideration may be given to the boundaries of school districts, cities, and counties. **How important are existing boundaries? What boundaries should be considered?**

**Geographic Boundaries** - District lines may be drawn along city blocks, roads, mountain divides, rivers, and other features. **What geographic boundaries should be considered?**

**Communities of Interest** - This could be an urban neighborhood or a rural area. It might be an area where people have similar jobs or lifestyles.    It might be an Indian reservation community. **What kinds of communities of interest should be considered?**

**Starting Point** - Redistricting could be characterized as a statewide ripple effect. Where one starts drawing lines affects other choices during the process. **Should existing districts be used as the starting point? What are other possible starting points?**

**Party Affiliation** - Montana does not require party registration. **But should the political makeup of a district be considered? If so, how?**

**Incumbents** - It may be that some incumbents may have to face each other for election in a new district. **Should consideration be given to incumbents? If so, what should be considered?**

Cl0429 0091jkna.

**Defendant's Trial
Exhibit 26**

Adopted by the Montana Districting and Apportionment Commission, July 2021

## Mandatory Criteria for State Legislative Districts

- Legislative districts must be as equal in population as is practicable. The commission shall remain within plus or minus 1% deviation, to be exceeded within federally allowable standards only for purposes of complying with the Voting Rights Act, maintaining political subdivisions, or other constitutionally mandatory criteria. The maximum average deviation of all House districts shall be no more than plus or minus 1% deviation. The commission may adjust this deviation if undercount analysis from the U.S. Census Bureau demonstrates that systematic undercounting occurred among identified geographic or demographic groups.

- Protection of minority voting rights are guaranteed in Article II, Section 4 of the Montana Constitution and through compliance with the Voting Rights Act. No district, plan, or proposal for a plan is acceptable if it affords members of a racial or language minority group "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." (42 U.S.C. 1973). Race cannot be the predominant factor to which traditional redistricting criteria are subordinated. (Shaw v. Reno, 509 U.S. 630 1993).

- Each district shall consist of compact territory. (Article 5, Section 14 of the Montana Constitution). The Commission shall consider the district's functional compactness in terms of travel and transportation, communication, and geography.

- Each district shall be contiguous, meaning that a district must be in one piece. (Article 5, Section 14 of the Montana Constitution). Areas that meet only at points of adjoining corners shall not be considered contiguous. Areas separated by natural geographical or artificial barriers that prevent transportation by vehicle on a maintained road shall be avoided when not in conflict with the commission's adopted criteria and goals.

**Defendant's Trial**
**Exhibit 26**

Adopted by the Montana Districting and Apportionment Commission, July 2021

Goals for State Legislative Districts

- No plan may be drawn to unduly favor a political party.
- The commission shall attempt to minimize dividing cities, towns, counties and federal reservations when possible.
- Keeping communities of interest intact. The Commission may consider keeping communities of interest intact. Communities of interest can be based on Indian reservations; urban interests, suburban interests, rural interests, including elementary and high school districts; tribal interests; neighborhoods; trade areas; geographic location; demographics; communication and transportation networks; social, cultural, historic, and economic interests and connections; or occupations and lifestyles.
- The commission may consider competitiveness of districts when drawing plans.
- The commission shall consider assigning holdover senators to the Senate District which contains the greatest number of residents of the district from which they were previously elected when possible.

Page 012
**Defendant's Trial
Exhibit 26**

# HISTORY OF STATE LEGISLATIVE DISTRICTING CRITERIA IN MONTANA, 1974 – 2010

| Commission Year | Starting Point | Mandatory Criteria | Discretionary Criteria | Ideal HD Size | # of Counties Below Ideal | Range of Deviation | Mean Deviation | Other Notes |
|---|---|---|---|---|---|---|---|---|
| 1974 | Commission recommended using "the periphery of the state" because the various borders limit the options for districts<br><br>"First districts drawn were rural and toward the boundaries of the state"<br><br>"Last districts drawn were urban and well within the state"<br><br>Started in NE corner[i] | • "Substantial equality" of population/one man one vote | • Keeping counties intact<br>• Maintaining communities of interest<br>• Considering on "a case by case basis" the following factors: "geography, trade areas, county lines, minorities, economic interests, rural-urban interest, district homogeneity" | 6,944 | 32[ii] | **HD:**<br>Overall: 15.48%<br>Max: +7.83%<br>Min: -7.65%<br><br>**SD:**<br>Overall: 13.08%<br>Max: +6.33%<br>Min: -6.75% | HD: ± 3.43%<br><br>SD: ± 2.94% | The Commission originally directed staff to split existing multi-member districts into single-member districts that had no more than a 10.9 percent deviation. This approach was abandoned after it created more problems than it solved. |
| 1980 | The Commission's report suggested starting in the rural, border areas, as had been done by the 1974 Commission.<br><br>Started in NW corner[iii] | • Population equality, which the commission established as an overall relative range of 10% or ± 5% from ideal average district population<br>• Compactness<br>• Contiguity | • Consideration of existing governmental lines<br>• Respect for geographic boundaries, especially the Continental Divide and the Missouri River<br>• Consideration to existing legislative district boundaries, when practical<br>• Senate district boundaries to follow congressional district division when possible<br>• Consider communities of interest and defined communities of interest | 7,866.9 | | **HD:**<br>Overall: 10.94%<br>Max: +5.78%<br>Min: -5.16%<br><br>**SD:**<br>Overall: 10.18%<br>Max: +5.14%<br>Min: -5.04% | | Commission abandoned criterion to have senate district boundaries follow congressional district boundary: impractical and "did not serve in the effectuation of a rational state policy."<br><br>Discretionary criteria not prioritized.<br><br>Included 6 House and 3 Senate districts in excess of the ± 5% deviation (upheld by a federal District Court in McBride v. Mahoney.[iv]) |

Defendant's Trial
Exhibit 26

| Commission Year | Starting Point | Mandatory Criteria | Discretionary Criteria | Ideal HD Size | # of Counties Below Ideal | Range of Deviation | Mean Deviation | Other Notes |
|---|---|---|---|---|---|---|---|---|
| 1990 | Northwest corner of the state with the end point in Yellowstone County | • Compactness and contiguity<br>• Population equality<br>• Maximum population deviation - relative population deviation from ideal population for an individual district may not exceed ± 5%<br>• Final results of the 1990 census must be used to form plan<br>• Protection of minority rights (may not dilute voting strength of racial or language minorities, compliance with section 2 of VRA) | • Consideration to local government boundaries<br>• Consideration when practical to existing voting precinct lines<br>• Consideration when practical to school district lines<br>• Preserve communities of interest when possible<br>• Respect geographical boundaries to the extent possible<br>• Consideration to existing districts when practical<br>• Political fairness, ie, districts may not be drawn for the purpose of favoring a political party or defeating an incumbent legislator | 7,990.65 | 31[v] | HD:<br>Overall: 9.96%<br>Max: +4.99%<br>Min: -4.97% | HD: ± 2.6% | Discretionary criteria were not prioritized.<br><br>Staff used ARC/INFO software from ESRI. |
| 2000 | Glacier County (and adjacent Flathead and Lake Counties, as necessary), then proceeded in clockwise motion around the state | • Population equality and maximum population deviation (+/- 5%)<br>• Compact, contiguous districts<br>• Protection of minority voting rights and compliance with VRA<br>• Race cannot be the predominant factor to which traditional redistricting criteria are subordinated | • Following lines of political units<br>• Following geographic boundaries<br>• Keeping communities of interest intact | 9,022 | 31[vi] | HD:<br>Overall: 9.85%<br>Max: 4.98%<br>Min: -4.88%<br><br>SD:<br>Overall:<br>Max:<br>Min: | HD: ± 3.5% | Held 16 public hearings, including mandatory one in Helena.<br><br>Staff used autoBound software from Citygate. |

Defendant's Trial Exhibit 26

| Commission Year | Starting Point | Mandatory Criteria | Discretionary Criteria | Ideal HD Size | # of Counties Below Ideal | Range of Deviation | Mean Deviation | Other Notes |
|---|---|---|---|---|---|---|---|---|
| 2010 | The Commission chose a statewide approach, taking public comment on 5 maps before adopting 100 House Districts. | • Population equality and maximum population deviation (+/- 3%)<br>• Compact, contiguous districts<br>• Protection of minority voting rights and compliance with VRA<br>• Race cannot be the predominant factor to which traditional redistricting criteria are subordinated | • Following lines of political units<br>• Following geographic boundaries<br>• Keeping communities of interest intact | 9,894 | 36 | HD:<br>Overall:<br>5.44%<br>Max: +2.45%<br>Min: -2.99%<br><br>SD:<br>Max: +2.28%<br>Min: -2.98% | HD: $\pm$ 0.91%<br><br>SD: $\pm$ 0.76% | Held 3 public hearings on districting criteria selection prior to the availability of Census figures<br><br>Staff used Maptitude software from Caliper<br><br>Commission held 17 public hearings on plans, including the mandatory one in Helena<br><br>Discretionary criteria were not prioritized |

Last updated 6/5/2019

---

[i] Susan Fox, Operational Guidelines for Congressional and Legislative Redistricting, Legislative Services Division, November 2000, available from: http://leg.mt.gov/content/publications/committees/interim/2001_2002/dist_apport/susan.pdf, last accessed Jan. 26, 2010.

[ii] Gregory Petesch, The State of the Montana Constitution (Turkey Feathers on the Constitutional Eagle), 64 Mont. L. Rev. 23 (2003).

[iii] Susan Fox, Operational Guidelines for Congressional and Legislative Redistricting, Legislative Services Division, November 2000, available from: http://leg.mt.gov/content/publications/committees/interim/2001_2002/dist_apport/susan.pdf, last accessed Jan. 26, 2010.

[iv] Report of the Montana Districting and Apportionment Commission, December 1992, page 15.

[v] Montana Counties and County Seats 1990 Census of Population, *U.S. Bureau of the Census, March 1993.*

[vi] Gregory Petesch, The State of the Montana Constitution (Turkey Feathers on the Constitutional Eagle), 64 Mont. L. Rev. 23 (2003).

Defendant's Trial Exhibit 26

## WHERE TO DRAW THE LINE:
## CRITERIA FOR REDISTRICTING
## IN MONTANA

Prepared for the Montana Districting and
Apportionment Commission
by Lisa Mecklenberg Jackson
Staff Attorney
April 2010

In the 2000 cycle of redistricting, 42 states were sued, and in more than a dozen, courts either drew or modified district plans.[1] What steps can the 2010 Montana Districting and Apportionment Commission take to make sure Montana is not one of those states in the 2010 cycle? One of the answers to that question lies in the selection of appropriate criteria adopted by the Commission to be utilized in drawing district lines.

---

[1] The U.S. Supreme Court has recognized that state courts have a significant role in redistricting and requires federal courts to defer to state courts. Scott v. Germano, 381 U.S. 407 (1965). After a federal court has determined that a state redistricting plan violates federal law, it will usually allow the state authorities a reasonable time to conform to state law. Vera v. Richards, 861 F. Supp. 1304 (S.D. Tex. 1994), aff'd Bush V. Vera, 517 U.S. 952 (1996). Once a state court has completed its work, the Full Faith and Credit Act, 28 U.S.C. Section 1738, requires a federal court to give the state court's judgment the same effect as it would have in the state's own court. Parsons Steel Inc. v. First Ala. Bank, 474 U.S. 518 (1986). A state's judgment may only be modified by the U.S. Supreme Court on appeal from the state's highest court.

The purpose of this memo is to inform the Montana Districting and Apportionment Commission of the requirements imposed by law for redistricting congressional and

> The Commission should be especially careful in applying the same mandatory and discretionary criteria to each district.

legislative districts and offer possibilities for potential discretionary criteria for legislative districts.

The Commission should adopt separate sets of criteria for congressional and legislative districts and be especially careful in applying the same mandatory and discretionary criteria to each district. The issue of redistricting is complex in that it involves both federal and state laws and Constitutions. Accordingly, some background information regarding the legal framework surrounding redistricting is essential.

### BACKGROUND—OR PUTTING THINGS INTO PERSPECTIVE

Federal courts use two different standards for judging redistricting plans—one for congressional plans and a different one for legislative plans.

### Criteria for Congressional Plans[2]

---

[2] Based on the 2010 Census, the U.S. population is apportioned among a set number of districts, whose

Page 016
**Defendant's Trial Exhibit 26**

Montana's Congressional Redistricting Plan is due 90 days from the receipt of U.S. Census figures in April 2011.[3] The primary criteria for congressional districts is population equality or "one person, one vote," based upon Article I, Section 2 of the U.S. Constitution. U.S. Supreme Court cases interpret that section to mandate congressional districts that are as nearly equal in population as is practicable,[4] which

> The primary criteria for congressional districts is population equality or "one person, one vote," based upon Article I, Section 2 of the U.S. Constitution.

means that the populations must be as mathematically equal as is possible.[5] This requirement is a much stricter test than the federal equal protection clause population equality test for legislative districts which will be discussed later.

The standard for judging congressional plans is that of strict equality. In 1983, in Karcher v. Daggett,[6] the U.S. Supreme Court struck down a congressional redistricting plan drawn by the New Jersey Legislature that had an overall range of less than 1%. The plaintiffs showed that at least one other plan before the legislature had an overall range less than the plan enacted by the legislature, thus carrying their burden of proving that the population differences could have been reduced or eliminated by a good-faith effort to draw districts of equal population.

---

boundaries are then redrawn. The 435 seats in the U.S. House of Representatives are apportioned among the 50 states and if population changes necessitate it, redrawing of the boundary lines of the districts would have to occur until the population of each district was within the accepted range. According to Polidata projections, eight states (primarily in the South and Southwest) are positioned to gain one or more seats in the remapping necessitated by the 2010 Census and 10 states (generally the Northeast and Industrial Midwest) are slated to lose a seat or more. It does not appear that there will be any congressional district changes in Montana as the population of the state has not grown to the extent that we would receive a second congressional seat. Accordingly, this section on criteria for congressional plans will likely not come into play during the 2010 redistricting cycle for Montana. However, the concepts surrounding it are important ones to be aware of.

[3] During that 90 days, the Commission must hold a public hearing on the congressional district plan and send a letter to the Montana Secretary of State, upon notification from the Clerk of the House of Representatives of the United States, that the State of Montana comprises one congressional district and is entitled to one representative in the U.S. House.

[4] "Practicable" is defined by Random House Unabridged Dictionary of English Language, 2nd ed.,

as "that which is capable of being done." It is not the same as "practical" which is defined as "adapted or designed for actual use." Something may be practicable, but not practical, making practicable a more stringent standard.

[5] Karcher v. Daggett, 462 U.S. 725 (1983).

[6] 462 U.S. 725 (1983).

Page 017
**Defendant's Trial Exhibit 26**

However, if the deviation is necessary to achieve "some legitimate state objective" the congressional redistricting plan could be saved by showing that each significant deviation from the ideal was necessary to achieve "some legitimate state objective."[7] Objectives should be articulated in advance, be followed consistently, and it should be shown that the objectives in each district could not have been achieved with districts that had a smaller deviation from the ideal.[8]

**Criteria for Legislative District Plans Generally**

As we've seen, while the standard for congressional redistricting plans, based on Article I, Section 2 of the U.S. Constitution, is quite strict, the U.S. Supreme Court has adopted a less exacting standard for legislative plans,[9] premised on the Equal Protection Clause of the 14th Amendment.[10] Based on the federally recognized standard, legislative plans should aim for an overall population deviation range of less than 10% from the ideal population.[11] Historically, an overall population range of 10% was considered to constitute a "substantial equality of population."[12] However, the Commission should know that more recently, an overall range of 10% was ruled to not be a safe harbor. In Larios v. Cox,[13] the court struck down the districts as a violation of the equal protection clause even though they were within the 10%

---

[7] Karcher at 740. Any number of consistently applied legislative policies might justify some variance including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent representatives.

[8] Turner v. Arkansas, 784 F. Supp. 585 (E.D. Ark. 1991).

[9] Article V, Section 14(1) of the Montana Constitution provides that Montana shall be divided into as many districts as there are members of the house and each district shall elect one representative. Each senate district shall be comprised of two adjoining house districts and shall elect one senator.

[10] 14th Amendment of the U.S. Constitution. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[11] Meaning that the population deviation range between the largest and smallest districts (from ideal district population) in the plan should not exceed 10%. The ideal district population is equal to the total state population divided by the total number of districts. In the 2000 redistricting cycle, the total population of Montana was 902,195 with the ideal population of a legislative house district standing at 9,022. If a district had a larger population than 9,022, it had a plus deviation. Less than 9,022, a minus deviation.

[12] Chapman v. Meier, 420 U.S. 1 (1975); Connor v. Finch, 431 U.S. 407 (1977); Brown v. Thompson, 462 U.S. 835 (1983); and Voinovich v. Quilter, 507 U.S. 146 (1993).

[13] 300 F. Supp.2d 1320 (N.D. Ga. 2004), aff'd, 542 U.S. 947 (2004).

**Page 018**
**Defendant's Trial**
**Exhibit 26**

range, because the plans tended to ignore traditional districting principles such as keeping districts compact, keeping counties whole, etc.

But, on the other hand, if deviation is necessary to achieve some "rational state policy" a deviation of even more than 10% can be legitimate. The U.S. Supreme Court in Reynolds v. Sims[14] had anticipated that some deviations from population equality in legislative plans had to be justified if they were based on legitimate considerations incident to the effectuation of a rational state policy. To this point, the only "rational state policy" that has served to justify an overall range of more than 10% in a legislative plan has been respecting the boundaries of political subdivisions. And

> "The Commission interprets its own criteria, such as what constitutes a community of interest and the possible ripple effects of any particular change; thus when the Commission made a good faith effort to balance the criteria, the reapportionment plan could not be struck down on the contention that it failed to exactly follow its own criteria."
>
> *McBride v. Mahoney*

that has happened in only three cases.[15]

There is an important Montana case addressing deviations of more than 10% in legislative plans. In McBride v. Mahoney,[16] involving the 1983 legislative redistricting plan, the population deviation between the largest and smallest House districts was 10.94% and between the largest and smallest Senate districts was 10.18%, which created a prima facie case of discrimination because the totals exceeded 10%. To be upheld, the deviations must be justified by legitimate state objectives. The federal district court determined that legitimate state objectives were stated in criteria established by the Reapportionment Commission. The criteria addressed governmental boundaries, geographic boundaries, communities of interest, consideration of existing district boundaries, and an attempt to stay within a 5% plus or minus deviation from the ideal population. The court held that these criteria were considerations and that conflicts between them as they existed within a district or between districts must be balanced in arriving at a plan embracing the entire state. The Commission interprets its own criteria, such as what constitutes a community of interest and the possible ripple effects of any particular change; thus

---

[15] Mahan v. Howell, 410 U.S. 315 (1973); Brown v. Thompson, 462 U.S. 835 (1983); and Voinovich v. Quilter, 507 U.S. 146 (1993).

[16] 573 F. Supp. 913 (D.C. Mont. 1983).

---

[14] 377 U.S. 533 (1964).

Page 019
**Defendant's Trial Exhibit 26**

when the Commission made a good faith effort to balance the criteria, the reapportionment plan could not be struck down on the contention that it failed to exactly follow its own criteria.

In summary, the criteria for drawing congressional districts is as equal as practicable, while the standard for drawing legislative districts has traditionally been plus or minus 10% population deviation range from the ideal population. With regard to legislative districts, in light of ever more increasingly sophisticated mapping capabilities, it may be wise for the Commission to aim for an even lower population deviation to the extent possible, respecting or balancing the other criteria adopted by the Commission.

## APPEARANCE OF DISCRIMINATION CAN BE FATAL TO ANY PLAN

When drawing district lines, one of the most important principles to keep in mind is not to discriminate against racial or language minorities. Any attempts to do so will be subject to strict scrutiny and the plan potentially thrown out by the courts. What are the recognized standards for racial or minority discrimination in districting?

### Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. Section 1973, provides there shall be no denial of the right to vote on account of race or color and has been used to attack reapportionment and redistricting plans on the grounds they discriminated against Blacks, Hispanics, or American Indians and abridged their right to vote by diluting the voting strength of their population in the state.[17] Section 2 is an issue of importance in Montana because of our Native American population.

In a Montana Section 2 case, Old Person v. Brown,[18] the plaintiffs[19] contended that the 1992 redistricting plan for the Montana House of Representatives and Senate diluted the voting strength of American Indians in violation of Section 2 of the

---

[17] All jurisdictions, including Montana, come under section 2 of the Voting Rights Act. There are two categories of counties in Montana with regard to the Voting Rights Act.
1. Counties that have been involved with Voting Rights Act litigation: Big Horn, Rosebud, Roosevelt, and Blaine Counties. Any county that has significant minority populations that are geographically compact will affect district creation.
2. All other counties: All counties are still subject to the Voting Rights Act, but may be without significant minority populations that are geographically compact and sufficient in number to affect district creation. The numbers should be reviewed each census to make this determination.

[18] 312 F3d 1036 (2002) (Pl. Petition for Cert. denied by U.S. Supreme Court, Nov. 17, 2003).

[19] The plaintiffs were four Native Americans: Earl Old Person, Carol Juneau, Joe MacDonald, and Jeannine Padilla.

Page 020
**Defendant's Trial
Exhibit 26**

Voting Rights Act of 1965. The plaintiffs also alleged that the redistricting plan was adopted with a discriminatory purpose in violation of Section 2. The federal district court dismissed the claim, holding that the totality of the circumstances did not establish vote dilution in the American Indians' districts. On appeal, the 9th Circuit court affirmed. Nothing in the record showed that the district court's conclusion about racial polarization was clearly erroneous, as the American Indians presented no new evidence concerning their socio-economic status in Montana, and the court had previously upheld the district court's finding that American Indians had a lower socio-economic status than whites in Montana. Even though the court found that the district court erred by limiting the frame of reference for proportionality to the legislative districts where the American Indians resided and by considering the number of Indian-preferred candidates who had been elected, the court held that given the totality of the circumstances, its determination that there was no vote dilution was not clearly erroneous. There was an absence of discriminatory voting practices, a viable policy underlying the existing district boundaries, and Native Americans had been successful in elections. The judgment dismissing the American Indians' vote dilution claim against the state officials was affirmed.

**What Do Courts Rely On In Determining Whether There Has Been A Violation Of Section 2?**

Before examining the totality of circumstances to determine the presence of discrimination in a Section 2 case, one must first look to a well-known U.S. Supreme Court case, Thornburg v. Gingles,[20] which established three preconditions [known as the Gingles preconditions] that a plaintiff must meet before a court will proceed to a detailed analysis of the redistricting plan for discrimination examination purposes. Those preconditions are: 1) that the minority is sufficiently large and geographically compact to constitute a majority in a single-member district; 2) that it is politically cohesive; and 3) that, in the absence of special circumstances, bloc voting by the white majority usually defeats the minority's preferred candidate. Once these three preconditions are satisfied, a court must look at a number of other factors in determining the totality of the circumstances surrounding an alleged violation of Section 2. These other factors include such things as the extent of the history of official discrimination, denial of access to the candidate slating process, and the extent to which members of the protected class have been elected.[21]

---

[20] 478 U.S. 30 (1986).

[21] 478 U.S. at 36-37.

A violation of Section 2 is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election are not equally open to participation by members of a class of citizens protected by Section 2 in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. However, that right is not absolute. Nothing in Section 2 establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Similarly, in Bush v. Vera,[22] the Court pointed out that, if the minority population is not sufficiently compact to draw a compact district, there is no violation of Section 2; if the minority population is sufficiently compact to draw a compact district, nothing in Section 2 requires the creation of a race-based district that is far from compact. The Court reached a similar conclusion in a more recent case, League of

> Nothing in Section 2 establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

United Latin American Citizens (LULAC) v. Perry. [23]

Even more recently, in Bartlett v. Strickland,[24] the U.S. Supreme Court reached the conclusion that Section 2 does not require the creation of a district that a minority population has a fair chance to win unless the minority will constitute a majority of the voting age population[25] in the district.

Next we'll discuss the non-discrimination companion to Section 2 of the Voting Rights Act--Section 5 of the Voting Rights Act.

---

[23] 548 U.S. 399 (2006). The Court said that for the Hispanic minority in the case before the court, citizen age voting population was the proper measure for a district under Section 2. The Court also said that the compactness precondition of Gingles refers not just to geographical compactness of the district, but also to compactness of the minority group.

[24] 129 S. Ct. 1231 (2009). The Justices voted 5-4 in setting a more than 50% threshold of the voting age population for Section 2 minority districts.

[25] There is some uncertainty as to the "correct" count to use in determining population for purposes of a Section 2 challenge. Should it be voting age population or citizen voting age population as set forth in LULAC? The U.S. Supreme Court has long held that other than for a state's congressional districts, population deviations between voting districts cannot be greater than 10%. However, the Court has not definitely stated what is the relevant "population" to be counted for purposes of that population deviation determination, whether it's voting age or citizen voting age.

---

[22] 517 U.S. 952 (1996).

Page 022
**Defendant's Trial
Exhibit 26**

## Section 5 of the Voting Rights Act

When the Voting Rights Act was adopted in 1965, Section 5[26] was considered one of the primary enforcement mechanisms to ensure that minority voters would have an opportunity to register to vote and fully participate in the electoral process free of discrimination. The intent of Section 5 was to prevent states that had a history of racially discriminatory practices from developing new ways to effectively disenfranchise minority voters.[27] Sixteen states, either wholly or partially,[28] are required by Section 5 to obtain approval of any change in election law by either the U.S. Department of Justice or the federal district court in Washington, D.C. That process can take up to four months. Montana is not one of the states subject to Section 5.

There has been some debate on whether there is still a need for Section 5. That debate remains open even though the issue recently became before the U.S. Supreme Court. In a closely watched Section 5 case decided just this last April, Northwest Austin Municipal Utility District Number One (NAMUDNO) v. Eric Holder,[29] the Supreme Court chose not to address the constitutionality of Section 5, ruling instead on narrow statutory grounds, that the utility district in Austin, TX, that had challenged the constitutionality of Section 5, might be eligible to "bail out" from being covered by it. The law limits the kinds of jurisdictions that can seek bailouts to states and their political subdivisions, which are defined in the law to mean counties, parishes, and units of government that register voters. Although the utility district did not meet any of these definitions, the Supreme Court said it might still be eligible to seek a bailout. What remains to be seen is whether other jurisdictions will now take advantage of the opening this opinion provides to try to opt out from coverage under Section 5.

In summary, although the Commission needs to be very aware of the non-discriminatory requirements of Section 2

> One must be careful to consider race as simply another districting principle, giving it the same weight as the other criteria. Never make race your dominant motive.

---

[26] Pub. L. No. 89-110, sec. 5, 79 Stat. 437, 439 (1965), codified at 42 U.S.C. Section 1973c (2006).

[27] In 2006 Congress extended Section 5, a temporary section, so that it would cover all redistricting cycles through 2031. Pub, L. No. 109-246, sec. 4, 120 Stat. 577, 580 (2006).

[28] Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, and Texas; most of Virginia; counties and townships in California, Florida, Michigan, New Hampshire, North Carolina, and South Dakota; and three New York City boroughs, Manhattan, Brooklyn, and the Bronx.

[29] 129 S. Ct. 1695 (2009).

Page 023
**Defendant's Trial
Exhibit 26**

and Section 5, this does not mean that race cannot be considered as one of the factors in redistricting. In redistricting, one is always aware of race when drawing district lines, just as one is aware of age, economic status, and a variety of other demographic factors. The district lines may be drawn, for example, to maintain communities of interest or the integrity of political subdivisions. One must be careful to consider race as simply another districting principle, giving it the same weight as the other criteria. Never make race your dominant motive.

That being said, the Commission must be diligent with regard to consideration of race in redistricting, being especially careful to avoid drawing racial gerrymanders[30] or creating bizarre shapes,[31] focusing instead on drawing districts that are reasonably compact and that follow traditional districting principles. Focus on the effect of the redistricting, not the intent.

Now, with that background redistricting legal framework in place, let's look at redistricting in Montana specifically.

---

[30] The process of drawing districts with odd shapes to create an unfair advantage is called "gerrymandering."

[31] Reapportionment is one area in which appearances do matter. Shaw v. Reno, 509 U.S. 630 (1993).

TRADITIONAL DISTRICTING PRINCIPLES
Since 1993, seven policies have been judicially recognized as "traditional districting principles."

1. Compactness,[1]
2. Contiguity,[2]
3. Preservation of counties and other political subdivisions,[3]
4. Preservation of communities of interest,[4]
5. Preservation of cores of prior districts,[5]
6. Protection of incumbents,[6] and
7. Compliance with Section 2 of the Voting Rights Act.[7]

[1] Shaw v. Reno (Shaw I), 509 U.S. 630 (1993); Bush v. Vera, 517 U.S. 952 (1996).

[2] Shaw v. Reno (Shaw I), 509 U.S. 630 (1993).

[3] Shaw v. Reno (Shaw I), 509 U.S. 630 (1993); Abrams v. Johnson, 521 U.S. 74 (1997).

[4] Miller v. Johnson, 515 U.S. 900 (1995); Abrams v. Johnson, 521 U.S. 74 (1997).

[5] Abrams v. Johnson, 521 U.S. 74 (1997).

[6] Abrams v. Johnson, 521 U.S. 74 (1997).

[7] Shaw v. Hunt (Shaw II), 517 U.S. 899 (1996).

**DECIDING UPON REDISTRICTING CRITERIA FOR MONTANA**

**Authority for the Redistricting Process**

Page 024
**Defendant's Trial Exhibit 26**

In Montana, direction for redistricting comes from the Montana Constitution and perhaps[32] statute:

1. Article V, Section 14 of the Montana Constitution. Districting and apportionment. Each district shall consist of compact and contiguous territory. All districts shall be as nearly equal in population as is practicable.

and

2. Section 5-1-115, MCA. Redistricting Criteria.

(1) Subject to federal law, legislative and congressional districts must be established on the basis of population.

(2)  In the development of legislative districts, a plan is subject to the Voting Rights Act and must comply with the following criteria, in order of importance:

(a)  The districts must be as equal as practicable, meaning to the greatest extent possible, within a plus or minus 1% relative deviation from the ideal population of a district as calculated from information provided by the federal decennial census. The relative deviation may be exceeded only when necessary to keep political subdivisions intact or to comply with the Voting Rights Act.

(b)  District boundaries must coincide with the boundaries of political subdivisions of the state to the greatest extent possible. The number of counties and cities divided among more than one district must be as small as possible. When there is a choice between dividing local political subdivisions, the more populous subdivisions must be divided before the less populous, unless the boundary is drawn along a county line that passes through a city.

(c)  The districts must be contiguous, meaning that the district must be in one piece. Areas that meet only at points of adjoining corners or areas separated by geographical boundaries or artificial barriers that prevent transportation within a district may not be considered contiguous.

(d)  The districts must be compact, meaning that the

---

[32] There is a redistricting statute in the MCA, Section 5-1-115, MCA, which was passed in 2003. However, there is a question as to whether the legislature has the authority under the Montana Constitution to pass any laws relating to redistricting as under the Montana Constitution the power of redistricting was given to the Districting Commission, not the legislature. Wheat v. Brown, 85 P.3d 765 (2004). See later discussion for more detail.

Page 025
**Defendant's Trial
Exhibit 26**

compactness of a district is greatest when the length of the district and the width of a district are equal. A district may not have an average length greater than three times the average width unless necessary to comply with the Voting Rights Act.

(3)  A district may not be drawn for the purposes of favoring a political party or an incumbent legislator or member of congress. The following data or information may not be considered in the development of a plan:

(a)  addresses of incumbent legislators or members of congress;

(b)  political affiliations of registered voters;

(c)  partisan political voter lists; or

(d)  previous election results, unless required as a remedy by a court.

**Past Precedence: Mandatory Criteria For Legislative Districts In Montana**[33]

---

[33] 1974 Mandatory Districting Criteria: "Substantial equality" of population/one person, one vote. 1980 Mandatory Districting Criteria: Population equality, established as an overall relative range of plus or minus 5% from ideal average district population; compactness; contiguity. 1990 Mandatory Districting Criteria: Compactness and contiguity; population equality; maximum population deviation – relative

Both mandatory and discretionary redistricting criteria in Montana have historically been based on federal caselaw, traditional redistricting principles, and the Montana Constitution.

In 2000 the Districting Commission chose as its mandatory criteria:

- Population equality and maximum population deviation of no more than plus or minus 5%.
- Compact and contiguous districts.
- Protection of minority voting rights and compliance with the Voting Rights Act.
- Race cannot be the predominant factor to which the traditional discretionary criteria are subordinated.

All of the mandatory criteria for 2000 are still mandatory in 2010 based on the U.S. Constitution, the Montana Constitution, and case law and are necessary mandatory criteria for the 2010 redistricting cycle.

Article V, Section 14(1) of the Montana Constitution provides that "All [legislative] districts shall be as nearly equal in population as is practicable." Under the Equal Protection Clause of the 14th

---

population deviation from ideal population for an individual district may not exceed plus or minus 5%; final results of the 1990 census must be used to form plan; protection of minority rights, compliance with Section 2 of the Voting Rights Act.

**Page 026**
**Defendant's Trial**
**Exhibit 26**

Amendment, state legislative districts must adhere to the one person, one vote principle of equality. The test, based on years of federal case holdings is that if the difference in population between the districts with the highest and lowest populations is less than 10%, the plan is assumed to meet federal equal protection standards.

Article V, Section 14(1) of the Montana Constitution also establishes the mandatory principle of compact, contiguous districts. Compactness is largely determined by looking at the district and using a general appearance test.[34] Compactness also takes into account such things as ease of travel and communication within a district, or what is called functional compactness. Contiguity means the district must be all in one piece—or one continuous mass. As the Commission draws proposed district lines, it should attempt to ensure physical and functional compactness by monitoring the shapes of the districts and the geography, road systems, and other physical aspects of the districts. Each individual district should be examined for compactness as well as the total plan.

Another 2000 mandatory criteria that should likely be articulated in 2010 is that

race cannot be the predominant factor to which the traditional discretionary criteria are subordinated.[35] This does not mean that the Commission cannot intentionally create a district in which Native Americans are a majority.  The Commission may do so if that race-based reason is not the predominant criteria and the Commission follows its other criteria in drawing the district lines. Court have recognized that race will obviously be a factor in the redistricting process, if for no other reason than the fact that the rights of a racial minority are protected by section 2 of the Voting Rights Act of 1965 and thus race must be taken into account when drawing

> The United States Supreme Court has held that "race cannot be the predominant reason for a district's lines, with the other redistricting criteria, particularly traditional discretionary criteria, being subordinated to race."
>
> *Shaw v. Reno*

---

[34] This is generally referred to as geographic compactness or what is the shape of the district in question. There is also the issue of racial compactness within a district. There may be one without the other.

[35] In a series of opinions beginning with Shaw v. Reno, 509 U.S. 630 (1993), the United States Supreme Court has held that race cannot be the predominant reason for a district's lines, with the other redistricting criteria, particularly traditional discretionary criteria, being subordinated to race. In addition, both Section 2 of the Federal Voting Rights Act of 1965 and the Equal Protection Clause of the 14th Amendment prohibit the drawing of district lines in a manner that dilutes the vote of a citizen on the basis of race or color. This applies to Native Americans in Montana.

Page 027
**Defendant's Trial Exhibit 26**

district lines. For each district created by the Commission in which Native Americans are a majority, it is crucial that the Commission establish a record showing that the criteria were considered and followed with respect to the district.

**Past Precedence: Discretionary Criteria For Legislative Districts In Montana**[36]

Here is the area where the Commission may have a bit more leeway in determining how the 2010 legislative districts will be drawn, as discretionary criteria are not mandated by the federal or state constitution or any other law. There are two basic purposes for

selection of discretionary criteria: 1. Deciding where lines should be drawn; and 2. Defending a district's lines, population, or characteristics of its residents in possible future legal proceedings.

In 2000 the Districting Commission chose as its discretionary criteria:
- Following the lines of political units.
- Following geographic boundaries.
- Keeping communities of interest intact.

Districts are often drawn to follow, to the extent possible, the boundary lines of counties, cities, towns, school districts, Indian reservations, voting precincts, and other political units. Districts can be drawn along geographic boundaries, such as mountain divides and ridge lines, rivers and creeks, and highways and roads. Communities of interest can be based on such things as trade areas, geographic locations, communication and transportation networks, media markets, Indian reservations, urban/rural splits, similarity in social cultural and economic interests, and prevalent occupations and lifestyles.

All of the above discretionary criteria from 2000 could be selected by the 2010 Districting Commission as discretionary criteria and have been recognized as

---

[36] 1974 Discretionary Districting Criteria: Keeping counties intact; maintaining communities of interest; considering on a case-by-case basis the following factors-geography, trade areas, county lines, minorities, economic interest, rural-urban interests, district homogeneity. 1980 Discretionary Districting Criteria: Consideration of existing governmental lines; respect for geographic boundaries, especially the Continental Divide and the Missouri River; consideration to existing legislative district boundaries, when practical; Senate district boundaries to follow congressional district division when possible; consider communities of interest and defined communities of interest. 1990 Discretionary Districting Criteria: Consideration to local government boundaries; consideration when practical to existing voter precinct lines; consideration when practical to school district lines; preserve communities of interest when possible; respect geographical boundaries to the extent possible; consideration to existing districts when practical; political fairness-districts may not be drawn for the purpose of favoring a political party or defeating an incumbent legislator.

Page 028
**Defendant's Trial
Exhibit 26**

> There are two basic purposes for selection of discretionary criteria: 1. Deciding where lines should be drawn; and 2. Defending a district's lines, population, or characteristics of its residents in possible future legal proceedings.

legitimate discretionary criteria in McBride v. Mahoney[37] mentioned earlier.

In addition, the 1990 Redistricting Commission adopted a discretionary criteria of political fairness which stated that a district may not be drawn for the purpose of favoring a political party or to protect or defeat an incumbent legislature. This concept mirrors the language in current Section 5-1-115 (3), MCA, and may be a criteria the Commission wishes to consider.

Something else for the Commission to consider is whether it wishes to preserve the lines of existing legislative districts as a starting point for the 2010 redistricting cycle.[38] Existing districts may provide a starting point from which to determine any variation in population from the ideal population and its compliance with the criteria for equal population within a certain deviation, keeping in mind that an existing

district may no longer comply with some of the redistricting criteria because of new population data. The Commission will also need to decide where in the state it wishes to start the redistricting process.[39]

**What Should The Commission Adopt As The Appropriate Population Deviation Ratio?**

One of the more thought-provoking decisions for the Commission in the 2010 redistricting cycle is what should it choose for its mandatory criteria as the appropriate population deviation standard for drawing legislative districts in Montana. Selection and implementation of the standard for deviation from the ideal district population is a critical element in withstanding legal challenges to the districting plan. The Commission has several options: "as nearly as practicable"[40] as stated in the Montana Constitution; 1% contained in Section 5-1-115, MCA; 5% as the past three

---

[37] 573 F. Supp. 913 (D.C. Mont. 1983).

[38] Continuity of existing district boundaries will likely be appealing to those involved in the election process as they would not have to deal with district line changes that in turn affect precinct lines, which must then be changed under Section 13-3-102, MCA.

[39] The 2000 Districting Commission began redistricting in Glacier County, and adjacent Flathead and Lake Counties as necessary, and proceeded in a clockwise motion throughout the state. The Commission proceeded along the Hi-Line to eastern Montana, then west through southcentral Montana, finishing up in the western third of the state.

[40] Should the Commission choose this standard, some sort of number percentage would likely need to be adopted within the definition of "as nearly as practicable" so as to have a baseline measurement from which to draw redistricting lines.

Page 029
**Defendant's Trial Exhibit 26**

Commissions have chosen,[41] or something in between.  Any of these deviation standards are possible. We've discussed the first two options a bit already so let's talk about that 1% population deviation standard from the ideal population imposed by Section 5-1-115, MCA.

The 2003 Montana Legislature passed HB 309 which was codified at Section 5-1-115, MCA. There was an attempt in 2009[42] to insert language in the Montana Constitution that would have mirrored the 1% deviation language in Section 5-1-115, MCA. That attempt failed.

Although Section 5-1-115, MCA, is arguably not binding on the Commission (see later discussion), the Commission could decide to adhere to the 1% population deviation from the ideal population contained in Section 5-1-115, MCA and to the specific criteria described in that statute. Drawing districts with a 1% deviation is certainly technically possible. And the statute does say that the 1% population deviation can be exceeded to keep political subdivisions intact or to comply with the Voting Rights Act, so there is some discretion included within the statutory language. However, the Commission should keep in mind several factors involved with adopting a 1% population deviation factor. A 1% deviation is a very exacting standard and may present a number of areas for Commission consideration in actual practice.  Adopting a 1% population deviation as a mandatory criteria would, by the very nature of its exactness, make this criteria the most "weighty," subjecting the other criteria to it.[43] This 1% standard would leave less room for deviation when considering factors such as communities of interest and Montana's varied geography. For example, when putting together a district in Eastern Montana, finding another 100 people to bring the deviation to 1% could mean a large district gets much larger. Or, it may mean slicing off a few blocks of the outer edge of Miles City. Accordingly, you would have some residents of Miles City belonging to a very rural district. Another example: a city or county has 120 people more (or fewer) than the ideal district size. You would need to split a county or city to keep it within 1%. If you had a larger deviation to work with, you might keep that city or county whole. From a technical standpoint, it is certainly possible to draw districts with a 1% population deviation. But it seems likely that adherence to such a deviation would affect other redistricting criteria considered traditional including contiguous and compact districts.

---

[41] Plus or minus five percent from the ideal district population was chosen as the mandatory population deviation in the last three redistricting cycles: 1980, 1990, and 2000.

[42] SB 187 (2009) which died in House State Administration.

[43] This is in keeping with the wording of Section 5-1-115, MCA, which contains the words "in order of importance" before listing the 1% population deviation as the first criteria.

Defendant's Trial
Exhibit 26

The Commission should also be aware that should it opt to go with a population deviation other than the 1% specified in Section 5-1-115, MCA, there are several arguments supporting that choice.

The 1% population deviation requirement in Section 5-1-115, MCA, may be unconstitutional. As we all know, the Montana Constitution trumps statute and the Constitution articulates the line drawing standard should be as "nearly in population as practicable." Can "practicable" be defined as 1%? Perhaps, perhaps not.

Case law also supports the notion that the Commission may choose a population deviation standard other than the statutory 1%. In 2003, the Montana Legislature passed Section 5-1-116, MCA, granting to itself the power to assign holdover senators to districts for the remainder of their terms and prohibiting the Districting Commission from making those assignments. In Wheat v. Brown,[44] three of the holdover senators challenged the legislative assignments. The district court declared Section 5-1-116, MCA, and the implementing language unconstitutional and the Montana Supreme Court affirmed. Thus, the 2003 legislation designed to transfer the power to assign holdover senators from the Commission to the legislature was unconstitutional and of no force and effect.

_____

[44] 2004 MT 33, 320 M. 15, 85 P.3d 765 (2004).

> "The constitutional grant of redistricting power to the Commission constitutes a denial of any latitude to the legislature to invoke its plenary powers."
>
> *Wheat v. Brown*

Similarly, in Brown v. Commission,[45] on Feb. 5, 2003, Bob Brown, Montana Secretary of State, refused to accept the 2003 final redistricting plan based on HB 309, which had been signed into law on Feb. 4, 2003. HB 309 contained the plus or minus 1% deviation language now codified in Section 5-1-115, MCA, and the plan had been drawn using a plus or minus 5% deviation. Judge McCarter, First Judicial District, ruled that HB 309 impermissibly conflicted with Article V, Section 14, of the Montana Constitution[46] and was void on that basis. She stated that HB 309 is not a valid implementation of Article V, Section 14 because that constitutional provision is self-executing, and because Article IV, Section 3[47] of the Montana Constitution does not authorize the legislature to interfere with the redistricting process beyond the express authority given to it in Article V, Section 14. The Secretary of State was required to file

_____

[45] Cause No. ADV 2003-72, 2003 ML 1896 (1st Jud. Dis., July 2, 2003).

[46] Establishing the Districting and Apportionment Commission authority for redistricting in Montana.

[47] Governing elections.

the Commission's plan and his refusal to do so was a violation of the Montana Constitution.

Several Montana Attorney General Opinions also serve to illustrate that the Districting Commission has the power regarding redistricting processes, and not the legislature. "The constitution and statutes provide no authority for changing Senators' terms after reapportionment. The reapportionment plan is the responsibility of the Montana Districting and Apportionment Commission which has the inherent authority under Article V, Section 14 of the Montana Constitution to do what is necessary to implement a plan that complies with the state's laws. How to deal with holdover Senators is the responsibility of the Commission."[48] In 35 A.G. Op. 12 (1973), it was determined that prior to the adoption of the 1972 Montana Constitution, the apportionment power was granted to the Legislature via Article VI,

> "With the adoption of the new constitution, the people of the state divested the legislature of all power concerning apportionment of the legislature, except for the power of recommendation in Article V, Section 14, 1972 Montana Constitution."
>
> *35 A.G. Op. 12 (1973)*

1889 Montana Constitution. However, with the adoption of the new constitution, the people of the state divested the legislature of all power concerning apportionment of the legislature, except for the power of recommendation in Article V, Section 14, 1972 Montana Constitution. Another opinion that same year provided that "the Commission to Redistrict and Reapportion has the exclusive power to determine the size of the legislative houses and the geographical makeup of the legislative and congressional districts, subject only to the restrictions of Article V of the Montana Constitution.[49]

So, as you can see, the 1% population deviation in statute does present some possible issues should the Commission select that as its population deviation standard. Accordingly, the Commission may wish to consider a bill draft repealing the 1% language from 5-1-115, MCA, to prevent these sorts of confusion and conflicts in the future. Or the Commission may decide to follow the 1% statutory deviation, in which case there is not an issue.

Regardless of which population deviation standard the Commission chooses, "as nearly practicable as possible," 5%, 1%, or something in between, the Commission should pick a population deviation standard as one of its mandatory criteria and take care to adhere to that standard in the

---

[48] 40 A.G. Op. 2 (1983).

[49] 35 A.G. Op. 12 (1973).

Page 032
**Defendant's Trial Exhibit 26**

drawing of lines for each district. The Commission may be wise to pick a population deviation standard somewhere in between 5% and 1%, such as 3%, which would be looked at in conjunction with other mandatory and discretionary criteria. The Commission should also keep in mind that this issue of population deviation from the ideal district is one that will likely be addressed in the public comments received during the hearings in April and the Commission may get valuable input from that process regarding this decision.

**WRAPPING UP**

The Montana Districting and Apportionment Commission should adopt mandatory criteria for redistricting congressional and legislative districts at a public hearing held prior to the time that the Commission begins the process of creating congressional or legislative districts. Throughout April 2010 the Commission will be seeking public comment on discretionary criteria and by next fall, the Commission should adopt the criteria it believes most appropriate for Montana. The mandatory criteria should be strictly applied. The discretionary criteria should be applied in a consistent manner in each district to the extent that they can be applied.

The meeting at which criteria are adopted can also be used to establish the content of the record of the Commission's meetings

and the method for maintaining that record.  A well preserved carefully documented record clearly stating the grounds for the Commission's decisions with regard to each legislative district is essential for, among other things, historical research into the proceedings of the Commission and successfully defending against inevitable lawsuits (see introductory paragraph).

> All discretionary criteria may not always be followed exactly, since sometimes the criteria may be at odds with each other, but if the Commission makes a good faith effort to consider and balance the criteria, the plan should be upheld as was found in McBride v. Mahoney.

The U.S. and Montana Constitutions and case law provide the foundation for criteria the Commission should adopt to guide redistricting and the criteria adopted should reflect the traditional redistricting principles recognized nationally. It is a complex balancing act that you, as Commissioners, must perform in applying the criteria consistently throughout the state. Good luck!

Cl0429 0091ljna

Page 033
**Defendant's Trial Exhibit 26**



**Montana Legislative Services Division**

PO BOX 201706<br>Helena, MT 59620-1706<br>(406) 444-3064<br>FAX (406) 444-3036

**Legal Services Office**

TO:             Districting and Apportionment Commission

FROM:       K. Virginia Aldrich, Staff Attorney

RE:            Litigation Background and Districting and
                   Apportionment Criteria

DATE:        May 31, 2020 [REVISED June 12, 2020]

This memorandum was prepared as background information for the Districting and Apportionment Commission (Commission), and it does not represent any opinion or action on the part of the Commission.

## I. Introduction and Important Deadlines

The U.S. Constitution provides that an "actual Enumeration" of the population must be made every ten years under provisions set by Congress.[1]  Under federal law, the Secretary of Commerce is commanded to "take a decennial census of population as of the first day of April" every ten years.[2]  Thus, April 1, 2020, is officially designated Census Day, the date that determines who is counted and where each person is counted. As a result, seats in the U.S. House of Representatives are apportioned to the states based on the census, and the federal government uses census numbers to help allocate federal funds.

By law, the U.S. Census Bureau must complete and report the total population count by state to the U.S. President within nine months after Census Day.[3]  Within a week of the opening of the 117th Congress[4], the President must transmit to Congress a statement showing the total population in each state and the number of congressional representatives to which each state is entitled.[5]  P.L. 94-171 redistricting data must be reported to the "Governor of the State involved and the officers or public bodies having responsibility for legislative apportionment or districting of such State" within one year after the census date. This data consists of the small area census data necessary for legislative redistricting.

Due to the COVID-19 pandemic, the U.S. Census Bureau has requested relief from these statutory deadlines. The Census Bureau has requested additional time to deliver final apportionment counts to the President and additional time to deliver the small area census data to the states. If this request is granted by Congress, the Census Bureau has stated that it would deliver apportionment counts to the

---

[1] U.S. Const. art. I, § 2.
[2] 13 U.S.C. § 141(a).
[3] 13 U.S.C. § 141(b).
[4] The 117th United States Congress is currently scheduled to convene on January 3, 2021, but Congress may designate another day. U.S. Const. amend. XX, § 2.
[5] 2 U.S.C. § 2a(b).

Page 034
**Defendant's Trial
Exhibit 26**

President by April 30, 2021, and redistricting data would be delivered to each state no later than July 31, 2021.[6]

The Districting and Apportionment Commission (Commission) is created under Article V, section 14, of the Montana Constitution, and the Commission has the responsibility to "prepare a plan for redistricting and reapportioning[7] the state into legislative districts and a plan for redistricting the state into congressional districts."[8]

Once redistricting data is delivered to the states by the U.S. Census Bureau, the Montana Constitution requires that the Commission file its final plan for congressional districts with the Secretary of State "[w]ithin 90 days after the official final decennial census figures are

> **Article V, Section 14. Districting and apportionment.**
> . . . .
> (3) Within 90 days after the official final decennial census figures are available, the commission shall file its final plan for congressional districts with the secretary of state and it shall become law.
> . . . .

---

[6] U.S. Department of Commerce Secretary Wilbur Ross and U.S. Census Bureau Director Steven Dillingham Statement on 2020 Census Operational Adjustments Due to COVID-19, Census Bureau Press Release, April 13, 2020.

[7] Even in the Constitutional Convention, there was some confusion about whether the Legislature or the Commission would set the size of the Legislature. *See* Montana Constitutional Convention 1971-1972, Verbatim Transcript, Vol. V., 1595, 1612-1613. In section 5-1-101(2), MCA, the Legislature has asserted its authority to determine the number of districts in the legislative session before the Census. However, a 1973 Attorney General's opinion states that "with the adoption of the new constitution, the people of Montana divested the legislature of all power concerning apportionment of the legislature, except for the power of recommendation . . . . [T]he reapportionment commission is the only agency empowered by the constitution to determine the size of the legislative houses and their geographical makeup. . . . The commission is, however, bound by the constitutional limitations of 40 to 50 senators and 80 to 100 representatives." 35 A.G. Op. 12 (1973). The power of the Commission to determine the size of the legislative houses and the geographical makeup of the congressional and legislative districts is "subject only to the restrictions of the Constitution." *Id.* Further, upon submission of the plans, "all previous statutory provisions in conflict with that plan are, in effect, repealed." *Id.* A subsequent legal opinion by the Director of Legal Services of the Montana Legislature disputed some portions of the Attorney General's opinion, including the conclusion that the Commission is not the sole body that may determine the size of the Legislature. "Determination of Size of Legislature", Gregory J. Petesch, June 1989. As noted in Petesch's memo, section 2-15-501(7), MCA, provides that in the case of conflicting opinions by the Attorney General and an attorney retained by the state, "the attorney general's opinion is controlling unless overruled by a state district court or the supreme court." In addition, in a 2004 case concerning the reassignment of holdover senators to districts by the Legislature, a unanimous Montana Supreme Court stated that "[b]y granting redistricting authority to the Commission under Article V, Section 14, the Constitution denied the Legislature any latitude to invoke its plenary powers." *Wheat v. Brown*, 2004 MT 33, ¶35, 320 Mont. 15, 25, 85 P.3d 765, 771. The same reasoning potentially may apply to apportionment. In any event, if the Commission contemplates reapportioning the number of legislative districts, there are several provisions of the Montana Constitution to consider, including Article V, section 2, concerning the size of the Legislature, Article V, section 3, concerning the election and terms of senators, and Article V, section 14(1), concerning the composition of legislative districts. A reduction in the size of the Legislature may raise questions about compliance with Article V, section 3, of the Montana Constitution because of inherent problems resulting from the terms of holdover Senators. Specifically, that provision requires that a senator's term is four years, and one-half of the senators must be elected every two years. *But see* Montana Constitutional Convention 1971-1972, Verbatim Transcript, Vol. V., 1568-1569. Attempts to reduce the size of the Legislature may reduce a senator's term or cause an unequal number of senators to be elected. The Legislature cannot be enlarged because it is currently at the maximum number of senators and representatives specified in the Montana Constitution. Mont. Const. art. V, § 2.

[8] Mont. Const. art. V, § 14.

available."[9] However, before it may file its final congressional redistricting plan, the Commission must hold "at least one public hearing on it."[10] When it files its plan with the Secretary of State, by historical practice and the recommendation of the Attorney General, the Commission should submit the plan with a cover letter signed by each Commission member to the Secretary of State for filing to signify that the Commission "duly and regularly adopted" the final plan.[11]

Legislative redistricting is subject to separate deadlines. Before it submits its legislative redistricting plan to the Legislature, the Commission must hold "at least one public hearing on the plan at the state capitol."[12] The Commission is required to submit its plan for legislative districts to the Legislature "at the first regular session after its appointment or after the census figures are available."[13] By statute, the Commission is instructed to submit its legislative redistricting plan to the Legislature "by the 10th legislative day"[14]. The Montana Constitution requires the Legislature to return the plan to the Commission with its recommendations "[w]ithin 30 days after submission."[15] However, the Legislature "has only the authority to recommend, not to adopt, alter or amend" the plan.[16]

> **Article V, Section 14. Districting and apportionment.**
> . . . .
> (4) The commission shall submit its plan for legislative districts to the legislature at the first regular session after its appointment or after the census figures are available. Within 30 days after submission, the legislature shall return the plan to the commission with its recommendations. Within 30 days thereafter, the commission shall file its final plan for legislative districts with the secretary of state and it shall become law.
> (5) Upon filing both plans, the commission is then dissolved.

Within "30 days thereafter," the Commission must file its final legislative redistricting plan with the Secretary of State.[17]

After both plans are filed, the Commission is dissolved.[18]

---

[9] Mont. Const. art. V, § 14(3).

[10] Section 5-1-108(1), MCA.

[11] 35 A.G. Op. 50 (1973).

[12] Section 5-1-108(2), MCA.

[13] Mont. Const. art. V, § 14(4). This phrase has historically and judicially been understood to mean that the designated session "is either that *following* the appointment of the Commission or that *following* the availability of census figures, whichever is later" (emphasis added). *St. ex rel. Greely v. Mont. Districting & Apportionment Commn.*, First Jud. Dist., No. 46873 (Aug. 12, 1981). In 1999, Legislative Services Division prepared a memo on the availability of an expedited schedule, which is available here. In addition, the Constitutional Convention specifically discussed requiring that the Commission submit the plan at the first *regular* session, rather than a special session.

[14] Section 5-1-109, MCA. Pursuant to section 5-2-103, MCA, the Legislature will convene on January 2, 2023. The 10th legislative day is currently projected to be Friday, January 13, 2023.

[15] Mont. Const. art. V, § 14.

[16] 35 A.G. Op. 12 (1973).

[17] Mont. Const. art. V, § 14.

[18] Mont. Const. art. V, § 14(5); Section 5-1-111(3), MCA.

Page 036
**Defendant's Trial
Exhibit 26**

**Current Timeline with approximate dates**



**Changes to timeline if Congress grants current census extension request with approximate dates**



If Congress grants the request by the Census Bureau to delay the delivery of Census data to the states due the COVID-19 pandemic, the Commission's constitutional deadline for submitting the congressional plan will fall approximately 120 days (depending on when the data is received) later than it would have otherwise because it is calculated from the date that the data is received. Assuming no further delays beyond the one already requested of Congress, there will not be an impact to the regular timeline for legislative redistricting.

## II. Recent History Regarding Districting in Montana[19]

### A. The Constitutional Convention and Early Legal Questions

Each decade since the Constitutional Convention has brought new hurdles and legal questions concerning redistricting in Montana. Following is a brief history of recent redistricting in Montana along with the associated legal challenges.

In 1972 during the Constitutional Convention, Delegate Skari outlined the history of redistricting in Montana:

> The Montana experience was that in 1965 the Legislature was unable to reapportion. About a dozen bills were introduced, and not a single one was accepted. Consequently, it fell to the federal District Court to reapportion the state. In 1971, the Legislature drew up one plan which was invalid because of a 37 percent variance [among Senate districts]. After working through the regular session [and] one special session, the Legislature finally came up with the [1970's] plan in the second special session, which

---

[19] For a discussion of early Montana reapportionment and redistricting, see Ellis Waldron, *100 Years of Reapportionment in Montana*, 28 Mont. L. Rev. 1 (1966).

4

the court allowed to stand for the election of [the Constitutional] Convention [delegates].[20]

The Constitutional Convention adopted a new section in the 1972 Constitution creating the Districting and Apportionment Commission, and the new section specified that previous multimember legislative districts[21] would be single-member legislative districts that were compact and contiguous. Five years earlier, Congress had passed legislation specifying that congressional seats must be elected from single-member districts.[22]

In the transition period after the adoption of the new state constitution, the first Commission was appointed in 1973 and adopted its legislative plan in early 1974.[23]

The new state constitution had provided for annual sessions, but in 1974, Montana voters also adopted a constitutional amendment to return to biennial sessions. Because both reapportionment plans could not be completed until after legislative review of the plans, the adoption of biennial sessions had unanticipated consequences on the redistricting cycle. As a result, the Districting and Apportionment Commission requested a legislative bill draft that would amend the Constitution to accelerate congressional redistricting within 90 days after receiving the official final decennial census figures, to specify that only the legislative district plan would be submitted to the legislature, to clarify that there were separate plans for congressional and legislative seats, and to state that the Commission would be dissolved upon the filing of both plans.[24] This proposal was placed on the ballot by the Legislature, and in 1984,[25] it was adopted by the people of Montana.[26]

Additionally, early questions arose about whether the Legislature could change the size of the legislative bodies after the final plan was adopted, an ability that could render a reapportionment plan ineffective. See n. 7, *supra*, for a discussion concerning this issue.

As a result of the 1990 census, Montana lost one of its two congressional seats, leaving it with one lone congressional seat. Montana filed suit, challenging the constitutionality of the congressional apportionment method, but ultimately, the state did not prevail,[27] and it has had only one congressional seat since then. However, data trends suggest Montana may gain a second congressional seat as a result of the 2020 apportionment.[28]

---

[20] Montana Constitutional Convention 1971-1972, Verbatim Transcript, Vol. IV., 682. *See also Herweg v. Thirty Ninth Legislative Assembly*, 246 F. Supp 454 (D. Mont. 1965) and *Wold v. Anderson*, 327 F. Supp. 1342 (D. Mont. 1971).

[21] *See Wold v. Anderson*, 335 F. Supp. 952 (D. Mont. 1971).

[22] 2 U.S.C. § 2c.

[23] Report and Recommendations of the Montana Districting and Apportionment Commission: A Report to the Forty-Eighth Legislature, Montana Legislative Council (December 1982).

[24] C-14 (1984); Ch. 421, L. 1983. The full text of the present section may be found here: https://leg.mt.gov/bills/mca/title_0000/article_0050/part_0010/section_0140/0000-0050-0010-0140.html

[25] Ch. 441, L. 1983.

[26] 1972-Current Historical Constitutional Initiatives and Constitutional Amendments, Montana Secretary of State, 4, https://sosmt.gov/Portals/142/Elections/Documents/Constitutional-Ballot-Issues-1972-Current.pdf?dt=1523475015122.

[27] *U.S. Dept. of Commerce v. Mont.*, 503 U.S. 442 (1992); *Mont. v. Dept. of Commerce*, 775 F. Supp. 1358 (D. Mont. 1991).

[28] "Political Power Set to Continue Shift to Southern States, Data Show," Wall Street Journal, https://www.wsj.com/articles/sunbelt-set-to-gain-congressional-seats-data-show-11577723599; "Montana Poised

Page 038
Defendant's Trial
Exhibit 26

### B. Holdover Senators

In 1980, there was a controversy as to whether senators should be held over after redistricting or whether their terms of office would be shortened.[29] These senators who have 2 years remaining in their term of office at the time of redistricting are known as "holdover senators".  The Commission did not assign holdover senators in its draft plan.

In response to a Senate request for an opinion on the issue, the Attorney General issued an opinion finding that the Constitution provides that senators are elected to a four-year term, and there was no legal authority to shorten or change a senator's term after reapportionment.[30] In making this determination, the Attorney General found that the assignment of holdover senators was the responsibility of the Commission and that "[t]he Commission has the inherent authority under the Montana Constitution Article V, section 14 to do what is necessary to implement a plan that complies with the State's law."[31] The 1983 Senate criticized the Commission for its failure to assign the holdover senators in the draft plan.[32]

During the next cycle in the 1990's, the Commission included assignments for holdover senators, and the plan became law.[33]

In 2003, after receiving the legislative plan from the Commission for comment, the Legislature passed section 5-1-116, MCA.[34] That section required the Legislature, rather than the Commission, to assign holdover senators to districts under the new plan for the remainder of their terms. The section specifically prohibited the Commission from assigning holdover senators to districts.[35] Then the 2003 Legislature passed another bill to repeal the transition section of the Districting and Apportionment Plan of 2003 which had assigned holdover senators to new districts.[36] In addition, the 2003 Legislature adopted a joint resolution assigning holdover senators to districts.[37]

Three holdover senators whose assigned districts differed between the Commission's assignments and the Legislature's assignments challenged the Legislature's authority to assign holdover senators.[38] The state District Court held that the two legislative bills and the joint resolution attempting to assign holdover senators were unconstitutional and of no force and effect, and the Secretary of State was ordered to give effect to the plan filed by the Commission, including the assignment of holdover senators.[39]

---

to Get Second House Seat Post-Census: Report," The Hill, https://thehill.com/homenews/news/476278-montana-poised-to-get-second-house-seat-post-census-report.

[29] *Wheat v. Brown*, 2004 MT 33, ¶25.

[30] 40 A.G. Op. 2 (1983).

[31] *Id.*

[32] *Wheat,* 2004 MT 33, ¶25.

[33] *Id.* at ¶26.

[34] Ch. 4, L. 2003. This section was repealed in 2005. Ch. 357, L. 2005.

[35] *Id.*

[36] Ch. 278, L. 2003.

[37] SJ 23 (2003).

[38] *Wheat v. Brown*, 2003 ML 3963 (Mont. Dist. 2003).

[39] *Id.* at ¶27-28.

Page 039
**Defendant's Trial
Exhibit 26**

On appeal, the Montana Supreme Court affirmed the District Court.[40] The Montana Supreme Court quoted the Constitutional Convention which provided that the Commission, after having been appointed, would "*in effect, bypass the Legislature from this point on*" (emphasis in original).[41] The Supreme Court found that the Constitutional Convention "assigned the task of redistricting to the Commission - an independent autonomous entity - and limited the Legislature's role to that of making 'recommendations.'"[42] The Supreme Court discussed the arguments made by the defendants, but noted that it did not need to "address the specifics of the [statutory criteria for assigning holdovers] since the issue presented is not whether the specific criteria are appropriate or well-intentioned. Rather, the more fundamental constitutional issue is whether the Legislature can inject itself into the redistricting process through the adoption of *any* criteria pertaining to holdovers" (emphasis in original).[43] Further, it found that "Article V, Section 14's mandate that the Commission effect redistricting is self-executing . . . . By granting redistricting authority to the Commission under Article V, Section 14, the Constitution denied the Legislature any latitude to invoke its plenary powers [with respect to assigning holdover senators]."[44]

Consequently, the unanimous Supreme Court affirmed the District Court's holding that all three legislative enactments were unconstitutional and of no force or effect.[45]

### C. Vote Dilution

Following the 1990s redistricting cycle, American Indian plaintiffs brought suit against the state, contending that the 1992 legislative redistricting plan diluted the voting strength of American Indians in violation of § 2 of the Voting Rights Act.[46] The District Court found that plaintiffs fulfilled two of the three threshold conditions (also known as *Gingles* factors, discussed later in section III(B)(1), *infra*), showing that the population of American Indians on the Blackfeet and Flathead Indian reservations was sufficiently large and geographically compact to constitute a majority in both an additional House district and an additional Senate district and that the American Indians were politically cohesive in the challenged districts.[47] However, the District Court found that white majority voters did not usually vote to defeat the preferred candidate of the Indian voters, failing the third threshold factor.[48]

On appeal, the Ninth Circuit found that in this determination, the District Court erroneously relied, in part, on the electoral success of Indian candidates in majority-Indian House districts when it concluded

---

[40] *Wheat v. Brown*, 2004 MT 33.
[41] *Id.* at ¶21 (citations omitted).
[42] *Id.* at ¶23.
[43] *Id.* at ¶29.
[44] *Id.* at ¶35.
[45] *Id.* at ¶36.
[46] *Old Person v. Cooney*, 230 F. 3d 1113 (9th Cir. 2000).  At the District Court level, the plaintiffs alleged vote dilution in two separate geographic areas involving eight House districts, four in the northwest part of the state (plaintiffs offered the "Blackfeet-Flathead Plan as an alternative to these House districts) and four in the northeast (plaintiffs offered the "Rocky Boy-Fort Belknap-Fort Peck Plan" as an alternative to these House districts). *Id.* at 1119. The District Court rejected the claim of voting dilution, and the plaintiffs appealed only with respect to the four House districts in the northwest part of the state. *Id.*
[47] *Id.*at 1121.
[48] *Id.* at 1122.

Page 040
**Defendant's Trial
Exhibit 26**

that white bloc voting in majority-white House districts was legally insignificant.[49] Consequently, the Ninth Circuit found that the third threshold factor had been satisfied.[50]

If the threshold factors have been satisfied, courts look at a number of nonexhaustive factors to determine, based on the totality of the circumstances, whether the minority group has been denied an equal opportunity to participate in the political process and elect representatives of their choice. The District Court had found some of the factors favored finding a § 2 violation including a history of discrimination by the federal and state governments, lower socioeconomic status which hindered the ability of Indians to participate fully in the political process, evidence of racially polarized elections, and in some elections, subtle or overt racial appeals.[51] The District Court also found that some of the factors did not favor such a finding, including that the state did not have unreasonably large districts, voting practices that enhanced the opportunity for discrimination among Indian voters, or a candidate slating process, state officials were generally responsive to the needs of American Indians, the policies underlying the creation of existing district boundaries were not tenuous, and the number of American Indians elected to the state legislature was "roughly proportional" to their share of the voting age population in Montana.[52]

Ultimately, the District Court found that based on the totality of the circumstances, the 1992 redistricting plan did not impermissibly impair the ability of American Indians to elect their preferred representatives.[53]

However, the Ninth Circuit found that the District Court erred in its analysis of one of the most important factors, proportionality.[54] The Ninth Circuit found that although the 1992 plan for House districts might reflect rough proportionality, the Senate and combined House and Senate legislature figures did "not permit a finding of proportionality."[55] Because this error "may have affected the district court's ultimate finding that, in light of the totality of circumstances, there was no dilution of American Indian voting strength," and because the "case is sufficiently close that we cannot know whether or not the district court would have found dilution if it had correctly assessed the factor of proportionality", the Ninth Circuit reversed and remanded the judgment for further proceedings to determine whether vote dilution had occurred.[56]

In the original proceedings, the plaintiffs also claimed, based on Districting and Apportionment Commission member statements at Commission hearings and meetings, that the Commission members acted with a discriminatory purpose in violation of § 2 of the Voting Rights Act when they adopted the 1992 legislative redistricting plan.[57] The Ninth Circuit "recognize[d] that some of the Commissioners' comments were inflammatory" but affirmed the District Court's opinion that there was no

---

[49] *Id.* at 1117, 1127.

[50] *Id.*

[51] *Id.* at 1129.

[52] *Id.*

[53] *Id.* at 1128.

[54] *Id.*

[55] *Id.* at 1130. Under the plaintiffs' plan, the proposed majority Indian House district would be adjacent to a reconfigured, existing majority-Indian House district. These would be combined to create a majority-Indian Senate district. *Id.* at 1121.

[56] *Id.* at 1130.

[57] *Id.* at 1117.

**Defendant's Trial Exhibit 26**

discriminatory purpose in the adoption of the plan, finding that the Commission did not deviate from its criteria, the plan increased majority-Indian districts, and the plan did not burden Indians more than whites.[58]

In its discussion on appeal, the Ninth Circuit had drawn attention to the fact that the original trial court had considered the question of proportionality within the entire state, rather than in a geographic subset such as the districts challenged at trial, but because the parties had not objected to the scope, it did not decide whether the entire state was the proper frame of reference for a proportionality finding.[59] When the case returned to the district court level to correctly assess the factor of proportionality, the District Court held that statewide proportionality was not determinative of the narrow vote dilution issue in the challenged districts, but rather each district "requires sufficient evidence that district-wide proportionality is lacking".[60] Although admitting that on a statewide basis, proportionality was lacking, in looking at the "relevant geographic subset", the court found that there was satisfactory proportionality.[61]

Nevertheless, because the presence or absence of proportionality was only one factor under the totality of the circumstances, the trial court also reexamined the totality of the circumstances, but it narrowed its focus to the districts in which the "four remaining Plaintiffs reside and have standing to sue."[62] In doing so, it examined at least one subsequent election which supported the court's finding "that proportional representations of American Indians exist in the four legislative districts at issue".[63] The District Court did not disturb any of the prior trial court's findings, and it concluded that plaintiffs had not met their burden of establishing vote dilution in the relevant districts, noting that "the fact that of the four districts [two Senate and two House districts] at issue, both House Districts and one Senate District are already represented by Indian-preferred candidates strongly suggests that American Indians have an equal opportunity to elect candidates of their choice in the particular districts in which Plaintiffs in this action have standing to sue."[64]

The District Court also addressed a new issue raised by the state, which argued that even if the court were to find vote dilution existed, it could not find a violation of § 2 of the Voting Rights Act unless it determined that a constitutionally acceptable remedy existed.[65] When the case returned to district court, six years had passed since the original trial, and the 1998 and 2000 elections and 2000 federal decennial census had occurred.[66] "To a degree," the District Court wrote, "these events are relevant to this Court's vote dilution inquiry; more particularly the question of whether a viable remedy is available to correct the effect of any vote dilution pending the completion of the work of the 2000 Montana Districting and Apportionment Commission."[67] The District Court concluded that because the 2002 election cycle then in process would be disturbed and because the Districting and Apportionment

---

[58] *Id.* at 1130-1131.
[59] *Old Person v. Brown*, 182 F. Supp. 2d 1002 (2002), 1009.
[60] *Id.* at 1011.
[61] *Id.* at 1011-1012.
[62] *Id.* at 1012, 1015.
[63] *Id.* at 1014.
[64] *Id.* at 1015-1016.
[65] *Id.* at 1016.
[66] *Id.* at 1008.
[67] *Id.* at 1009.

Page 042
**Defendant's Trial
Exhibit 26**

Commission was proceeding with its work after the 2000 decennial census, "any action by this Court to compel partial redistricting would impair" the legitimate state electoral policy which allowed the Commission to accomplish its task in a comprehensive and coherent fashion.[68] The District Court went on to hold that:

> without regard to whether the availability of a constitutionally acceptable remedy is deemed an essential element of a § 2 claim, given the particular circumstances of this case, it is an appropriate factor to be weighed in the § 2 totality of circumstances inquiry. Having done so, and for the reasons discussed above, the Court finds that this is the "unusual case" in which a viable short-term remedy is not available. The Court's conclusion in this regard is reinforced by the very real prospect that comprehensive and long-term relief designed to address vote dilution throughout the State of Montana is in the offing within a year under the auspices of the Montana Districting and Apportionment Commission, and further by the Court's finding that no vote dilution has been demonstrated in the particular legislative Districts at issue.

The case was again appealed to the Ninth Circuit.[69]

The Ninth Circuit addressed the District Court's holding that the plaintiff's claims failed, even if they showed vote dilution, because there was no adequate remedy for the alleged Voting Rights Act violation. The Ninth Circuit reversed the District Court's holding, concluding that barring valid claims because of disruption to the election process would defeat the purpose of the Voting Rights Act, even if the only practical effect would be declaratory relief after elections were held.[70]

In addition, the Ninth Circuit once again addressed proportionality, finding that "limiting the frame of reference to the plaintiffs' legislative districts would allow for an inaccurate proportionality calculus that may interfere with the goals of the Voting Rights Act."[71] The Ninth Circuit held that limiting a frame of reference to certain legislative districts was impermissibly narrow, and instead of considering the number of Indian-preferred candidates who had been elected, the District Court should have considered the Indians' share of majority-minority districts, a share that was not proportional.[72] Thus, the Ninth Circuit found, "the proportionality factor weighs in favor of a finding of vote dilution."[73]

Although the proportionality analysis was erroneous, because it was only one factor in the overall assessment, the Ninth Circuit had to face "the ultimate question as to whether our disagreement on proportionality analysis requires reversal." Because the ultimate legal question of whether vote dilution has occurred is to be treated as factual and reviewed for clear error rather than *de novo*, the Ninth Circuit stated:

> This is one of those not unusual cases where our decision is controlled by the proper standard of review. On one side of the scale lies a history of official discrimination, the presence of racially polarized elections, the presence of socioeconomic factors limiting Indians' political participation, the use of racial appeals in elections, and

---

[68] *Id.* at 1019.
[69] *Old Person v. Brown*, 312 F.3d 1036 (9th Cir. 2002), 105.
[70] *Id.* at 1051.
[71] *Id.* at 1045.
[72] *Id.* at 1045-1046.
[73] *Id.* at 1046.

**Defendant's Trial Exhibit 26**

disproportionality. On the other side of the scale we see the absence of discriminatory voting practices, the viable policy underlying the existing district boundaries, the success of Indians in elections, and officials' responsiveness to Native Americans' needs. We have fully considered the legal issues presented and the detailed factual record with which the district court grappled. We cannot say that the district court's determination that there was no vote dilution, considered in the totality of circumstances, was clearly erroneous.[74]

### D. Redistricting Criteria and the Constitutional Authority of the Commission

During the 2000 round of redistricting, the Commission submitted its legislative plan to the Legislature, but the plan proved contentious. The Legislature sent its recommendations back to the Commission, requesting that the Commission reconvene and adopt a new plan.[75] The Legislature also passed a bill, signed by the Governor on the same day the recommendations were returned to the Commission, that enacted statutory redistricting criteria.[76] The criteria included constitutionally mandated requirements under Article V, section 14(1), (specifically, that districts be compact and contiguous and that districts be as equal as is practicable).[77] In addition to restating constitutional requirements, the bill provided a legislative definition for the "as equal as practicable" population standard for legislative districts.[78] The bill, HB 309, provided that "as equal as practicable" means "within a plus or minus 1% relative deviation from the ideal population of a district as calculated from information provided by the federal decennial census." [79]

In addition to creating the new section, the bill amended what had previously been a statutory restatement of Article V, section 14's constitutional requirements concerning the filing of the plans. The bill inserted language prohibiting the Secretary of State from accepting a plan that did not comply with the new 1% relative deviation criteria, and it made the dissolution of the Commission contingent upon acceptance of the plan by the Secretary of State.[80]

> **Ch. 3, L. 2003 (HB 309) provided:**
>
> **Section 1. Redistricting criteria.** (1) In the drawing of legislative districts, the districting and apportionment commission shall comply with the following criteria: (a) the districts must be compact and contiguous; and (b) the districts must be as equal as practicable. (2) For the purposes of this section, "as equal as practicable" means within a plus or minus 1% relative deviation from the ideal population of a district as calculated from information provided by the federal decennial census.

> **Ch. 3, L. 2003 (HB 309) provided:**
> **5-1-111. Final plan -- dissolution of commission.**
> . . .
>    (2) Within 30 days after receiving the legislative redistricting plan and the legislature's recommendations, the commission shall file its final legislative redistricting plan with the secretary of state and it shall become law. The secretary of state may not accept any plan that does not comply with the criteria in [section 1]. Upon acceptance of a plan by the secretary of state, the plan is considered filed and becomes law.
>
>    (3) Upon the acceptance and filing of both plans, the commission shall be is dissolved."

---

[74] *Id.* at 1050.
[75] HR 3 (2003), SR 2 (2003).
[76] *Brown v. Mont. Districting and Apportionment Commn.*, 2003 ML 1896 (Mont. Dist. 2003).
[77] Ch. 3, L. 2003.
[78] *Id.*
[79] *Id.*
[80] *Id.*

**Page 044**
**Defendant's Trial Exhibit 26**

The day after the Legislature sent its recommendations back to the Commission, the Commission considered the resolutions, but it ultimately adopted its original plan.[81] Subsequently, the Commission attempted to file the plan, but the Secretary of State refused to file it.[82]

The Secretary of State brought suit in *Brown v. Montana Districting and Apportionment Commission*,[83] arguing that the Legislature, using its plenary power, could implement Article V, section 14, by providing a definition for the Montana constitutional requirement that legislative districts "be as nearly equal in population as is practicable."

The District Court disagreed, finding that the constitutional provision was unambiguous and self-executing; in other words, the provision could be "given effect without the aid of the legislature and there [was] nothing to indicate that the legislation [was] contemplated in order to render it operative."[84] The District Court noted that the Commission had the responsibility to designate legislative districts, "and in doing so, to exercise its own discretion and expertise in determining the equal as practicable factor."[85]

Because the Constitution does not contemplate the Secretary of State exercising discretion in filing or refusing to file the plan, the District Court further found that the Legislature's attempt to convert the Secretary of State's ministerial involvement to discretionary was unconstitutional.[86] As a result of HB 309's impermissible conflict with Article V, section 14, the District Court declared the bill void and found that the Montana Constitution "does not authorize the legislature to interfere with the redistricting process beyond the express authority given to it in Article V, Section 14."[87]

It is important to understand the background of *Brown* because during the 2003 session, the Legislature passed *another* bill concerning redistricting criteria, SB 429.[88] HB 309, the bill challenged in *Brown*, was technically codified *together* with SB 429 at section 5-1-115, MCA, although the entirety of the section's content appeared independently in SB 429.

In a nutshell, SB 429 reused the definition of "as equal as practicable" which appeared in HB 309 and which was challenged and overturned in *Brown*. In addition to this definition, SB 429 expanded upon how constitutional criteria should be prioritized, interpreted, and defined. The bill also added additional restrictions, including requiring that districts cannot be drawn for the purposes of favoring a political party or incumbent and placing prohibitions on considering certain partisan data.

After the 2003 session ended, in July 2003 the *Brown* case was decided. SB 429 was likely not challenged in the same action because it was passed late in the session.

---

[81] *Brown*, 2003 ML 1896, ¶2.
[82] *Id.*
[83] *Id.*
[84] *Id.* at ¶14 (citations omitted).
[85] *Id.* at ¶15.
[86] *Id.* at ¶¶23-24.
[87] *Id.* at ¶30.
[88] Ch. 546, L. 2003.

Page 045
**Defendant's Trial Exhibit 26**

It is well settled law that a statute is presumed constitutional, and the challenging party has the burden of establishing the statute's unconstitutionality.[89] Only the portion of section 5-1-115, MCA, concerning the definition of "as equal as practicable" has been declared void by the courts.[90]

Having said that, the issues inherent in section 5-1-115, MCA, are overwhelmingly similar to the issues decided in *Brown*, which is one of several judicial cases and Attorney General's opinions that have found that the Legislature's redistricting power is limited by Article V, section 14.[91]

Although most of the statute has not been voided by the courts, during the 2010 round, the Commission did not address the status of the statute. In an article for the Montana Law Review, the Chairman of the last Commission, retired Supreme Court Justice Jim Regnier, and Caitlin Boland Aarab wrote "[a]lthough the constitutionality of § 5–1–115 has not been litigated, its requirements are largely ignored and the Montana Supreme Court would likely find it unconstitutional for the

> **5-1-115. Redistricting criteria.** (1) Subject to federal law, legislative and congressional districts must be established on the basis of population.
>
> (2) In the development of legislative districts, a plan is subject to the Voting Rights Act and must comply with the following criteria, in order of importance:
>
> (a) The districts must be as equal as practicable, *meaning to the greatest extent possible, within a plus or minus 1% relative deviation from the ideal population of a district as calculated from information provided by the federal decennial census.* The relative deviation may be exceeded only when necessary to keep political subdivisions intact or to comply with the Voting Rights Act.
>
> (b) District boundaries must coincide with the boundaries of political subdivisions of the state to the greatest extent possible. The number of counties and cities divided among more than one district must be as small as possible. When there is a choice between dividing local political subdivisions, the more populous subdivisions must be divided before the less populous, unless the boundary is drawn along a county line that passes through a city.
>
> (c) The districts must be contiguous, meaning that the district must be in one piece. Areas that meet only at points of adjoining corners or areas separated by geographical boundaries or artificial barriers that prevent transportation within a district may not be considered contiguous.
>
> (d) The districts must be compact, meaning that the compactness of a district is greatest when the length of the district and the width of a district are equal. A district may not have an average length greater than three times the average width unless necessary to comply with the Voting Rights Act.
>
> (3) A district may not be drawn for the purposes of favoring a political party or an incumbent legislator or member of congress. The following data or information may not be considered in the development of a plan:
>
> (a) addresses of incumbent legislators or members of congress;
>
> (b) political affiliations of registered voters;
>
> (c) partisan political voter lists; or
>
> (d) previous election results, unless required as a remedy by a court.

---

[89] *Wheat v. Brown*, 2004 MT 33, ¶15 (citations omitted).

[90] However, in *Willems* v. State, plaintiffs alleged that the Commission's actions were in violation of 5-1-115(3)(a) concerning the consideration of an incumbent legislator's address and 5-1-1115(3)(d) concerning the consideration of previous election results. Upon stipulation of the plaintiffs, the court dismissed those claims. *Willems v. St.*, No. ADV-2013-509, slip op. (Mont. Dist. Dec. 6, 2013).

[91] *See, e.g. Wheat,* 2004 MT 33, ¶35, (holding that the power to assign holdover senators is an inherent part of the redistricting process and because the Constitution granted redistricting authority to the Commission, it denied the Legislature "any latitude to invoke its plenary powers"); *Brown,* 2003 ML 1896 (holding that because the constitutional provision is self-executing and because the Legislature is not authorized "to interfere with the redistricting process beyond the express authority given to it in Article V, Section 14" an attempt to define "as equal as practicable" for purposes of redistricting was unconstitutional; 40 A.G. Op. 2 (1983) (finding that the

same reasons the First Judicial District Court found House Bill 309 unconstitutional."[92]

If the Commission chooses to use the criteria in 5-1-115, MCA, no conflict with the statute exists. However, if the Commission decides to adopt alternative or conflicting criteria, it may decide to request an Attorney General's opinion. The Attorney General is required to give an opinion in writing, without fee, to "to the legislature or either house of the legislature, to any state officer, board, or commission . . . when required upon any question of law relating to their respective offices . . . . If an opinion issued by the attorney general conflicts with an opinion issued by a city attorney, county attorney, or an attorney employed or retained by any state officer, board, commission, or department, the attorney general's opinion is controlling unless overruled by a state district court or the supreme court."[93]

The Commission can also request a legislative bill to repeal the statute,[94] although it would need to identify a legislative sponsor to introduce the bill.

Either of these methods could help clarify the legal status of the statute for the Commission, the Legislature, and the public.

### E. Right to Know & Right of Participation

In 2013, plaintiffs brought a lawsuit regarding a last-minute amendment made by the Commission concerning placement of particular holdover senators.[95] Plaintiffs argued that the Commission's one-on-one discussions concerning the amendment should have been observed by the public, contending that

the "Right to Know" under Article II, section 9, of the Montana Constitution includes the right to observe governmental deliberations that occur when a majority of the members communicate one-on-one among themselves (known as a "constructive quorum" or "walking quorum"). Although noting that the open meetings laws under the Montana Constitution must be liberally construed, the Montana Supreme Court

> **Article II, Section 9. Right to know.** No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

declined to adopt the constructive quorum rule on the facts before it because there was no evidence that a majority of the commissioners reached an agreement concerning the amendment prior to the meeting or that a decision was made outside of the meeting.

---

Commission has the inherent authority under the Constitution "to do what is necessary to implement a plan that complies with the State's laws" which includes designating holdover senators to the new districts); 35 A.G. Op. 12 (1973) (finding that the Constitution denies the Legislature the ability to change the size of the Legislature after redistricting and providing that when the Commission submits its plan "that plan will become law and all previous legislative enactments [relating to the size of the legislative houses] must be, in effect, repealed").

[92] Caitlin Boland Aarab and the Honorable Jim Regnier, *Mapping the Treasure State: What States Can Learn From Redistricting in Montana*, 76 Mont. L. Rev. 257, 265 (2015).

[93] Section 2-15-501(7), MCA.

[94] The Commission has previously requested at least one bill draft, a Constitutional amendment, C-14 (1984), Ch. 421, L. 1983. The full text of the present section may be found here: https://leg.mt.gov/bills/mca/title_0000/article_0050/part_0010/section_0140/0000-0050-0010-0140.html

[95] *Willems v. St.*, 2014 MT 82.

Page 047
**Defendant's Trial
Exhibit 26**

Although the Commission took public comment at the meeting, the plaintiffs also argued that the holdover amendment, made at the Commission's final meeting before submitting the plan, violated the public's right to participate because the Commission failed to provide adequate notice of the amendment and effectively denied the public the right to submit written comments on it.[96] However, Article II, section 8, unlike the broader application of Article II, section 9, *only* applies to "governmental agencies." Because the Legislature has defined governmental agency to exclude the Legislature, the Montana Supreme Court held that the Commission was part of the legislative branch and exempt from the requirements of Article II, section 8, and the statutes promulgating the right of participation.

> **Article II, Section 8. Right of participation.** The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law.

Although Article II, section 8, does not apply to the Commission under this holding, the 2020 Commission has adopted its own public participation guidelines.[97] The Commission must ensure that it carefully follows its own operating procedures, as amended.

Further, the plaintiffs claimed that their right of suffrage was violated because the assignment of a holdover to Senate District 15 meant that the electorate would have to wait 6 years between Senate elections, but the Supreme Court found that "the shuffling of legislators is a necessary byproduct of the redistricting process when senators serve staggered four-year terms," and the requested remedy of striking the holdover amendment would merely shift the purported violation to another set of voters.[98]

### III. Legal Criteria

The Constitution of the United States requires that districts be equally populated, although there is a different standard of population equality that is applied to congressional districts and legislative districts. Additional federal requirements provide that in drawing districts, the state may not purposefully discriminate between individuals on the basis of race or impose a practice that results in the denial or abridgment of a citizen's right to vote on account of race, color, or status as a member of a language minority group.

In addition to federal requirements, the Montana Constitution requires that legislative districts be compact and contiguous. Each of these requirements will be discussed, in turn, below. Statutory law also provides standards for redistricting, as discussed previously.[99]

> **Article V, Section 14. Districting and apportionment.** (1) The state shall be divided into as many districts as there are members of the house, and each district shall elect one representative. Each senate district shall be composed of two adjoining house districts, and shall elect one senator. Each district shall consist of compact and contiguous territory. All districts shall be as nearly equal in population as is practicable.
> . . . .

During the 2020 cycle, the Commission should ensure that it separately adopts criteria for congressional and legislative districts. In addition to the legal requirements contained in this memo, the Commission in its discretion may choose to adopt additional criteria. If the

---

[96] *Id.* at ¶28.
[97] "Operating Procedures of the 2020 Montana Districting and Apportionment Commission," Revised Feb. 19, 2020.
[98] *Willems v. St.*, 2014 MT 82, ¶34.
[99] See section II(D), *supra.*

Page 048
**Defendant's Trial Exhibit 26**

Commission does so, it should weigh how it will balance or prioritize particular criteria beyond the legal constraints outlined in this memo. Regardless of the specific criteria the Commission adopts, the Commission must vigilantly ensure that criteria are consistently applied to each district.

### A. Equal Population[100]

#### 1. Congressional Districts

Article I, section 2, of the United States Constitution requires that members of the House of Representatives be chosen "by the People of the several States. . . ." In *Wesberry v. Sanders*, the United States Supreme Court held that this phrase meant "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's . . . . To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected 'by the People,' a principle tenaciously fought for and established at the Constitutional Convention."[101] This has become known as the "one person, one vote" principle.

Shortly after *Wesberry* was decided, plaintiffs challenged Montana's two congressional seats under Article I, section 2.[102] At statehood, Montana had one congressional representative, but it gained a second seat following the 1910 census.[103] Until 1917, these were at-large seats.[104] From 1917 until the legal challenge in 1965, the Legislature had failed to revise the congressional boundaries even though state law at the time required the Legislature to reapportion seats after every state census made every five years and after the federal census "according to ratios fixed by law".[105] The deviation between the two congressional districts at the time was 18.7%.[106] The federal district court held that this violated Article I, section 2, of the U.S. Constitution, and it reapportioned the congressional districts by transferring seven counties from one congressional district to the other.[107]

In interpreting the "one person, one vote" principle, the U.S. Supreme Court has stated that "[s]tates must draw congressional districts with populations as close to perfect equality as possible."[108] For instance, in 1983, the U.S. Supreme Court struck down a New Jersey plan containing 14 congressional districts that, on average, deviated from the ideal-sized district by .1384% (approximately 726 people).[109] The Supreme Court has made clear that there is not a fixed population variance it would consider as *de minimus*, and it has stated that the "as nearly as practicable" standard:

---

[100] *See also* section 5-1-115, MCA, and the discussion of related case law at section II(D), *supra*.

[101] 376 U.S. 1 (1964), 7-8

[102] *Roberts v. Babcock*, 246 F. Supp. 396 (D. Mont. 1965).

[103] Congressional Districts, Email of Susan Fox (Feb. 23, 2017).

[104] *Id.*

[105] *Roberts,* 246 F. Supp. 396, 398.

[106] *Id.*

[107] *Id.* at 398-399.

[108] *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).

[109] *Karcher v. Daggett*, 462 U.S. 725 (1983), 730-731.

Page 049
**Defendant's Trial
Exhibit 26**

is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case . . . . [It] requires that the State make a good faith effort to achieve precise mathematical equality . . . . Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small. . . . Toleration of even small deviations detracts from these purposes. Therefore, the command of Art. I, § 2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown"[110]

> In a challenge under Article I, section 2, if plaintiffs can establish that population differences could have been practicably avoided, the burden shifts to the state to prove that population deviations in its plan were necessary to achieve some legitimate state objective. In doing so, the state may not rely on general assertations, but it must show with some specificity that a particular objective required the specific deviations in its plan. Furthermore, the burden is a flexible one, depending on the size of the deviation, the importance of the state's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might vindicate those interests but approximate population equality more closely. The Supreme Court has stated that it is willing to defer to state legislative policies "so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts." *Tennant v. Jefferson County Comm.*, 567 U.S. 758 (2012), 760, citing *Karcher v. Daggett*, 462 U.S. 725 (1983), 740.

Thus, in drawing congressional districts, the Commission must make a good-faith effort to achieve population equality for each congressional district within the state, and it must ensure that any variance between congressional districts is necessary to achieve a legitimate state objective.[111]

What might a legitimate state objective be? The Supreme Court has stated that *consistently applied*, nondiscriminative legislative policies might justify small, acceptable variances in the population of congressional districts, such as making districts compact, not splitting political subdivisions, preserving the cores of prior districts, minimizing population shifts between districts, and avoiding contests between incumbent representatives.[112] Such legislative policies must be applied in a systematic manner to all congressional districts rather than in an *ad hoc* manner, and they may not result in unacceptably large variances.[113]

## 2. Legislative Districts: The 10% Standard

The principle of population equality in state legislative districts is not governed by the same standard as congressional districts. As mentioned, above, Congressional districts are subject to the strict standards of Article I, section 2, of the United States Constitution. Legislative districts, on the other hand are subject to a different standard established under the Equal Protection Clause of the 14th Amendment.

In *Reynolds v. Sims*, the U.S. Supreme Court held that the Equal Protection Clause required both houses of a bicameral legislature to be apportioned on a population basis.[114] There, the U.S. Supreme Court restated the phrase taken from *Wesberry* that votes must be equalized, "as nearly as is practicable," but

---

[110] *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), 530-531 (citations omitted).
[111] *Karcher*, 462 U.S. 725, 730-731.
[112] *Id.* at 741; *Tennant v. Jefferson County Comm.*, 567 U.S. 758 (2012), 764.
[113] *Id.* at 741. *See also Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), 535 (discussing accuracy required for population shifts).
[114] *Reynolds v. Sims*, 377 U.S. 533 (1964).

recognized that "some distinctions may well be made between congressional and state legislative representation."[115]

Montana has also recognized the importance of this phrase denoting the one person, one vote principle, placing it directly in the Montana Constitution and requiring that "[a]ll districts shall be as nearly equal in population as is practicable."[116] Because the Montana Supreme Court has not interpreted this phrase, it is not clear whether it is more stringent than the population equality standard interpreted by the U.S. Supreme Court to legislative districts, described below.[117]

The U.S. Supreme Court has held that "[w]hile mathematical nicety is not a constitutional requisite", the "overriding objective must be substantial equality of population among various districts."[118] This requires "that a state make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable [because] it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters."[119]

Since *Reynolds v. Sims*, the Court has continued to refine the requirements of the Equal Protection Clause for legislative districts.

Specifically, a plan where the maximum population deviation between the largest and smallest district is more than 10% creates a *prima facie* case of discrimination and is presumptively impermissible.[120] Nevertheless, the state may offer a justification for the deviations by showing rational state policy considerations that cannot be achieved with plans of lower deviations.[121] The U.S. Supreme Court has stated that "when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness and contiguity."[122] In *Mahan v. Howell*, Virginia established legislative districts with a roughly maximum

> In a challenge to a legislative district plan under the Equal Protection Clause, if a legislative plan has a maximum deviation of more than 10%, it is presumptively impermissible. However, the state may rebut this presumption by showing that it implemented a rational state policy that could not be achieved with plans of lower deviations.
>
> If a legislative plan has a maximum deviation of less than 10%, it is presumptively valid. However, this presumption is also rebuttable. In this scenario, if the plaintiffs establish that illegitimate factors predominated in the redistricting process, the plan can still violate the Equal Protection Clause

---

[115] *Reynolds*, 377 U.S. 533, 577-578.

[116] Mont. Const. art. V, § 14(1). The Constitutional Convention did not substantively discuss the meaning and extent of this phrase, although some delegates referred to the "one man, one vote" standard in passing." *See e.g.* Montana Constitutional Convention 1971-1972, Verbatim Transcript, Vol. IV., 694.

[117] Note that "practicable" is defined as "capable of being put into practice or of being done or accomplished." Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/practicable. This is a different standard from "practical." Something may be practicable but not practical, making practicable a more stringent standard.  *See* section 5-1-115, MCA, and the discussion of related case law at section II(D), *supra*.

[118] *Reynolds*, 377 U.S. 533, 569, 579.

[119] *Brown v. Thomson*, 462 U.S. 835 (1983), 842 (citing *Reynolds*, 377 U.S. 533, 577).

[120] *Id.* at 850; *Evenwel*, 136 S. Ct. 1120, 1124.

[121] *See*, e.g. *Voinovich v. Quilter*, 507 U.S. 146 (1993).

[122] *Evenwel*, 136 S. Ct. 1120, 1124; *Cox v. Larios*, 542 U.S. 947 (2004), 949.

Defendant's Trial
Exhibit 26

variation of 16% to preserve the integrity of subdivision lines, but the Supreme Court cautioned that the percentage "may well approach tolerable limits."[123]

In Montana, in 1983, plaintiffs in Gallatin County brought a suit in federal court against the Commission's legislative plan where the total deviation was 10.94% between house districts and 10.18% between senate districts.[124] The Commission adopted the following criteria: (1) that, insofar as possible, consideration should be given to existing governmental boundaries; (2) that geographic boundaries must be respected, unless such boundaries should impede voting; (3) that communities of interest be considered as they relate to a particular area; (4) that existing district boundaries be given consideration wherever practical; and (5) that the Commission stay within a plus or minus 5% deviation from the ideal.[125] The federal District Court found that the deviation was justified because the Commission had considered legitimate state objectives.[126] Further, the criteria that the Commission had considered were not inflexible, but rather they were "considerations only" and that "the criteria as they existed within a district and as they existed between districts had to be balanced in arriving at a plan embracing the entire State."[127] Because "the adoption of any feasible plan would have to some extent departed from the objectives set by the criteria," the District Court found that the Commission made a good-faith effort to balance all of the legitimate State objectives and upheld the plan.[128]

Where the maximum deviation between the largest and smallest district is less than 10%, a legislative map "presumptively complies with the one-person, one-vote rule."[129] However, because the overriding objective of districting must be "substantial equality of population", deviations from substantial population equality are "permissible only if 'incident to the effectuation of a rational state policy.'"[130] Therefore, if plaintiffs can prove that impermissible factors predominated in the redistricting process such as regional protectionism or the selective protection of incumbents (protection of incumbent facilitated in a way that is not consistent and neutral), the map may still be declared constitutionally infirm.[131]

The Legislature has also adopted a statutory provision concerning population deviation which was challenged and overturned in *Brown v. Montana Districting and Apportionment Commission*.[132] *See* the sidebar for the relevant statutory text, and *see* section II(D), *supra*, for a discussion of related case law.

> **5-1-115. Redistricting criteria.** (1) Subject to federal law, legislative and congressional districts must be established on the basis of population.
> (2) In the development of legislative districts, a plan is subject to the Voting Rights Act and must comply with the following criteria, in order of importance:
> (a) The districts must be as equal as practicable, meaning to the greatest extent possible, within a plus or minus 1% relative deviation from the ideal population of a district as calculated from information provided by the federal decennial census. The relative deviation may be exceeded only when necessary to keep political subdivisions intact or to comply with the Voting Rights Act.
> . . .

---

[123] 410 U.S. 315, 329.
[124] *McBride v. Mahoney*, 573 F. Supp. 913 (D. Mont. 1983), 914.
[125] *Id.* at 915.
[126] *Id.*
[127] *Id.* at 916.
[128] *Id.* at 917.
[129] *Evenwell*, 136 S. Ct. 1120, 1124.
[130] *Larios*, 542 U.S. 947, 949 (citing *Reynolds*, 377 U.S. 533, 579).
[131] *Larios*, 542 U.S. 947.
[132] 2003 ML 1896 (Mont. 20th Dist. 2003).

### 3. Population Base Metrics

States almost universally use total population[133] as the metric for calculating compliance with "one person, one vote" requirements. Are there other population bases a state could use to comply with these requirements?

There are competing theories of representation that underly attempts to use different population metrics. A representational equality theory is based on the premise that a legislator represents all the residents of a district, regardless of their age or state citizenship, and the political body to which the legislator belongs affects all the residents of a district.[134] Thus, all individuals should be treated equally when districts are drawn. The competing theory, electoral equality, is based on the premise that a subset of the total population of a district, *i.e.* potentially eligible voters, should be equalized so that there is voting equality between districts.[135] These theories have been around for decades. For instance, it is clear that the apportionment of congressional seats as enshrined in the U.S. Constitution was based on representational equality.[136] More recently, there have been questions about whether legislative districts should be subject to electoral quality rather than representation equality.[137] Therefore, it is important here, once again, to draw a distinction between congressional and legislative districts.

As discussed above, equal population for congressional districts is based on Article I, section 2, of the U.S. Constitution. The 14th Amendment to the United States Constitution requires that United States Representatives be apportioned among the states "counting the whole number of persons in each state", in other words using total population. While this section specifies that "apportionment" (the act of proportionally dividing congressional seats) among the states is based on total population, it does not specifically address redistricting (the setting of boundaries by states to the seats apportioned to them). While the apportionment of seats to the states is calculated based on total population by the language of the 14th Amendment, there is not an explicit ruling limiting the redrawing of boundaries for representational districts to total population; although the U.S. Supreme Court has questioned "whether distribution of congressional seats except according to total population can ever be permissible under Art. I, § 2."[138] Nevertheless, given the historical background of Article I, section 2, the 14th Amendment, district court decisions, and related U.S. Supreme Court commentary,[139] an attempt to use a population

---

[133] The Census counts the "usual residents" of a state. "Usual residence" is defined by the Census as "the place where a person lives and sleeps most of the time." 83 Fed. Reg. 5526 (2/8/2018). It is not necessarily the same as the person's voting residence, their legal residence, or where they prefer to be counted. *Id*. The usual residents of a state make up "total population" for the purposes of this memo.

[134] "Issues Affecting the Apportionment Base," Bob Heath, Testimony Before the Texas Senate Committee on Redistricting, Oct. 29, 2019.

[135] *Id.*

[136] *See* note 58, *supra*.

[137] *Evenwel*, 136 S. Ct. 1120. In *Evenwel*, Texas voters challenged the state's use of total population for drawing legislative districts, arguing that it produced unequal voter-eligible populations. The Court found that pursuant to constitutional history, judicial decisions, and longstanding practice, a state may comply with the one-person, one-vote principle by designing its legislative districts based on total population. The court did "not resolve whether . . . States may draw districts to equalize voter-eligible population rather than total population." *Id.* at 1133.

[138] *Kirkpatrick*, 394 U.S. 526, 534.

[139] *See* discussion of historical background concerning Article I, section 2, and historical debates concerning section 2 of the Fourteenth Amendment in *Evenwel*, 136 S. Ct. 1120, 1127-1129. There, in addition to tracing the historical debates rejecting legal voter population as an apportionment base for the U.S. House of Representatives, the

Page 053
Defendant's Trial
Exhibit 26

base other than total population (or a population which approximates total population) for drawing congressional districts is unlikely to survive a legal challenge.

Because legislative districts are subject to the Equal Protection Clause of the 14th Amendment rather than Article I, section 2, there is latitude to use population metrics other than total population. In 1966, the U.S. Supreme Court noted that "the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which [the] substantial population equivalency is to be measured."[140]

After statehood, Hawaii apportioned its legislative representative districts according to registered voter population pursuant to its state constitution.[141] The 1950 constitutional convention in Hawaii chose registered voters as an approximation of both citizen and total population because total population did not necessarily comport with traditional local boundaries and citizen population had been difficult to administer because statistics were not readily available.[142] After *Reynolds v. Sims*, Hawaii faced a challenge to its plan for legislative districts which included multimember districts based partially on geographic principles among the state's islands and representative districts based on registered voters.[143] As part of a multiprong challenge, plaintiffs questioned the distribution of seats according to registered voters.[144]  Because of a large military presence, many of whom claim residency in other states and do not vote in Hawaiian elections, the U.S. Supreme Court stated that "Hawaii's special population problems might well have led it to conclude that state citizen population rather than total population should be the basis for comparison."[145] The Supreme Court noted that it did not suggest that a state must include "aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime, in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere."[146]

While the Equal Protection Clause did not necessarily forbid other population bases, Hawaii's use of *registered* voters depended on the particular extent of political activity of each individual making it "susceptible to improper influences" and highly dependent on potentially "sudden and substantial" fluctuations in the number of registered voters.[147] Drawing attention to this distinction, the Court held that Hawaii's apportionment "satisf[ied] the Equal Protection Clause *only* because on this record it was found to have produced a distribution of legislators not substantially different from that which would

---

Court pointed to *Wesberry*'s conclusion that there "is no excuse for ignoring our Constitution's plain objective of making equal representation of *equal numbers of people* the fundamental goal for the House of Representatives. *Evenwel*, 136 S. Ct. 1120, 1129 (emphasis in original, citations omitted). *See also Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982), 571 ("we hold that pursuant to article I, § 2 of the Constitution states must depend on total federal census figures to apportion congressional districts within their boundaries").

[140] *Burns v. Richardson*, 384 U.S. 73 (1966), 91.

[141] *Id.* at 77.

[142] *Id.* at 93.

[143] *Id.*

[144] *Id.*

[145] *Id.* at 93.

[146] *Id.* at 92.

[147] *Id.* at 92-93.

21

Defendant's Trial Exhibit 26

have resulted from the use of a permissible population basis" (emphasis added).[148] In doing so, the Court cautioned that "[w]e are not to be understood as deciding that the validity of the registered voters basis as a measure has been established for all time or circumstances, in Hawaii or elsewhere."[149]

A three-judge court later struck down a subsequent Hawaiian apportionment plan based on registered voters because of insufficient justifications for disparities in allocation.[150] Since 1992, the Hawaiian constitution has required that the population be apportioned on the basis of permanent residents (state citizens) for legislative districts, excluding nonresident students and nonresident military personnel and their family members, rather than registered voters.[151]

Should the Commission consider using another population base for legislative seats during this cycle, it should bear in mind that the Montana Constitution requires that "[a]ll districts shall be as nearly *equal in population* as is practicable" (emphasis added).[152] Although in the federal judicial context from which this phrase originates, as traced above, indicates that there is some room for additional population metrics at the legislative level, the Montana Supreme Court has not construed whether "population" in Article V, section 14(1), requires total population or may include other acceptable population bases.

The Montana Supreme Court applies the same rules of construction for the Constitution that are applied to statutory law, interpreting the Constitution by viewing the "plain meaning of the words used and applying their usual and ordinary meaning."[153] The "intent of the framers of the Constitution is controlling and that intent must first be determined from the plain language of the words used."[154] Indeed, the Court's responsibility is "[n]ot to insert what has been omitted or to omit what has been inserted."[155] Mirriam-Webster's dictionary defines "population" as "the whole number of people or inhabitants in a country or region."[156] Thus, the Montana Supreme Court may construe this phrase to require total population to be equalized for legislative districts, rather than using a subset of the population, such as eligible voter population.

### 4. Reallocations and Exclusions from the Population Base

In a developing area of law, states have not necessarily been precluded from adjusting congressional and legislative data to correct perceived flaws, but there may be differences in the latitude between congressional and legislative districts for reallocating or excluding populations. While these concepts have not yet been developed in case law, one way of thinking of exclusions is to consider that they may

---

[148] *Id.*

[149] *Id.* at 96.

[150] *Travis*, 552 F. Supp. 554.

[151] *Kostick v. Nago*, 960 F. Supp. 2d 1074 (D. Haw. 2013), aff'd, 571 U.S. 1161 (2014). Hawaii uses total population for its federal congressional districts. *Id.* at 1079, 1093.

[152] Mont. Const. art. V, § 14(1).

[153] *Cross v. Van Dyke*, 2014 MT 193 citing *In re M.N.*, 2011 MT 245, ¶27.

[154] *Id.* at ¶10 citing *St. ex. rel. Racicot v. Dist. Ct.*, 243 Mont. 379 (1990), 384.

[155] *City of Missoula v. Cox*, 2008 MT 364, ¶11.

[156] Merriam-Webster Dictionary, https://www.merriam-webster.com/. *But see* section 1-2-106, MCA, "Words and phrases used in the statutes of Montana are construed according to the context and the approved usage of the language, but technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning or definition."

Page 055
**Defendant's Trial Exhibit 26**

be related to the choice of a population base other than total population while reallocations merely adjust the location of individuals *within* the statewide population.

With respect to congressional districts, Maryland adjusted its 2010 Census data for congressional districts to reallocate prisoners from their place of incarceration to their last-known residence before incarceration.[157] The Maryland federal District Court, affirmed without comment by the U.S. Supreme Court, found that the use of adjusted census data was not barred, citing *Karcher* and *Kirkpatrick* for the premise that "[i]f a State does attempt to use a measure other than total population or to 'correct' the census figures, it may not do so in a haphazard, inconsistent, or conjectural manner."[158] Because of the potential legal difficulties with adjusting congressional data, states have generally not adjusted populations for congressional districts, and it is not yet clear how far a state may adjust data for congressional districts to correct "perceived flaws."

With respect to legislative districts, states have also adjusted data by reallocating prisoners. In the last cycle, New York[159] and Maryland adjusted their legislative data to reallocate prisoners. Several additional states have passed laws to reallocate prisoners during the 2020 cycle.[160]

In the 2010 cycle, Hawaii and Kansas extracted nonresident students and military personnel from their legislative data. Since that time, Kansas eliminated its extraction of students and military personnel under a legislative referendum passed in 2019.[161]

Hawaii successfully defended its nonresident military and student extractions against a court challenge where the record indicated the state extracted all nonpermanent populations that existed in sufficient numbers to affect the apportionment of districts about which it could obtain relevant, reliable data using a rational method of extraction.[162] However, if the exclusion had been "carried out with an eye to invidiously targeting only certain nonresident groups, it would raise serious constitutional concerns."[163]

In sum, if the Commission implements any adjustments to the census data, it must use accurate and reliable data in a systematic approach using clear guidelines[164]. The U.S. Supreme Court has been clear

---

[157] *Fletcher v. Lamone*, 831 F. Supp. 2d 887 (D. Md. 2011), 893, aff'd, 133 S. Ct. 29 (2012).

[158] *Id.* at 894, citing *Karcher*, 462 U.S. 725, 732 n. 4, and *Kirkpatrick*, 394 U.S. 526, 534-535.

[159] The New York law withstood a legal challenged brought under the New York Constitution. *Little v. N.Y. St. Task Force on Demographic Research and Reapportionment*, No. 2310-2011, slip op. (N.Y. Sup Ct. Dec. 1, 2011).

[160] "Reallocating Incarcerated Persons for Redistricting," National Conference of State Legislatures, https://www.ncsl.org/research/redistricting/reallocating-incarcerated-persons-for-redistricting.aspx.

[161] "Kansas Voters Approve Amendment to Eliminate Unusual Redistricting Practices," Jurist, https://www.jurist.org/news/2019/11/kansas-voters-approve-amendment-to-eliminate-unusual-redistricting-practices/.

[162] *Kostick*, 960 F. Supp. 2d 1074, 1090. Some of the difficulties in extracting populations depends on determining the individual locations for census purposes and the level of certainty about nonpermanent status. *See id.* Active duty military were not automatically excluded by Hawaii, and the extraction tracked residency requirements under Hawaiian law. *Id.* at 1087. Students were extracted on the basis of the payment of nonresident tuition or a home address outside of Hawaii and included students at both state and private collegiate institutions. For further information on the methods used by Hawaii, see *Kostick* at 1095-1098.

[163] *Id.* at 1093-1094 (citations omitted).

[164] *See*, e.g. Reallocating Incarcerated Persons for Redistricting, NCSL, https://www.ncsl.org/research/redistricting/reallocating-incarcerated-persons-for-redistricting.aspx.

Page 056
**Defendant's Trial
Exhibit 26**

that systematic, consistent policies must govern any attempt to correct census data.[165] Extractions may ultimately prove more problematic, but if they are used, they cannot unreasonably discriminate among nonresident groups[166], and they must be free of any taint of arbitrariness or invidious discrimination against minority groups or the military[167].

### B. Prohibition of Racial Discrimination

Federal constitutional and statutory law prohibit racial discrimination in the drawing of districts. This may happen in a variety of forms -- including "packing" minority voters into a district to minimize the districts they control, splitting minority voters between districts to dilute the strength of their votes ("cracking"), or purposefully drawing districts using race as the predominant factor without sufficient justification. The following sections discuss these federal law requirements that apply to both congressional and legislative districts, including how these principles interact with each other.

#### 1. Minority Vote Dilution

Following the U.S. Civil War, the 15th Amendment to the U.S. Constitution was ratified, providing that the "right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." However, the Amendment proved largely ineffective, so in 1965, Congress pass the Voting Rights Act of 1965[168] to enforce the 15th Amendment.[169]

> **Amendment XV to the U.S. Constitution.**
> **Section 1.**
> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude.
> **Section 2.**
> The Congress shall have power to enforce this article by appropriate legislation.

Section 2[170] of the Voting Rights Act of 1965 (VRA) applies to Montana and its political subdivisions.[171] This section prohibits any state or political subdivision from imposing any voting qualification, standard, practice, or procedure

---

[165] *Karcher*, 462 U.S. 732, n. 4, and *Kirkpatrick*, 394 U.S. 526, 534-535.

[166] *See Carrington v. Rash*, 380 U.S. 89, 95 (1965), holding that although a state may impose reasonable residence requirements for voting, it may not deny the ballot to a bona fide resident merely because he is a member of the armed services.

[167] *See Kostick*, 960 F. Supp. 2d 1074, 1095.

[168] People often refer to the original sections of the Voting Rights Act of 1965. This is the original bill as enacted in 1965. However, the Act and amendments to the Act are now codified at 52 U.S.C. 10301, et seq.; 52 U.S.C. 10501, et seq.; and 52 U.S.C. 10701, et. seq.

[169] *S.C. v. Katzenbach*, 383 U.S. 301 (1966), 310-312.

[170] Other sections of the VRA include: § 4(a), which eliminates literacy tests and similar voting qualifications, and § 4(b), which contains a coverage formula determining which jurisdictions would be subject to § 5. Section 4(b) was declared unconstitutional in *Shelby County v. Holder*, 570 U.S. 529 (2013). Section 5 of the VRA requires changes by covered jurisdictions defined in § 4(b) to be precleared by the Attorney General or the federal court in the District of Columbia, and it was rendered ineffective due to the *Shelby County* holding that invalidated the preclearance coverage formula. However, if Congress enacted a new preclearance formula, this section may be used in the future. Nevertheless, Montana was not a jurisdiction subject to preclearance. Section 3(c) has similar provisions to § 5, except that it is initiated by court order after finding violations of the Fifteenth Amendment.

[171] Big Horn, Blaine, Flathead, Lake, Glacier, Pondera, Rosebud, and Roosevelt Counties have been involved with Voting Rights Act litigation. *See Wandering Medicine v. McCulloch*, 2014 U.S. Dist. LEXIS 183736 (D. Mont. 2014); *Old Person v. Brown*, 312 F.3d 1036 (9th Cir. 2002); *United State v. Blaine County*, 363 F.3d 897 (9th Cir. 2003); *Windy Boy v. County of Big Horn*, 647 F. Supp. 1002 (D. Mont. 1986); *Jackson v. Bd. of Trustees*, 2014 U.S. Dist. LEXIS 49830 (D. Mont. 2014); *U.S. v. Roosevelt Co.*, 2000 U.S. Dist. LEXIS 23974 (D. Mont. 2000).

**Page 057**
**Defendant's Trial**
**Exhibit 26**

that results in the denial or abridgment of any US citizen's right to vote on account of race, color, or membership in a language minority group.[172] The abridgment of the right to vote includes a racial or language group having "less opportunity than other members of the electorate . . . to participate in the electoral process and to elect representatives of their choice."[173] In essence, a § 2 claim is that "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequity in the opportunities [between majority and minority voters] to elect their preferred representatives."[174] Thus, the VRA recognizes that in addition to absolute prohibitions on casting ballots, the right to vote can be affected by a dilution of a minority's voting power.[175]

The largest racial minority in Montana is its American Indian population,[176] and there have been challenges concerning American Indian vote dilution in Montana legislative districts, county districts, and school districts.[177]

Judicial determination of whether there is a violation of § 2 of the Voting Rights Act is a two-step process. First, plaintiffs must prove the existence of three threshold conditions. These were first identified in a case, *Thornburg v. Gingles*,[178] and they are known colloquially as *Gingles* preconditions, factors, or requirements. First, plaintiffs must show that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district."[179]  Second, plaintiffs must show that "the minority group . . . is politically cohesive," and third, plaintiffs must show that the "majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances . . . usually to defeat the minority's preferred candidate."[180] These three factors are necessary to show that the minority group has the potential to elect a representative of its own choice in a possible district but racially polarized voting prevents it from doing so in the district as actually drawn because it has been submerged in a larger majority voting population.[181]

If all three of these factors are present, courts proceed to the second step. A violation of § 2 may be found if, as a result of the challenged practice or structure:

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its

---

[172] 52 U.S.C. § 10301.

[173] *Id.*

[174] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

[175] *Allen v. St. Bd. of Elections*, 393 U.S. 544, 569 (1969) (citations omitted).

[176] Montana Population Estimates, US Census Bureau (2019).

[177] *See* section II(c), *supra*. *See also Old Person*, 312 F.3d 1036; *Blaine County*, 363 F.3d 897; *Windy Boy*, 647 F. Supp. 1002; *Jackson*, 2014 U.S. Dist. LEXIS 49830; *Roosevelt Co.*, 2000 U.S. Dist. LEXIS 23974.

[178] 478 U.S. 30 (1986), 50-51.

[179] *Thornburg*, 478 U.S. 30, 50. In *Bartlett v. Strickland*, the Supreme Court rejected claims that a group's ability to influence elections was cognizable under § 2, requiring the plaintiffs to show that they were sufficiently numerous, e.g. more than 50% of the voting age population, to create a majority in a compact single-member district. 556 U.S. 1 (2009). Further, note that "compactness" for purposes § 2 means the compactness of the minority group whose vote is being diluted. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006), 433. This is different than the compactness of district lines, which is a traditional redistricting described at section III(C), *infra*.

[180] *Thornburg*, 478 U.S. 30, 51.

[181] *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017).

**Page 058**
**Defendant's Trial**
**Exhibit 26**

members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .[182]

To assess the "totality of the circumstances," the courts have looked to factors suggested by the Senate Committee on the Judiciary report that accompanied 1982 amendments to the VRA and subsequent case law.[183] These factors include:

- the history of voting-related discrimination in the state or political subdivision
- the extent to which voting in the elections of the state or political subdivision is racially polarized
- the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group
- the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, that hinder their ability to participate effectively in the political process
- the use of overt or subtle racial appeals in political campaigns
- the extent to which members of the minority group have been elected to public office in the jurisdiction
- whether elected officials are unresponsive to the particularized needs of the members of the minority group
- whether the policy underlying the use of the contested practice or structure is tenuous
- whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area

This is necessarily an analysis that is highly dependent on district-by-district facts. In *Thornburg v. Gingles*, the U.S. Supreme Court noted that:

> Because loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election . . . Also for this reason, in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest.[184]

*Thornburg v. Gingles* further made clear that racially polarized voting does not refer to voting patterns for which the principle cause is race of the candidate.[185] Because causation is irrelevant to a § 2 inquiry, racially polarized voting simply refers to the situation where different races vote in blocs for different

---

[182] 52 U.S.C. § 10301.
[183] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006), 426 (citations omitted).
[184] *Thornburg*, 478 U.S. 30, 57
[185] *Id.* at 62-68.

Page 059
**Defendant's Trial Exhibit 26**

candidates.[186] Similarly, the cause of the majority bloc voting is likewise unimportant under this analysis.[187]

The Court noted that proof that some minority candidates have been elected does not foreclose a § 2 claim, but if the minority candidates enjoyed sustained success, the success is evidence of persistent proportional representation, and persistent proportional representation is inconsistent with the claim that a minority's ability to be able to elect representatives of their choice is not equal to that of the majority.[188]

Ultimately, § 2 of the VRA is an important tool that prevents the unconstitutional vote dilution of minorities, but if a state invokes the VRA to justify race-based districting, it must show that it had "good reasons" to think it would transgress the Act if it did not draw a race-based district.[189] Otherwise, it will be in violation of the Equal Protection Clause, discussed in the next section.

### 2. Discrimination and Racial Gerrymandering

The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."[190] This clause protects against the purposeful discrimination between individuals on the basis of race. Thus, in the absence of sufficient justification, a state cannot intentionally assign citizens to a district on the basis of race or use race as the predominant factor in drawing district lines.[191]

A racial gerrymander is the "deliberate and arbitrary distortion of district boundaries . . . for [racial] purposes."[192] A districting plan may be evaluated for a racial gerrymander if it distinguishes between citizens because of race or if it is so bizarre, even if it on its face it is race neutral, that it is unexplainable on grounds other than race.[193] The shape of the district is relevant only because it may be circumstantial evidence that race and not other districting principles was the dominant rationale in drawing the district's lines.[194]

In a racial gerrymandering claim, the plaintiff must prove that "race was the *predominant* factor motivating the legislature's decision to place a significant number of voters within or without a particular district" (emphasis added).[195] This entails showing that other objective factors, such as traditional race-neutral redistricting criteria,[196] were subordinated to race.[197] A plaintiff may prove this through direct evidence of legislative intent, circumstantial evidence including a district's shape and

---

[186] *Id.*
[187] *Id.* at 70-74.
[188] *Id.* at 75, 77.
[189] *Cooper*, 137 S. Ct. 1455, 1464.
[190] U.S. Const. amend. XIV, § 1.
[191] *Cooper*, 137 S. Ct. 1455, 1463; *Abbott v. Perez*, 138 S. Ct. 2305 (2018), 2314 (citation omitted).
[192] *Shaw v. Reno*, 509 U.S. 630 (1993), 640.
[193] *Id.* at 644.
[194] *Miller v. Johnson*, 515 U.S. 900 (1995), 913.
[195] *Cooper*, 137 S. Ct. 1455, 1463 (citing *Miller*, 515 U.S. 900, 916).
[196] *See* section III(D), *infra*, for a list of traditional redistricting criteria.
[197] *Cooper*, 137 S. Ct. 1455, 1464.

Page 060
Defendant's Trial
Exhibit 26

demographics, or both.[198] A racial gerrymandering claim applies to individual districts, taken on a case-by-case basis, not the state as a whole.[199]

This does not mean that the Commission must be race-blind when drawing districts, but it does mean that race cannot be the dominant or controlling factor. The Supreme Court has explained:

> Redistricting differs from other kinds of state decisionmaking in that [the decision-making body] always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination. . . . [A] reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes. The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivision . . . . Put differently, we believe that reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group -- regardless of their age, education, economic status, or the community in which they live -- think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes.[200]

If racial considerations predominated over other factors, the design of the district is subject to strict scrutiny, a difficult legal burden.[201] To uphold the design of the district, the burden shifts from the plaintiff to the state to prove that 'its race-based sorting of voters serves a "compelling interest" and is "narrowly tailored" to that end.'[202]

Because the Equal Protection Clause restricts consideration of race and the VRA demands consideration of race, a decision-making body attempting to produce a lawful districting plan is vulnerable to "competing hazards of liability."[203] The Supreme Court has said that '"[i]n an effort to harmonize these conflicting demands, we have assumed that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed. In technical terms, we have assumed that complying with the VRA is a compelling state interest . . . and that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has 'good reasons' for believing that its decision is necessary in order to comply with the VRA."[204]

Consequently, one compelling interest is compliance with the VRA, as amended.[205] However, compliance with the VRA does not justify race-based districting "where the challenged district was not

---

[198] *Id.*

[199] *Ala. Leg. Black Caucus v. Ala.*, 135 S. Ct. 1257 (2015), 1270.

[200] *Shaw*, 509 U.S. 630, 646-647.

[201] *Cooper*, 137 S. Ct. 1455, 1464.

[202] *Id.*

[203] *Abbott*, 138 S. Ct. 2305, 2315 (citing *Bush v. Vera*, 517 U.S. 952 (1996), 977).

[204] *Id.* (citations omitted).

[205] *Id.*

Page 061
Defendant's Trial
Exhibit 26

reasonably necessary under a constitutional reading and application of those laws."[206] This requires the state to have a "strong basis in evidence" for the conclusion that it must draw a race-based district to comply with the VRA.[207] This requires an assessment of the three *Gingles* preconditions and the totality of the circumstances test for minority vote dilution described in section III(B)(1), *supra*. Merely trying to avoid meritless litigation under the VRA is not a compelling interest.[208]

Another compelling interest is in remedying past or present discrimination, but it must be identified with some specificity before using "race-conscious relief" and there must be a "strong basis in evidence" to conclude that remedial action was necessary before embarking on an affirmative-action program.[209] Further, "an effort to alleviate the effects of societal discrimination is not a compelling interest", nor is a generalized assertion of past discrimination in a particular region or industry adequate.[210]

The Commission must be very careful as it draws districts, bearing in mind the federal protections against discrimination for all districts and ensuring that it does not discriminate against racial or language minorities. In sum, on the one hand, the Commission must be conscious of race to ensure electoral districts do not dilute minority votes, but on the other hand, race cannot be the predominant consideration when drawing districts except in the limited circumstances described above.

### C. Compactness & Contiguity

The Montana Constitution requires that legislative districts "shall consist of compact and contiguous territory." Compactness and contiguity are formal and relatively objective criteria that look to the geographic shape and characteristics of individual districts.

Compactness[211], in geographic terms, means "occupying a small volume by reason of efficient use of space."[212] Because there are varying standards for compactness,[213] compactness is often determined by using a general appearance or "eyeball" test.[214]

Contiguity, on the other hand, means that all parts of the district be connected or touching in one unbroken sequence.

---

[206] *Miller*, 515 U.S. 900, 921.

[207] *Shaw v. Hunt*, 517 U.S. 899 (1996), 915.

[208] *Id.*

[209] *Id.* at 909-910.

[210] *Id.*

[211] Do not confuse the geographic term "compact" used here with the term used in the evaluation of federal section 2 claims under the Voting Rights Act (concerning whether race predominated in the drawing of lines). Under a section 2 claim, "compactness" refers to the compactness of the minority group whose vote is being diluted rather than the compactness of district lines. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433.

[212] Miriam-Webster dictionary, https://www.merriam-webster.com/dictionary/compactness.

[213] Hofeller, Thomas B., *Compactness in the Redistricting Process*, https://www.ncsl.org/documents/redistricting/Compactness-March-2010Hofeller.pdf (2010).

[214] *Bush*, 517 U.S. 952, 960.

Page 062
**Defendant's Trial
Exhibit 26**

The Legislature has also provided statutory requirements concerning compactness and contiguity in section 5-1-115, MCA. *See* the sidebar for the statute's text and section II(D), *supra*, for a discussion of case law related to the criteria statute.

In evaluating compactness and contiguity, courts have also evaluated the functional aspects of the district, including ease of travel and communication in a district.[215]

Consequently, as the Commission draws proposed districts, it should attempt to ensure physical and functional compactness and contiguity by monitoring the shape, geography, road systems, and other physical aspects of the districts.

> **5-1-115. Redistricting criteria.**
> . . .
> (2)
> . . .
> (c) The districts must be contiguous, meaning that the district must be in one piece. Areas that meet only at points of adjoining corners or areas separated by geographical boundaries or artificial barriers that prevent transportation within a district may not be considered contiguous.
> (d) The districts must be compact, meaning that the compactness of a district is greatest when the length of the district and the width of a district are equal. A district may not have an average length greater than three times the average width unless necessary to comply with the Voting Rights Act.

### D.  Other Traditional Redistricting Criteria

The preceding portions of this memo discussed federal and state legal requirements for districts, but there are numerous ways to draw district boundaries, and these can have dramatic political consequences.

In addition to the criteria required under federal and state law, many states, including previous Montana Commissions on Districting and Apportionment, have adopted additional criteria[216] to help consistently guide their decision-making throughout the districting process. These are generally long-standing traditional redistricting principles. From a practical perspective, these principles help to draw lines, but in a legal challenge, applying consistent, race-neutral criteria demonstrates to courts that decision-makers have not drawn boundaries with impermissible motives.

Traditional redistricting principles that have been judicially recognized on the federal level as permissible criteria include compactness,[217] contiguity,[218] preservation of counties and other political

---

[215] *See e.g. Wilkins v. West*, 264 Va. 447, 464 (Va. 2002).
[216] Past congressional criteria adopted by the Montana Commission may be found in Appendix A. For ease of reading, the original document is available at https://leg.mt.gov/content/Districting/2020/Topics/Legal/congressional-criteria-june-2020.pdf. Past legislative district criteria may be found in Appendix B. For ease of reading, the original document is available at https://leg.mt.gov/content/Districting/2020/Topics/Legal/history-districting-criteria-2020-version-january-2020.pdf
[217] *Shaw*, 509 U.S. 630, 647.
[218] *Id.*

Page 063
**Defendant's Trial
Exhibit 26**

subdivisions,[219] preservation of communities of interest,[220] preservation of cores of prior districts,[221] and protection of incumbents.[222]

Previous commissions have chosen to adopt additional criteria such as following geographic boundaries (to the extent possible, drawing districts along geographic boundaries, such as mountain divides, ridge lines, creeks, rivers, or roads), following lines of political units (to the extent possible, drawing districts to follow the boundaries of counties, cities, towns, school districts, Indian reservations, precincts, and other political subdivisions),[223] consideration of communities of interest (consideration of populations where residents have common interests, often defined by geography, socioeconomic status, and economic activity), consideration of existing district boundaries where practical (existing districts may provide a starting point for the Commission's work to determine population variance from the ideal district population but existing districts may not comply with redistricting criteria because of updated population data), and a maximum deviation from the ideal district. Each of these criteria was found to be a legitimate state objective by the Montana federal district court in *McBride v. Mahoney*.[224]

> **5-1-115. Redistricting criteria.**
> . . .
> (2)
> . . .
> (b) District boundaries must coincide with the boundaries of political subdivisions of the state to the greatest extent possible. The number of counties and cities divided among more than one district must be as small as possible. When there is a choice between dividing local political subdivisions, the more populous subdivisions must be divided before the less populous, unless the boundary is drawn along a county line that passes through a city.
> . . .
> (3) A district may not be drawn for the purposes of favoring a political party or an incumbent legislator or member of congress. The following data or information may not be considered in the development of a plan:
> (a) addresses of incumbent legislators or members of congress;
> (b) political affiliations of registered voters;
> (c) partisan political voter lists; or
> (d) previous election results, unless required as a remedy by a court.

Preserving political subdivisions was the subject of one portion of the criteria statute adopted by the Legislature at section 5-1-115, MCA. *See* the sidebar for the statute's text and section II(D), *supra*, for a discussion of case law related to the criteria statute.

In 1990, the Commission also adopted the criteria of "political fairness" so that districts could not be drawn for the purpose of favoring a political party or defeating an incumbent legislator.[225] This is also reflected in the

[219] *Id.*
[220] *Miller*, 515 U.S. 900, 916 (1995); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997). However, if communities of interest align racial boundaries, they may not be used to circumvent rules against racial gerrymandering. *See Bush*, 517 U.S. 952. Further, communities of interest must be considered at the time the plan is made, not as a post-hoc justification. *Id.*
[221] *Karcher,* 462 U.S. 725, 740.
[222] *Id.*
[223] *See also* section 5-1-115, MCA, and the discussion of related case law at section II(D), *supra*.
[224] 573 F. Supp. 913 (D. Mont. 1983).
[225] *See* Appendix B. In addition, numerous partisan gerrymandering (the practice of setting district boundaries to favor a particular political party) claims have been brought in various courts, but the Supreme Court has held that these are nonjusticiable political questions beyond the reach of the federal court. *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). In response, litigants are now turning to state courts using state constitutional grounds to try to find workable legal standards to adjudicate partisan gerrymandering claims. *See*, e.g. *League of Women Voters of Pa. v. Commonwealth of Pa.*, No. 159 MM 2017, slip op. (Pa. Feb. 7, 2018); *N.C. v. Common Cause*, 18 CVS 014001 (N.C. Super. Sept. 3, 2019).

31

redistricting criteria statute adopted by the Legislature, section 5-1-115(3), MCA. *See* the sidebar for the statute's text and section II(D), *supra*, for a discussion of case law related to the criteria statute.

The criteria mentioned here are not an exhaustive list, and additional criteria, as long as they are race-neutral, may also be considered.[226]

### E. Prioritizing Criteria

Although federal and state constitutional requirements must be strictly applied, how can the Commission navigate the inevitable conflicts between criteria? The criteria adopted by the Commission will inevitably present conflicts, and these conflicts will require the Commission to make policy choices.

Some states choose to explicitly prioritize their criteria to help clarify the state's priorities, restrict policymaker choices, and reduce legal challenges.[227] The criteria statute adopted by the Legislature, section 5-1-1115, MCA, discussed previous at section II(D), *supra*, specifically ranks criteria. However, prioritizing criteria also limits the Commission's flexibility to accommodate criteria ranked "less important."

In a 1983 lawsuit, plaintiffs alleged that the Commission did not follow its own criteria. The Court said, "[i]t is clear from the wording of the criteria and the Commission discussions that [the criteria] were considerations only and that the conflicts between the criteria as they existed within a district and as they existed between districts had to be balanced in arriving at a plan embracing the entire State."[228] In that case, the Commission had been presented with conflicts between its adopted criteria, and it had to make choices between criteria. The federal District Court found that "the adoption of any feasible plan would have to some extent departed from the objectives set by the criteria. It was the function of the Commission to interpret its own criteria -- to decide, for instance, what constituted a community of interest and then, looking at not just one county but all counties potentially affected, to balance the interests involved and arrive at a conclusion."[229]

Thus, the Commission should consider whether it wishes to balance criteria, as it has historically done, or to prioritize criteria. This choice should clearly be reflected on the record. Any prioritized criteria must be applied consistently. If the Commission chooses to balance criteria, it must make a good-faith effort to consider and balance all of the criteria it adopts, and it should diligently ensure that the record reflects these considerations.

### IV. Defending the Plans

As seen in the history since the Constitutional Convention, redistricting is often accompanied by litigation, though the legal issues have varied from plan criteria to open meeting laws. In this litigious environment, it is imperative that the Commission diligently follow federal and state constitutional law, engage in an open and public process, and ensure that a well preserved and carefully documented record reflects not only the Commission's decisions but the deliberations concerning *why* the Commission has made substantive decisions with regard to each district. Importantly, federal courts

---

[226] For new criteria recently being used by states, see "Emerging Criteria," *Redistricting 2020*, 80-82, National Conference of State Legislatures (2019).

[227] *Id.* at 82.

[228] *McBride*, 573 F. Supp. at 916.

[229] *Id.* at 917.

Page 065
**Defendant's Trial Exhibit 26**

defer to state judicial determinations *and* state political determinations on redistricting, including districting criteria, as long as they are consistent with federal requirements.[230] Thus, commissioners must ensure that they make an adequate record of their decision-making process to ensure that the Commission's plans are upheld in any subsequent litigation at the state or federal level.

In the event that litigation is brought against the Commission, the Attorney General would be requested to represent the Commission at the district court level. Although the Attorney General has no statutory duty to do so, the Attorney General may represent the Commission at the district court level. If the Attorney General declines to represent the Commission, Legislative Services Division would contract with the Agency Legal Services Bureau to provide litigation services.

However, after the plans are filed, the Commission is dissolved.[231] Thus, a legal suit would routinely name the Secretary of State, the entity with which the plan is filed. In this case, the Secretary of State would determine the entity to defend itself, although the Attorney General may still represent the state's interests.

In any event, unlike at the district court level, at the Montana Supreme Court, the Attorney General is statutorily required to "defend all causes in the supreme court in which the state or any officer of the state in the officer's official capacity is a party or in which the state has an interest."[232]

---

[230] Daniel Hayes Lowenstein, Richard L. Hasan, and Daniel R. Tokaji, *Election Law Cases and Materials*, 107 (5th ed., Carolina Academic Press 2012) (citing *Scott v. Germano*, 381 U.S. 407 (1965) and *Growe v. Emison,* 507 U.S. 25 (1993), 32-37)).

[231] Mont. Const. art. V, § 14(5).

[232] Section 2-15-501(1), MCA.

Page 066
Defendant's Trial
Exhibit 26

**APPENDIX A**

For ease of reading, you may open the original document at:

https://leg.mt.gov/content/Districting/2020/Topics/Legal/congressional-criteria-june-2020.pdf

## History of Congressional Districting Criteria in Montana: 1974 to 2010

| Commission Year | Number of Districts | Mandatory Criteria | Discretionary Criteria | Counties Split? | Other Notes |
|---|---|---|---|---|---|
| 1974 | 2 | None[1] | None[1] | None | The 1974 Commission the districts adopted in 1965 by a federal court |
| 1980 | 2 | ✓ To "achieve the minimum amount of deviation in congressional districts" | None | None | Absolute range: - 47 to +47<br>Overall Absolute Range: 94<br>Relative Range: -.01% to +.01%<br>Overall Relative Range: .02% |
| 1990 | 1 | None | None | N/A | |
| 2000 | 1 | ✓ Population equality | ✓ Following the lines of political units<br>✓ Following geographic boundaries<br>✓ Keeping communities of interest intact | N/A | Adopted November 16, 2000[2] |
| 2010 | 1 | ✓ Population equality | None | N/A | Adopted May 28, 2010[3] |

Notes

1. The 1974 Commission report does not mention commissioners discussing or adopting criteria. It states: "The Commission has made no changes in the existing Congressional districts since they already comply with the law."
2. November 16, 2000, meeting minutes: https://leg.mt.gov/content/committees/interim/2001_2002/dist_apport/nov16min.pdf
3. Congressional and Legislative Redistricting Criteria: https://leg.mt.gov/content/Committees/Interim/2011-2012/Districting/Other-Documents/1124RWFA-corrected-criteria-updated-2011.pdf



# APPENDIX B

**For ease of reading, you may open the original document at:**
https://leg.mt.gov/content/Districting/2020/Topics/Legal/history-districting-criteria-2020-version-january-2020.pdf

## HISTORY OF STATE LEGISLATIVE DISTRICTING CRITERIA IN MONTANA, 1974 – 2010

| Commission Year | Starting Point | Mandatory Criteria | Discretionary Criteria | Ideal HD Size | # of Counties Below Ideal | Range of Deviation | Mean Deviation | Other Notes |
|---|---|---|---|---|---|---|---|---|
| 1974 | Commission recommended using "the periphery of the state" because the various borders limit the options for districts<br><br>"First districts drawn were rural and toward the boundaries of the state"<br><br>"Last districts drawn were urban and well within the state"<br><br>Started in NE corner[i] | • "Substantial equality" of population/one man one vote | • Keeping counties intact<br>• Maintaining communities of interest<br>• Considering on "a case by case basis" the following factors: "geography, trade areas, county lines, minorities, economic interests, rural-urban interest, district homogeneity" | 6,944 | 32[ii] | HD:<br>Overall: 15.48%<br>Max: +7.83%<br>Min: -7.65%<br><br>SD:<br>Overall: 13.08%<br>Max: +6.33%<br>Min: -6.75% | HD: ± 3.43%<br><br>SD: ± 2.94% | The Commission originally directed staff to split existing multi-member districts into single-member districts that had no more than a 10.9 percent deviation. This approach was abandoned after it created more problems than it solved. |
| 1980 | The Commission's report suggested starting in the rural, border areas, as had been done by the 1974 Commission.<br><br>Started in NW corner[iii] | • Population equality, which the commission established as an overall relative range of 10% or ± 5% from ideal average district population<br>• Compactness<br>• Contiguity | • Consideration of existing governmental lines<br>• Respect for geographic boundaries, especially the Continental Divide and the Missouri River<br>• Consideration to existing legislative district boundaries, when practical<br>• Senate district boundaries to follow congressional district division when possible<br>• Consider communities of interest and defined communities of interest | 7,866.9 | | HD:<br>Overall: 10.94%<br>Max: +5.78%<br>Min: -5.16%<br><br>SD:<br>Overall: 10.18%<br>Max: +5.14%<br>Min: -5.04% | | Commission abandoned criterion to have senate district boundaries follow congressional district boundary: impractical and "did not serve in the effectuation of a rational state policy."<br><br>Discretionary criteria not prioritized.<br><br>Included 6 House and 3 Senate districts in excess of the ± 5% deviation (upheld by a federal District Court in McBride v. Mahoney.") |

MONTANA LEGISLATIVE SERVICES DIVISION
Office of Research and Policy Analysis

1

Page 068
**Defendant's Trial Exhibit 26**

**May 2019**

| Commission Year | Starting Point | Mandatory Criteria | Discretionary Criteria | Ideal HD Size | # of Counties Below Ideal | Range of Deviation | Mean Deviation | Other Notes |
|---|---|---|---|---|---|---|---|---|
| 1990 | Northwest corner of the state with the end point in Yellowstone County | • Compactness and contiguity<br>• Population equality<br>• Maximum population deviation - relative population deviation from ideal population for an individual district may not exceed ± 5%<br>• Final results of the 1990 census must be used to form plan<br>• Protection of minority rights (may not dilute voting strength of racial or language minorities, compliance with section 2 of VRA) | • Consideration to local government boundaries<br>• Consideration when practical to existing voting precinct lines<br>• Consideration when practical to school district lines<br>• Preserve communities of interest when possible<br>• Respect geographical boundaries to the extent possible<br>• Consideration to existing districts when practical<br>• Political fairness, ie, districts may not be drawn for the purpose of favoring a political party or defeating an incumbent legislator | 7,990.65 | 31* | HD:<br>Overall: 9.96%<br>Max: +4.99%<br>Min: -4.97% | HD: ± 2.6% | Discretionary criteria were not prioritized.<br>Staff used ARC/INFO software from ESRI. |
| 2000 | Glacier County (and adjacent Flathead and Lake Counties, as necessary), then proceeded in clockwise motion around the state | • Population equality and maximum population deviation (+/- 5%)<br>• Compact, contiguous districts<br>• Protection of minority voting rights and compliance with VRA<br>• Race cannot be the predominant factor to which traditional redistricting criteria are subordinated | • Following lines of political units<br>• Following geographic boundaries<br>• Keeping communities of interest intact | 9,022 | 31** | HD:<br>Overall: 9.85%<br>Max: 4.98%<br>Min: -4.88%<br><br>SD:<br>Overall:<br>Max:<br>Min: | HD: ± 3.5% | Held 16 public hearings, including mandatory one in Helena.<br>Staff used autoBound software from Citygate. |

MONTANA LEGISLATIVE SERVICES DIVISION   2
Office of Research and Policy Analysis

Page 069
Defendant's Trial
Exhibit 26

**May 2019**

| Commission Year | Starting Point | Mandatory Criteria | Discretionary Criteria | Ideal HD Size | # of Counties Below Ideal | Range of Deviation | Mean Deviation | Other Notes |
|---|---|---|---|---|---|---|---|---|
| 2010 | The Commission chose a statewide approach, taking public comment on 5 maps before adopting 100 House Districts. | • Population equality and maximum population deviation (+/- 3%) <br> • Compact, contiguous districts <br> • Protection of minority voting rights and compliance with VRA <br> • Race cannot be the predominant factor to which traditional redistricting criteria are subordinated | • Following lines of political units <br> • Following geographic boundaries <br> • Keeping communities of interest intact | 9,894 | 36 | HD: <br> Overall: 5.44% <br> Max: +2.45% <br> Min: -2.99% <br><br> SD: <br> Max: +2.28% <br> Min: -2.98% | HD: ± 0.91% <br> SD: ± 0.76% | Held 3 public hearings on districting criteria selection prior to the availability of Census figures <br><br> Staff used Maptitude software from Caliper <br><br> Commission held 17 public hearings on plans, including the mandatory one in Helena <br><br> Discretionary criteria were not prioritized |

Last updated 6/5/2019

---

[i] Susan Fox, Operational Guidelines for Congressional and Legislative Redistricting, Legislative Services Division, November 2000, available from: http://leg.mt.gov/content/publications/committees/interim/2001_2002/dist_apport/susan.pdf, last accessed Jan. 26, 2010.

[ii] Gregory Petesch, The State of the Montana Constitution (Turkey Feathers on the Constitutional Eagle), 64 Mont. L. Rev. 23 (2003).

[iii] Susan Fox, Operational Guidelines for Congressional and Legislative Redistricting, Legislative Services Division, November 2000, available from: http://leg.mt.gov/content/publications/committees/interim/2001_2002/dist_apport/susan.pdf, last accessed Jan. 26, 2010.

[iv] Report of the Montana Districting and Apportionment Commission, December 1992, page 15.

[v] Montana Counties and County Seats 1990 Census of Population, *U.S. Bureau of the Census, March 1993*.

[vi] Gregory Petesch, The State of the Montana Constitution (Turkey Feathers on the Constitutional Eagle), 64 Mont. L. Rev. 23 (2003).

MONTANA LEGISLATIVE SERVICES DIVISION   3
Office of Research and Policy Analysis

Page 070
**Defendant's Trial Exhibit 26**

# Exhibit C

# Montana State Senate



*The Treasure State*

**SENATOR FRED THOMAS**
**MAJORITY LEADER**

HELENA ADDRESS:
  PO BOX 200500
  HELENA MT 59620-0500
  PHONE: (406) 444-4800

HOME ADDRESS:
  1004 S BURNT FORK RD
  STEVENSVILLE MT 59870-6658
  PHONE: (406) 370-4001
  EMAIL: fthomas@paynewest.com

The following represents my Rule 26 Report in the matter of *Brown et al. v. Jacobsen*. It is based on review of material submitted to me by the Defendant (enumerated later), my involvement in redistricting the Public Service Commission in 2003 and 2013, my experience as a Montana legislator, and my knowledge and experience sponsoring two attempts (one successful) at reapportioning the Public Service Commission districts. I reserve the right to amend this report if other evidence becomes available.

## Professional Opinion and Basis for these Opinions:

In my opinion, the Montana Legislature, in conjunction with the Governor of Montana, possesses sole responsibility and authority to reapportion the Public Service Commission districts to rebalance those districts following the decennial census.

In my opinion, the Montana Legislature follows, for the Public Service Commission districts, the Montana Constitutional requirements for legislative districts that each district shall consist of compact and contiguous territory, that all districts shall be as nearly equal in population as is practicable. In my opinion, it is also essential to keep county lines intact, thus keeping communities within the counties intact. Further, in addition to the above constitutional criteria, the Montana Legislature in its discretion considers communities of interests, keeping

those counties that share similar economies, geography, and culture together.

1.    The Montana Public Service Commission is a creature of statute, not the Montana Constitution. The provisions for commissioner qualifications and district boundaries are found only in statute. Except for initiative and referenda, only the Legislature may pass laws, subject to the Governor's signature. In 2003, I sponsored legislation to redraw Public Service Commission district boundaries based on the 2000 Census. At that time the PSC districts, being massively out of population balance, had not been apportioned since creation by the Montana Legislature. This legislation was passed by both chambers and signed by the Governor. This process excludes other state officials such as Public Service Commissioners and the Secretary of State.

2.    In drawing Public Service Commission districts, I relied on historical practice as well as other common criteria in redistricting state legislative seats. First, I kept Public Service Commission district boundaries to county lines as that has been the historic practice and because keeping district lines to political subdivision boundaries creates a clear line for citizens and officeholders to know who represents them. Second, I followed for the Public Service Commission the Montana Constitutional requirement that legislative districts be as equal as practicable. Third, I also followed for the Public Service Commission the Montana Constitutional requirements for compact and contiguous districts that the Montana Districting and Apportionment Commission follows for legislative districts.

3.    The final criteria for redistricting maps is keeping communities of interest intact. This means keeping those communities with shared geography, socioeconomic status, and economic activity together. The principle is that the people should be able to choose a representative who fairly represents their interests and their concerns. Breaking up communities of interest risks making some communities a minority interest within that district such that their voices will not be fairly represented as compared to if their community had been left intact.

In 2003 my assessment was to update the Public Service Commission districts as equal in population as possible, making sure we keep communities and counties together and make sure the districts were contagious and visually compact as well.

Based on the intention of the 2003 redistricting, my assessment of the current Public Service Commission districts is as follows in regard to population balance and communities of interest:

- District 1 represents northeast and central Montana. The Hi-line and highway 200 communities. Counties that contain a similar character to existing counties in District 1 include those counties east of the continental divide and north of the I-90 corridor.
- District 2 represents southeast Montana and the Billings area. Because the current district is very close to the ideal population, no change is needed.
- District 3 represents southwest Montana. The core of the district is Beaverhead County to Anaconda/Butte and over to Bozeman. This covers the greater Yellowstone area. If counties were moved out of the district, those counties in central Montana share communities of interest with District 1.
- District 4 represents the Missoula-Bitterroot area extending up to the northwest mining and logging communities in Lincoln County. This district is close to its ideal size and should be left together as the current counties compose a coherent community of interest.
- District 5 represents the Flathead Lake area crossing over to the Rocky Mountain Front. If counties are moved out of the district, then those counties east of the continental divide; Glacier, Pondera, and Toole, share similar communities to interest with the counties in district 1.

4.      Additionally, I considered whether other criteria, such as incumbency, political affiliation of voters, or previous election results

should be included.  Senate Bill 153, Section 2(2) included a list of criteria prohibited from being used in the development of a reapportionment plan.  Later legislative efforts also included similar criteria.  Ultimately, the Montana Legislature has never adopted such criteria for redistricting Public Service Commission seats.  Because as previously stated, it is my opinion that the Montana Legislature controls this process, it would be inappropriate to insert criteria never before adopted by the Montana Legislature.

**Information considered in formulating the above opinions:**

1. Legislative history concerning:
   a. Senate Bill 220 (2003)
   b. Senate Bill 153 (2013)
   c. Senate Bill 210 (2017)
   d. Senate Bill 246 (2019)
   e. Senate Bill 309 (2019)
2. Montana Districting and Apportionment Commission rules, procedures, and history.
3. Knowledge, training, and experience as a Montana Legislator, House of Representative from 1984 to 1992 and Montana Senate 1996-2004 and 2012-2020 including servicing as Senate Majority Leader from 2000-2004 and 2016-2020.
4. Knowledge and experience sponsoring the successful 2003 Public Service Commission reapportionment legislation and sponsoring the attempt at reapportionment in 2013.

**Attachments:**

I have attached my Curriculum Vitae and the relevant documents from the Montana Districting and Apportionment Commission as exhibits.  The legislative history relied upon has already been entered as exhibits in this case.

**Compensation**:

I am providing this report and testimony without compensation.

*Fred Th* 2-7-22

**Defendant's Trial
Exhibit 26**