MINUTES

MONTANA HOUSE OF REPRESENTATIVES
58th LEGISLATURE - REGULAR SESSION

COMMITTEE ON FEDERAL RELATIONS, ENERGY, AND TELECOMMUNICATIONS

**Call to Order:**  By **CHAIRMAN ROD BITNEY**, on March 17, 2003 at 3:00
P.M., in Room 455 Capitol.

ROLL CALL

**Members Present:**
Rep. Rod Bitney, Chairman (R)
Rep. Gary Matthews, Vice Chairman (D)
Rep. Dee Brown (R)
Rep. Eileen J. Carney (D)
Rep. Tim Dowell (D)
Rep. Daniel Fuchs (R)
Rep. Hal Jacobson (D)
Rep. Diane Rice (R)
Rep. Jim Shockley (R)

**Members Excused:**  Rep. Brennan Ryan (D)
Rep. John Parker (D)
Rep. Alan Olson, Vice Chairman (R)
Rep. Jeff Laszloffy (R)
Rep. Scott Mendenhall (R)

**Staff Present:**  Glenna McClure, Committee Secretary
Mary Vandenbosch, Legislative Branch

**Please Note.** These are summary minutes.  Testimony and discussion
are paraphrased and condensed.

**Committee Business Summary:**
Hearing & Date Posted:   SJ 13, 3/13/2003; SB 220,
3/13/2003; SB 316, 3/13/2003
Executive Action:   SB 220

**Defendant's Trial
Exhibit 28** Page 001
030317FEH_Hm1.wpd

## HEARING ON SJ 13

**Sponsor**:  SENATOR KEN TOOLE, SD 27

**Opening Statement by Sponsor**:

*{Tape: 1; Side: A; Approx. Time Counter: 1 - 3.7}*

**SEN. TOOLE** said that this is a study resolution to look at energy efficiency issues in Montana.  Following the heightened awareness of energy conservation in the 1980's, building practices got better in construction of energy-efficient structures.  The State Building Codes Division is preparing to update codes.  It is a good time to look at these issues.  There are other nonprofit groups that would participate in the study which may reduce the costs.  This is a study resolution.  He indicated that if this study is approved, it makes sense to assign it to the Environmental Quality Council.

**Proponents' Testimony**:

*{Tape: 1; Side: A; Approx. Time Counter: 3.7 - 13.1}*

**Patrick Judge, Montana Environmental Information Center (MEIC),** said that they are pleased to be here in support of SJ 13.  There are efforts around the region to update energy efficiency codes. He indicated that the codes for Washington, Idaho, and New York are a few of the states that recently have changed their standards to be more stringent.  The use of enforced standards can make a big difference.

**Debbie Smith, Natural Resource Defense Council/Renewable Northwest Project,** said that this is a timely and excellent idea. The least expensive form of reducing the use of energy in homes and businesses is using more efficient products in the construction of buildings.  They support this resolution.

**Sherm Janke, Sierra Club,** provided written testimony.

**EXHIBIT** (feh56a01)

**Matt Leow, Montana Public Interest Research Group (MontPIRG),** said that they stand in support of this resolution.  Until the study is completed it is unclear how much can be done to improve the energy efficiency in our buildings.  It is a good idea and will have an economic impact also.  He asked that the committee give this resolution a do pass.

**Defendant's Trial
Exhibit 28** Page 002

**Opponents' Testimony**:  None

**Informational Testimony**:

*{Tape: 1; Side: A; Approx. Time Counter: 13.1 - 14.1}*

**Jim Brown, Administrator, Business Standards Division, Department
of Labor and Industry,** said that the 1991 Legislative Session
passed a similar resolution that was essentially a consensus
builder which the 1993 Legislative Session acted on.  He offered
to answer any questions of the committee.

**Questions from Committee Members and Responses**:

*{Tape: 1; Side: A; Approx. Time Counter: 14.1 - 16.9}*

**REP. FUCHS** asked the sponsor if he had an idea of the cost of
this study.

**SEN. TOOLE** said that his experience is that there is a process
within the Environmental Quality Council to complete an
evaluation within the existing budget.

**REP. FUCHS** asked the sponsor if he was familiar with any of the
national programs for energy efficiency.

**SEN. TOOLE** said that he was somewhat familiar.  He said that
there has been a lot of activity in this area.

**Closing by Sponsor**:

*{Tape: 1; Side: A; Approx. Time Counter: 16.9 - 17.8}*

**SEN. TOOLE** said that this makes a lot of sense. It is a timely
topic and there can be much coordination with other groups to
provide education for the public.

**HEARING ON SB 220**

**Sponsor**:  **SENATOR FRED THOMAS, SD 31**

**Defendant's Trial
Exhibit 28** Page 003

030317FEH_Hm1.wpd

HOUSE COMMITTEE ON FEDERAL RELATIONS, ENERGY, AND
TELECOMMUNICATIONS
March 17, 2003
PAGE 4 of 6

**Opening Statement by Sponsor**:

*{Tape: 1; Side: A; Approx. Time Counter: 17.8 - 24.8}*

**SEN. THOMAS** said that the districts for the Public Service
Commission (PSC) have not changed since the 1970's.  There were
several different options of which he picked Option C which he
moved through the Senate.  It has the smallest deviation by
population and most compact by eyesight.  He distributed a copy
of the current PSC districts, a copy of the Option C changes, and
a table that showed the population deviation.

<span style="color:red">**EXHIBIT**</span>(feh56a02)
<span style="color:red">**EXHIBIT**</span>(feh56a03)
<span style="color:red">**EXHIBIT**</span>(feh56a04)

**Proponents' Testimony**:

*{Tape: 1; Side: A; Approx. Time Counter: 24.8 - 28}*

**Greg Jergeson, Public Service Commission,** provided a copy of his
testimony.

<span style="color:red">**EXHIBIT**</span>(feh56a05)

**Opponents' Testimony**:  None

**Informational Testimony**:  None

**Questions from Committee Members and Responses**:

*{Tape: 1; Side: A; Approx. Time Counter: 28 - 30}*

**REP. MATTHEWS** asked how this change would affect commissioners
from other districts.

**Mr. Jergeson** said that one commissioner is term-limited.  Two of
the commissioners are up for election in 2006, two are up for
election in 2004, there isn't a commissioner in the new district
which would be an open seat for the next election.

**Closing by Sponsor**:

*{Tape: 1; Side: B; Approx. Time Counter: 1 - 1.7}*

**SEN. THOMAS** said that REP. FUCHS has agreed to carry this bill in
the House.

**Defendant's Trial
Exhibit 28** Page 004

### EXECUTIVE ACTION ON SB 220

*{Tape: 1; Side: B; Approx. Time Counter: 1.7 - 4.1}*

**Motion/Vote**:  **REP. SHOCKLEY** moved that **SB 220 BE CONCURRED IN.**
**Motion carried unanimously 10-0** with **REP. RYAN** voting by proxy.


### HEARING ON SB 316

**Sponsor**:  **SENATOR DUANE GRIMES, SD 20**

**Opening Statement by Sponsor**:

*{Tape: 1; Side: B; Approx. Time Counter: 4.1 - 7.6}*

**SEN. GRIMES** said that this bill is actually a followup to a piece
of legislation that was carried in a previous session.  It
provides for exploration credit.  It clears up some language in
the bill to say that the credit is "for each distinct mining
operation" and that it "not exceed a total of $20 million."

**Proponents' Testimony**:

*{Tape: 1; Side: B; Approx. Time Counter: 7.6 - 8.5}*

**Shona McHugh, Department of Revenue,** said that this bill cleans
up two areas in Title 15, Chapter 32.

**Opponents' Testimony**: None

**Informational Testimony**:  None

**Questions from Committee Members and Responses**:  None

**Closing by Sponsor**:

*{Tape: 1; Side: B; Approx. Time Counter: 8.5 - 9.5}*

**SEN. GRIMES** said that they haven't found a sponsor to carry the
bill in the House.  He would suggest to have Title 15 available.


**Defendant's Trial
Exhibit 28** Page 005

HOUSE COMMITTEE ON FEDERAL RELATIONS, ENERGY, AND
TELECOMMUNICATIONS
March 17, 2003
PAGE 6 of 6

## ADJOURNMENT

Adjournment:  3:45 P.M.


_____
REP. ROD BITNEY, Chairman


_____
GLENNA MCCLURE, Secretary


RB/GM

**EXHIBIT** (feh56aad)


**Defendant's Trial
Exhibit 28** Page 006

030317FEH_Hm1.wpd

SOS 0008

MINUTES

MONTANA SENATE
58th LEGISLATURE - REGULAR SESSION

COMMITTEE ON ENERGY AND TELECOMMUNICATIONS

**Call to Order:** By **CHAIRMAN ROYAL JOHNSON**, on January 28, 2003 at 3:00 P.M., in Room 317-C Capitol.

ROLL CALL

**Members Present:**
Sen. Royal Johnson, Chairman (R)
Sen. Corey Stapleton, Vice Chairman (R)
Sen. Bea McCarthy (D)
Sen. Walter McNutt (R)
Sen. Gary L. Perry (R)
Sen. Don Ryan (D)
Sen. Emily Stonington (D)
Sen. Bob Story Jr. (R)
Sen. Mike Taylor (R)
Sen. Ken Toole (D)

**Members Excused:**  None.

**Members Absent:**  None.

**Staff Present:**  Todd Everts, Legislative Services Division
Marion Mood, Committee Secretary

**Please Note.** These are summary minutes.  Testimony and discussion are paraphrased and condensed.

**Committee Business Summary:**
Hearing & Date Posted:   SB 220, 1/24/2003;
                         SB 234, 1/24/2003

        Executive Action:   SB 173; SB 215; SB 219

HEARING ON SB 220

**Sponsor**:     **SEN. FRED THOMAS, SD 31, STEVENSVILLE**

**Proponents**:  **Bob Rowe, Public Service Commissions (PSC)**

Defendant's Trial
Exhibit 28 Page 007
030128ENS_Sm1.wpd

SOS 0009

**Opponents:**     **None**

**Opening Statement by Sponsor:**

**SEN. FRED THOMAS, SD 31, STEVENSVILLE,** stated he submitted SB 220 after it had come to light that the PSC districts had not been redistricted by population since the commission's creation nor was such a provision written in Montana's Constitution or in statute.  He submitted **EXHIBIT(ens18a01),** data for the current districts as well as two options for the proposed redistricting. He went over the deviation percentage for the five districts shown, saying SB 220 would serve to make the population shifts more equitable.  He had **Susan Fox, Legislative Services,** prepare maps to illustrate Options C and C-2, **EXHIBIT(ens18a02)** and **EXHIBIT(ens18a03).**  He explained that originally, he had come up with four different options, but ultimately, the bill was drafted to incorporate Option C because it had the closest net deviation percentages.  He assured the committee that county boundaries were kept intact as well.  Out of a meeting with members of the Public Service Commission came Option C-2 which shows Lake County moving into District 5 and Lincoln County into District 4.  The sponsor endorsed these changes without reservation.  Amendment SB022001.asb, **EXHIBIT(ens18a04),** was introduced as an amendment necessary to incorporate C-2 into the bill.

**Proponents' Testimony:**

**Bob Rowe, PSC,** submitted written testimony, **EXHIBIT(ens18a05).**

**Questions from Committee Members and Responses:**

**SEN. BEA McCARTHY, SD 29, ANACONDA,** asked if the sponsor had a map depicting the current districts and was advised that the red lines in the map before her indicated the old boundaries.

**SEN. KEN TOOLE, SD 27, HELENA,** was curious whether the sponsor had at all considered how the redistricting would affect regulated electric supply customers versus unregulated co-op customers.  **SEN. THOMAS** replied that the only criteria used were deviation percentages and keeping counties intact.

**SEN. TOOLE** then posed the same question to **Commissioner Rowe** because he felt these were fairly dramatic shifts in terms of regulated utility customers and co-op customers, particularly in Districts 3 and 5.  **Commissioner Rowe** felt that this was not a powerful constitutional issue as in "one person, one vote"; secondly, he felt it would be too difficult to try and factor this in because at issue were both telecommunications and utilities, and these did not necessarily coincide.  He pointed to

Centurytel serving both Flathead and Lake Counties which might be combined in District 5.  **SEN. TOOLE** then voiced concern over taking Cascade County into District 1, and combining Lewis & Clark with Flathead County because it would dilute a block of voters concerned with electric distribution rates.  **Chairman Rowe** thought the District 5 configuration could potentially be contentious but he did not see a better way to draw its boundaries than what had been done.  **SEN. TOOLE** wondered if county lines had to be followed.  **Commissioner Rowe** responded it was not necessary but that the Public Service Commission supported following county lines because then they knew who was in charge, i.e., the County Commissioner.  **SEN. TOOLE** again brought up the breakdown between regulated versus unregulated utility customers and asked if **Commissioner Rowe** could establish this based on his information regarding the five districts.  **Commissioner Rowe** assured him this could be done with the help of the legislative staff.

**Closing by Sponsor**:

**SEN. THOMAS** closed on SB 220, saying it was ultimately up to the committee to redraw the boundaries.


**HEARING ON SB 234**

**Sponsor**:        SEN. JOHN COBB, SD 25, AUGUSTA

**Proponents**:     Bob Rowe, Public Service Commission (PSC)
                    Bob Nelson, Montana Consumer Council
                    John Bushnell, Northwest Power Planning Council,
                    Governor's Office
                    Tom Schneider, PSC, self

**Opponents**:      John Alke, Montana-Dakota Utility (MDU)
                    Mike Strand, Montana Independent Telecom Systems
                    Geoff Feiss, MT Telecommunications Assn.
                    Rick Hays, Qwest
                    John Fitzpatrick, NorthWestern Energy

**Opening Statement by Sponsor**:

**SEN. JOHN COBB, SD 25, AUGUSTA,** opened by saying SB 234 clarifies the Public Service Commission's authority to approve, disprove or modify the acquisition or transfer of regulated public utilities, or public utilities' property, to ensure public interest will not be adversely affected and nor should it diminish the utility's ability to provide reasonable and adequate service.

**Defendant's Trial Exhibit 28**

reasonable rates.  He explained some of the bill's provisions and confirmed that SB 234 would put in statute the PSC's power to review these transactions whereas currently, the commission merely asserts its ability to review significant transactions involving regulated property.

**Proponents' Testimony**:

**Bob Rowe, PSC,** submitted written testimony, **EXHIBIT(ens18a06).**

*{Tape: 1; Side: B, 0.8}*
**Bob Nelson, Montana Consumer Council,** rose in support of SB 234 because it clarified the commission's consumer protection and public interest function, namely ensuring adequate service at just and reasonable rates.  In his opinion, the PSC has the power and the obligation to conduct this kind of review.  He agreed with **Commissioner Rowe's** statement that the utilities have consistently challenged this authority and stressed that by adopting SB 234, it would be statutory.  **Mr. Nelson** informed the committee that he had heard of certain proposed amendments which would limit the review and take out certain types of transactions.  He was willing to listen to and work with the parties to develop something acceptable to everyone affected by these provisions.

**John Bushnell, Northwest Power Planning Council, and on behalf of the Governor's Office,** urged the committee to thoroughly examine SB 234 because of its importance and review it in light of **Mr. Nelson's** comments.

**Tom Schneider, PSC,** testifying in his own behalf, lauded the sponsor's efforts to clarify Montana's public utility law in a way that was fundamental to consumer protection.  He affirmed that it was designed to give explicit authority and responsibility to the PSC to protect the public interest in public utility transactions.  Recent corporate actions in Montana illustrated the risk and cost to Montana's economy, and he felt it imperative that the PSC evaluate and act upon these complex transactions involving regulated utilities to ensure that both consumers and emerging competitive markets are fairly protected, preserved, and enhanced.  He was adamant that a solid regulatory framework was good for consumers as well as for competition.  In closing, he offered the commission's help in crafting legislation that would not compromise the principles the sponsor presented in his bill.

**Opponents' Testimony**:

**Defendant's Trial
Exhibit 28** Page 010

**John Alke, Montana-Dakota Utility (MDU),** reminded the committee that a similar bill was heard and rejected in 2001.  He stressed that the breadth of this bill was too great, vesting in the commission powers far beyond what it needs in order to exercise its authority as a rate and service regulator. In his opinion, the PSC did not have the authority it has claimed all this time. He explained that Montana was unique in that it does not have a certificate system.  In most states, if a utility wants to go into business, it has to get a certificate from the regulator, and that certificate vests in it both an obligation and a right to exclusively serve that territory.  He submitted **EXHIBIT**(ens18a07) and **EXHIBIT**(ens18a08), and quoted from the latter that in 1948, the commission specifically ruled it did not have jurisdiction over the sale or transfer of utilities, and he affirmed there had been no change in the law concerning this issue.  He did say, however, that with numerous bills, legislators had tried to vest this power in the PSC, giving it the ultimate authority over sales and transfers of utilities.  He further stated SB 234 was not necessary to protect the ratepayers from potentially adverse impacts because under public utility rate-making law, the acquiring utility did not have the right to have its purchase price reflected in rates but must use the selling utility's original cost appreciated as its rate base. The purchasing utility is required to record the difference between value and purchase price as an "acquisition adjustment" and is prohibited from reflecting this difference in rates unless the commission so rules.  As an example of how public utility law works, he used the PacifiCorp case, informing the committee that MDU, Montana Power and the cooperatives all were interested in purchasing PacifiCorp.  In the end, the cooperatives were able to buy it because the principles of public utility rate-making do not apply to them; the regulated utilities could not bid an amount equal to the co-op's because in order to recoup their investment, they would have had to make an extraordinary showing to the PSC to have the difference between cost appreciated and the higher purchase price reflected in rates.  He was adamant that this bill would also allow a spurned bidder to argue that a sale was not in the best public interest and the commission should find that he should be the buyer.  To further illustrate MDU's opposition to SB 234, he pointed to Section 2, subsection (a) and explained that MDU's electric and gas operations are merely a fraction of the entire company; and only 3% of MDU Resources Group, Inc.'s operating profits are derived from its utility operation as it pertains to its Montana holdings. Despite the fact that 97% of the company does not fall under the jurisdiction of the PSC, in order to comply with federal law, MDU as a whole is viewed as a public utility and therefore, should it desire an acquisition or transfer, its respective agreements could be rewritten by the Montana PSC.  In closing, he advocated consideration of

**Defendant's Trial**
**Exhibit 28** Page 011

EXHIBIT (7), an alternative bill version he had drafted, if the
sponsor's concern was giving the PSC the power to weed out unfit
buyers and to ensure the ratepayers' interest would not be
adversely affected by a proposed purchase of a utility.
**Mike Strand, Montana Independent Telecommunications Systems,**
while allowing that the PSC could approve or disapprove the terms
of a contract, also stated that his organization did not deem it
appropriate for the PSC to dictate the terms of a deal to the
concerned parties.  He offered an amendment, **EXHIBIT (ens18a09)**
without which he would totally oppose SB 234.  He repeated **Mr.
Alke's** concern that SB 234 did not limit itself to utility
property located in Montana.  Another stipulation, page 1, line
26, states that property may not be leased to or from others
without commission approval, and this directly affected many of
his organization's members who lease telecommunication circuits
or fiber optic capacity in their efforts to provide service to
their customers.  He stated most of this activity was with
respect to data services which the commission does not  regulate,
and he failed to understand why the commission should be able to
approve or disapprove leases as well.  He claimed the language of
the bill forced the commission to literally look at every single
transaction so it could determine whether the property involved
was necessary or useful in providing utility service to the
public; only then could it determine whether to approve,
disapprove, modify or condition a transaction.  Lastly, he
expressed disbelief at the fiscal note which showed zero impact,
saying it would be impossible for the commission to review every
transaction regulated utilities engage in without any additional
staff.

**Geoff Feiss, Montana Telecommunications Association,** agreed with
previous testimony and cautioned the bill as written was subject
to extremely broad interpretation and potentially could allow
commission intervention in any transaction related to utility
service.  He stated that he would favor an amendment clarifying
under which circumstances a review by the PSC was appropriate.

**Rick Hays, Qwest,** while also agreeing with previous opponents'
testimony, wanted to make it clear that Qwest opposed SB 234
because it attempted to regulate transactions which have nothing
to do with providing services to Montanans; it did not apply to
all providers; every sale transaction regardless of size would be
subject to the PSC's review and scrutiny which would drive up
costs; and lastly, he felt the bill was not necessary, explaining
that Qwest, for one, had always sought the commission's approval
for its transactions within the state and would continue to do so
in the future.  He felt this broad-based statutory scheme held no
consumer benefits; on the contrary, it would lead to higher

costs.  He also cautioned that time delays caused by this bill could have unintended consequences for all involved.

*{Tape: 2; Side: A}*
He talked about Qwest's sale of its "Yellow Pages" last year which was done in an effort to improve the bottom line of its parent company, QCI, an entity not regulated by the PSC.  He stated that this transaction, as most corporate transactions would be, was highly time-sensitive because of the built-in walk-away clause, plus, in the eyes of the seller, a mandatory regulatory review would have diminished the price because of the time delay and the uncertainty, thus harming the seller and his customers.  This sale was not subject to the regulatory review, so the first phase has been completed and closed.  He stressed that regulatory uncertainty was challenging because the company sells assets based on assumptions regarding those sales and an anticipated closing and expects to receive its proceeds by a certain date.  A delay might force renegotiation or cause a deal to fail altogether; this would have been problematic in the aforementioned example because the sale was critical in keeping the company from having to file for bankruptcy.  Lastly, he pointed out that SB 234 attempted to replace a company's Board of Directors or shareholders with the views of the Montana PSC, and it should not be the PSC's role to manage the companies it regulates.

**John Fitzpatrick, NorthWestern Energy,** stated that public utility regulation meant balancing public interest, represented by the ratepayers, and business interest, represented by the shareholders.  This bill upsets that balance by vastly overreaching its boundaries in that it injects itself into the management and daily operations of a company.  He felt SB 234 was unnecessary as the PSC had already involved itself in the sale of Montana Power Company's assets as well as the sale of the gas and electric transmission distribution assets, where it did realize substantial benefits for the consumers.  In his opinion, the lack of specific deadlines made it open-ended and effectively took companies out of the equation, and he urged the committee to consider **Mr. Alke's** bill draft.

<u>**Questions from Committee Members and Responses**</u>:

**SEN. EMILY STONINGTON, SD 15, BOZEMAN,** wondered whether there had been a Supreme Court decision with regard to the authority the commission asserted it had.  **Commissioner Rowe** replied that there had not, and he felt this was for the Legislature to decide.  **SEN. STONINGTON** then asked for his interpretation of the

**Defendant's Trial
Exhibit 28**

language in SB 234 which **Mr. Alke** claimed gave the PSC authority to approve or disapprove MDU's entire sale even though only 3% of its ownership is in Montana.  **Commissioner Rowe** explained that if utility property was out-of-state, the Legislature could not confer jurisdiction;  the proper practice was for states within a region to coordinate their review with regards to being on the same time schedule and so on.  Secondly, MDU is a unified company rather than a conglomeration of utility affiliates and other businesses.  He maintained that the focus of the commission review should be on those things which have a material effect on rates and service.  **SEN. STONINGTON** sought his response to the claim that SB 234 was not necessary because currently, purchasing companies were not able to reflect sales price in rates.
**Commissioner Rowe** replied that **Mr. Alke** correctly described Montana law regarding acquisition adjustments but the reality was that if a sales price was substantially above the book value, there were only three ways in which this money could be made up: with efficiencies; through raising rates, or inferior service. He claimed that the PSC has always strived to pick an acceptable purchaser and the fact that, as in **Mr. Alke's** example, the purchaser of the regulated property was an unregulated entity made for a stronger argument in favor of appropriate review because after the transaction closes, the purchaser has no other recourse.  **SEN. STONINGTON** wondered whether 180 days were appropriate, and **Commissioner Rowe** assured her that while the PSC tried to work within a reasonable time line, six to nine months seemed more reasonable.  He admitted that while delays could have unforeseen and negative consequences, it was also true that any number of agencies such as FERC, the SEC or FCC could be conducting their own reviews at the same time, and he could not fathom that the state commission review would be the one holding up the process.  **SEN. STONINGTON** asked if there was room for common ground between this bill's approach and **Mr. Alke's.**
**Commissioner Rowe** replied he had not studied the latter but knew SB 234 was based on statutes which were working well in surrounding states.  In his view, a number of the proposed amendments fit very well with his request for constructive suggestions and alternatives while **Mr. Alke's** were the most radical compared with what the sponsor had in mind.

**SEN. KEN TOOLE, SD 27, HELENA,** remembered there had been litigation about the PSC's jurisdiction over the transfer of assets.  **Commissioner Rowe** mentioned that in every case, the utility started by challenging commission jurisdiction.  He explained that in the Flathead case, they had gone to District Court to obtain a 30 day time span in which to do a minor review which resulted in consumer benefits, but a year later the review was deemed invalid.  **SEN. TOOLE** tried to ascertain that the court had conveyed jurisdiction to the PSC, and **Commissioner Rowe**

**Defendant's Trial
Exhibit 28** Page 014

explained they had reached an agreement which the court approved and supervised. **SEN. TOOLE** recalled with regard to the transfer to NorthWestern, arguments were raised by both Montana Power and NorthWestern Energy that the PSC did not have jurisdiction over stock transfers, and **Commissioner Rowe** confirmed that. **SEN. TOOLE** asked how the controversy was resolved. **Commissioner Rowe** replied that it did go through a commission hearing and ultimately, the commission asserted its jurisdiction. He felt SB 234 would clarify this issue.

**SEN. MIKE TAYLOR, SD 37, PROCTOR,** asked **Commissioner Rowe** to comment on the MDU amendment, and the latter professed that he could not at this time but had asked the involved parties to meet in order to come up with acceptable alternatives.

**CHAIRMAN ROYAL JOHNSON, SD 5, BILLINGS,** asked **Commissioner Rowe** how all of this related to the decision made last week by the PSC regarding NorthWestern's credit application. **Commissioner Rowe** explained that Montana's utility law differed from most other states as Montana does not have the general authority to adopt affiliate interest rules or to review transactions, and these two issues came together last week. The goal was to protect the utility company and to avoid shifting risk from the non-utility onto the utility operations. In both the sale of MPC to NorthWestern and the previous week's action, the argument was made that if action was not taken quickly, the non-utility operations could jeopardize the utility operations. He recalled how the PSC had determined that NorthWestern's acquisition met a minimal standard and the transaction was viable, and he stressed that now, the utility operation was indeed profitable and it was the non-utility which was close to bringing down the rest of the company. He affirmed that the previous week's PSC order was the toughest order on a financing request they had ever issued, but it had been necessary to reach further because the utility operations themselves were at stake. **CHAIRMAN JOHNSON** wondered if the assets of the former MPC were part of the full corporation or merely a division of NorthWestern and not responsible for NorthWestern Resources problem. **Commissioner Rowe** replied the company was originally organized as a utility affiliate which was then brought in as a unitary operation. **CHAIRMAN JOHNSON** probed further by asking whether the PSC understood, before making its decision, that the utility was part of NorthWestern's assets, and **Commissioner Rowe** replied they did.

**SEN. GARY PERRY, SD 16, MANHATTAN,** pointed to EXHIBIT (8) where it states "this commission does not have authority over transfers and sales of utilities" and asked for an explanation.
**Commissioner Rowe** affirmed that in 1948 when the statement was made, reviews where not in the commission's purview.

**Defendant's Trial Exhibit 28** Page 015

experience had demonstrated a failure to review these transactions could produce serious consequences for customers. More recently, it has been the PSC's position that transactions affecting the customers' rates and service should be reviewed based on the Legislature's mandate that rates and service are the commission's responsibility.

**SEN. COREY STAPLETON, SD 10, BILLINGS,** asked for an example of a transaction where the outcome would have been different had this bill been law. **Commissioner Rowe** pointed to the PacifiCorp transaction as the most poignant; also, the PSC's ability to do a rigorous review was affected in the MPC/NorthWestern transaction because of the pressure of potential consequences. He repeated it was up to the Legislature to clarify the commission's authority. **SEN. STAPLETON** then asked him to elaborate what he wished would have happened with the PacifiCorp transaction as opposed to what actually happened. **Commissioner Rowe** explained that the commission was not able to adequately review due diligence and the relationship between the sale price and the value of the assets, and he claimed that the commission would have been able to ensure the property was as represented had it performed a proper review.
*{Tape: 2; Side: B}*
**SEN. STAPLETON** wanted to know the sale price for PacifiCorp, and also what the commission thought it should have been. **Commissioner Rowe** recalled the price was somewhere below $60 million and professed he did not have an opinion on what the price should have been, particularly since they were not afforded the opportunity to review. **SEN. STAPLETON** wondered, given the PSC's ability to disapprove the deal, how it could have gone forward without being sure about a proper price. **Commissioner Rowe** claimed that was the intent behind the bill's language, referring to "modify or condition a transaction"; typically, the Consumer Council would do discovery, testimony, and negotiating with the parties to make appropriate adjustments allowing a transaction to go forward in such a way as not to jeopardize the purchaser or its customers.

**SEN. BOB STORY, SD 12, PARK CITY,** asked if the PSC could prevent a regulated utility from making a sale to a cooperative. **Commissioner Rowe** replied they would approve the transaction if they thought the sale was in the public interest because after the transfer, the customer would not be able to go to the commission with regard to rate and service issues. **SEN. STORY** wanted to know what the seller's option was if the PSC found the sale was not in the public's interest. **Commissioner Rowe** answered that realistically, a transaction is modified so rates and service will not be harmed. It would be rare for a transaction to be disapproved outright. **SEN. STORY** wondered if

Defendant's Trial
Exhibit 28 Page 016

the PSC then was not applying its regulatory power to the co-op in a roundabout way.  **Commissioner Rowe** replied the intent was to ensure the co-op was starting from a good, solid position and added that the commission had reviewed transactions between regulated and unregulated entities by request.  **SEN. STORY** asked where the line should be drawn with regard to the reviews as someone had implied the PSC could review the sale of an old service truck and other insignificant equipment.  **Commissioner Rowe** replied SB 234 clarified what the Commission's authority is, as in the wording "transactions that would materially affect rates for services".  As for the service truck, he could only conceive its sale being reviewed if the Consumer Council raised a question whether it was part of a revenue requirement.  He was, however, intrigued by the idea of a minimum dollar threshold even though a million dollar contract could be huge for some companies and pocket change for others.

**SEN. PERRY** asked whether the PSC already had the authority to review transactions and acquisitions or did SB 234 vest a brand-new authority in the commission.  **Commissioner Rowe** replied that in their view, it may conduct reviews under its general supervisory powers, and he looked to the Legislature to solve this contested issue.  **SEN. PERRY** wondered if he understood correctly that the PSC had little to do in the crafting of SB 234.  **Commissioner Rowe** explained that **Sen. Cobb** had taken the initiative, the PSC did not ask for this bill even though they might be responsible for causing some of the problems by having suggested the language concerning "modify or condition".  He then asked for permission to give a third example to **SEN. STAPLETON** regarding an earlier question, namely that the restructuring law specifically prohibited the commission from either requiring or prohibiting the sale of generating assets which, in the case of Montana Power's sale of generators to NorthWestern Energy, raised concerns about potentially creating a monopoly.

**SEN. PERRY** sought assurance that he understood **Mr. Alke's** statement that the PSC wanted the authority granted to them in SB 234, and **Mr. Alke** repeated if the commission's true concern was to make sure an unqualified buyer who might jeopardize the utility's ability to provide just and reasonable rates and service did not acquire a Montana utility, then they should go with the bill he proposed because it specifically narrowed the PSC's authority to just the regulated operations of a utility. He repeated the term "public utility" in SB 234 refers to the company as a whole, and while MDU is a public utility as defined by Montana law, only 12% of the entire company is a utility and thus the PSC should not be able to assert any power beyond the utility operations.

**Defendant's Trial Exhibit 28** Page 017

030128ENS_Sm1.wpd

SOS 0019

**SEN. TOOLE** asked for clarification of the terms "acquisition
adjustment" and "original cost appreciated".  **Mr. Alke** explained
that the original cost of the company which devoted property to
public service becomes the basis of rate calculations and not
what the purchasing company paid for it, even if the purchase
price was higher than the base value; the difference between the
seller's rate base and the purchasing price is called acquisition
adjustment.  **SEN. TOOLE** wondered if, under either bill, the PSC
could step in under the provision pertaining to "reasonable and
just rates" if a utility was to sell its generating assets.  **Mr.
Alke** replied this would not be covered under either bill because
the restructuring law does not allow the PSC to prohibit such a
sale.  **SEN. TOOLE** changed his question to the potential sale of
distribution assets.  **Mr. Alke** explained his bill draft empowered
the commission to disapprove a sale if the buyer was not
qualified, either because he was not financially capable or
because of a bad history.  He went on to say the commission sets
the rates both for the buying and the selling utility, and a
higher purchase price cannot be reflected in rates unless an
extraordinary showing is made by the buyer.

**SEN. STORY** asked whether the commission had no say in the
Flathead example, where a regulated utility sold into an
unregulated market.  **Mr. Alke** confirmed this.  **SEN. STORY** touched
on the affiliated interest issue and asked how his bill draft
would protect the ratepayer should the buyer get involved in such
a diverse company and there was a downturn in the market.  **Mr.
Alke** answered neither bill would be able to successfully deal
with potential mismanagement on the part of the utility in their
effort to diversify.

**CHAIRMAN JOHNSON** referred to Section (1) of **Mr. Alke's** proposed
bill and asked what "substantial credible evidence" meant.  **Mr.
Alke** explained the commission could not base its ruling on
speculation but had to have solid evidence to support a
determination that either the buyer was unqualified or the
transaction would adversely affect the ratepayers' interests.
**CHAIRMAN JOHNSON** assumed that the only recourse left after the
PSC's decision was an appeal to the court, which **Mr. Alke**
confirmed.

*{Tape: 3; Side: A}*
**SEN. STONINGTON** sought to ascertain that **Mr. Alke's** intention was
to tie the commission's authority specifically to just and
reasonable rates and public interest as defined in statute.  **Mr.
Alke** replied he wanted to limit their review to the matters which
they regulate and tie it to the just and reasonable rates.  **SEN.
STONINGTON** felt there was common ground between **Defendant's Trial**

and **Mr. Alke** in the "due diligence" issue because in her opinion, the former had said "due diligence" meant the sale was as presented, whereas the latter thought it meant the company was qualified financially and capable of providing service.  **Mr. Alke** charged that the PSC should only look at the purchase price from a rate making standpoint, namely if it was so high as to jeopardize the interest of the customer.

**SEN. STONINGTON** expressed hope that all parties concerned would sit down and come to some consensus because she felt the members were interested in the PSC conducting reviews.  **Mr. Alke** explained that his bill draft was the result of a conversation with **Commissioner Rowe** who had asked him to prepare a proposal he could accept since he could not support the bill at hand, and he stated whatever the committee ultimately came up with would have to look a lot like his bill draft or he could not support it.

**CHAIRMAN JOHNSON** asked for clarification of a statement made by **Mr. Fitzpatrick** who then repeated his stance that in a regulated environment, the PSC's function was to balance public interest with business interest, and this bill overreached by getting into areas which should be left up to the companies managers and shareholders. **CHAIRMAN JOHNSON** wondered if it would have been in the public's best interest had the PSC stopped MPC's sale to NorthWestern Energy.  **Mr. Fitzpatrick** replied several different transactions had taken place, and the PSC did play a role in three of the five.  With regard to the transfer of the gas and electric distribution and transmission systems, TouchAmerica Holdings Company had the desire to get out of the electric utility business and the transfer was a proper management decision by the two parties.  He speculated any company tied to TouchAmerica might now be involved in bankruptcy proceedings had the sale not taken place.  **CHAIRMAN JOHNSON** remembered, though, that at the time, MPC had assured everyone TouchAmerica's evident problems would not affect their assets.  **Mr. Fitzpatrick** could not comment since he had not been in their employ.

**SEN. TOOLE** reminded the committee that NorthWestern's purchase price was above the book value.  **Mr. Fitzpatrick** charged that the difference was small; the big issue was stranded costs.  **SEN. TOOLE** corrected him, saying that they did pay more and it was ultimately reflected in higher rates.  He suggested the company explain this in a letter to the committee, and **Mr. Fitzpatrick** promised he would get an answer from the corporation.  However, he disputed the fact that the price difference was reflected in rates;  the rate increase happened with the gas and oil sale involving Pan Canadian because the price in that transaction was substantially above the book value.

**Defendant's Trial Exhibit 28** Page 019

030128ENS_Sm1.wpd

SOS 0021

**Closing by Sponsor**:

**SEN. COBB** closed by saying this legislation was current law in 45 other states, and the bill was necessary in order to clarify and put in statute what the PSC was already asserting.


## EXECUTIVE ACTION ON SB 173

**Motion/Vote**:  **SEN. RYAN** moved that **SB 173 DO PASS. Motion carried unanimously**.


## EXECUTIVE ACTION ON SB 215

**Motion/Vote**:  **SEN. TOOLE** moved that **SB 215 BE INDEFINITELY POSTPONED**.

**Substitute Motion/Vote**:  **SEN. STAPLETON** made a substitute motion that **SB 215 DO NOT PASS. Substitute motion carried unanimously**.


## EXECUTIVE ACTION ON SB 219

**Motion**:  **SEN. TOOLE** moved that **SB 219 DO PASS**.

**Discussion**:

**SEN. STORY** stated he could not support a do pass because historically, the Legislature had avoided regulating co-ops; he understood that most of them already had net-metering programs and should decide for themselves on how to handle this issue. **SEN. McNUTT** agreed with **SEN. STORY**, saying that historically, they had been allowed to conduct their own business, and he could not support changing the rules at this point.

**Substitute Motion/Vote**:  **SEN. STORY** made a substitute motion that **SB 219 BE INDEFINITELY POSTPONED. Substitute motion carried unanimously**.

SENATE COMMITTEE ON ENERGY AND TELECOMMUNICATIONS
January 28, 2003
PAGE 15 of 15

## ADJOURNMENT

Adjournment:  5:30 P.M.


_____
SEN. ROYAL JOHNSON, Chairman


_____
MARION MOOD, Secretary


RJ/MM

**EXHIBIT**(ens18aad)

**Defendant's Trial Exhibit 28**Page 021
030128ENS_Sm1.wpd
SOS 0023

1               SENATE BILL NO. 153

2         INTRODUCED BY THOMAS, BERRY, LARSEN, OLSON

3

4    A BILL FOR AN ACT ENTITLED: "AN ACT REVISING PUBLIC SERVICE COMMISSION DISTRICTS FOR THE

5    PURPOSE OF POPULATION EQUITY; REQUIRING THE ENERGY AND TELECOMMUNICATIONS INTERIM

6    COMMITTEE TO REVIEW PUBLIC SERVICE COMMISSION DISTRICTS; ESTABLISHING A PROCESS FOR

7    THE REVIEW OF DISTRICTS; AND AMENDING SECTION 69-1-104, MCA."

8

9    BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:

10

11   NEW SECTION. **Section 1. Energy and telecommunications interim committee -- redistricting for**

12   **public service commission.** (1) In each interim following the release of county population figures for each

13   federal population census, the energy and telecommunications interim committee provided for in 5-5-230 shall

14   review the public service commission districts provided for in 69-1-104.

15         (2) In developing a plan for revising public service commission districts, the committee shall:

16         (a) comply with the requirements of [section 2];

17         (b) complete its work before September 15 of the year preceding a legislative session; and

18         (c) submit its recommendations to the legislature in the form of draft legislation or in the form of a report

19   if draft legislation is not needed and changes in the district are unnecessary.

20         (3)   The committee may consult with the public service commission and with the districting and

21   apportionment commission provided for in Title 5, chapter 1, part 1, in preparing the plan.

22         (4)  (a) Before the committee submits a public service commission redistricting plan to the legislature,

23   it shall hold at least one public hearing on the plan at the state capitol.

24         (b) The committee may hold other hearings as it considers necessary.

25

26   NEW SECTION. **Section 2. Redistricting criteria.** (1) In the development of public service commission

27   districts, a plan must provide for five public service commission districts, with one commissioner elected from

28   each district, distributed as follows:

29         (a) The districts must be as equal as practicable based on population.

30         (b) District boundaries must coincide with the boundaries of counties of the state.



Defendant's Trial
Exhibit 28 Page 022

SOS 0024

1      (c)  The districts must be contiguous, meaning that the district must be in one piece.

2      (2) A district may not be drawn for the purpose of favoring a political party or an incumbent public service

3   commissioner. The following data or information may not be considered in the development of a plan:

4      (a)  addresses of incumbent public service commissioners;

5      (b)  political affiliations of registered voters;

6      (c)  partisan political voter lists; and

7      (d)  previous election results unless required as a remedy by a court.

8

9      **Section 3.**  Section 69-1-104, MCA, is amended to read:

10      **"69-1-104. Public service commission districts.** In this state there are five public service commission

11   districts, with one commissioner elected from each district, distributed as follows:

12      (1)  first district: Blaine, Cascade, Chouteau, Daniels, Dawson, Fergus, Garfield, <u>Glacier,</u> Hill, Judith

13   Basin, Liberty, McCone, Petroleum, Phillips, ~~Pondera,~~ PRAIRIE, Richland, Roosevelt, Sheridan, Toole, Valley, and

14   Wibaux Counties;

15      (2)  second district: Big Horn, Carbon, Carter, Custer, Fallon, MUSSELSHELL, Powder River, ~~Prairie,~~

16   Rosebud, Treasure, and Yellowstone Counties;

17      (3)  third district: Beaverhead, Broadwater, ~~Deer Lodge,~~ DEER LODGE, Gallatin, Golden Valley, Jefferson,

18   Madison, Meagher, ~~Musselshell,~~ Park, Silver Bow, Stillwater, Sweet Grass, and Wheatland Counties;

19      (4)  fourth district: ~~Deer Lodge,~~ Granite, Lincoln, Mineral, Missoula, ~~Powell,~~ POWELL, Ravalli, and Sanders

20   Counties;

21      (5)  fifth district: Flathead, ~~Glacier,~~ Lake, Lewis and Clark, ~~Pondera,~~ ~~Powell,~~ PONDERA, and Teton

22   Counties."

23

24      <u>NEW SECTION.</u>  **Section 4.  Transition.** For the purposes of the 2014 election, the secretary of state

25   shall declare which district a sitting commissioner represents for any public service commissioner whose district

26   is not up for election and shall use as criteria the residence of the respective commissioner on [the effective date

27   of this act].

28

29      <u>NEW SECTION.</u>  **Section 5.  Notification to tribal governments.** The secretary of state shall send a

30   copy of [this act] to each tribal government located on the seven Montana reservations and to the Little Shell



*Legislative*
*Services*
*Division*

- 2 -

*Authorized Print Version - SB 153*

**Defendant's Trial**
**Exhibit 28** Page 023

63rd Legislature                                                                                           SB0153.02

1    Chippewa tribe.

2

3            <u>NEW SECTION.</u>  **Section 6.  Codification instruction.** [Sections 1 and 2] are intended to be codified

4    as an integral part of Title 69, chapter 1, part 1, and the provisions of Title 69, chapter 1, part 1, apply to [sections

5    1 and 2].

6

7            <u>NEW SECTION.</u>  **Section 7.  Saving clause.** [This act] does not affect rights and duties that matured,

8    penalties that were incurred, or proceedings that were begun before [the effective date of this act].

9                                                    - END -



**Defendant's Trial**
**Exhibit 28** Page 024

SOS 0026

1    SENATE BILL NO. 246

2    INTRODUCED BY M. MACDONALD

3

4    A BILL FOR AN ACT ENTITLED: "AN ACT GENERALLY REVISING THE PUBLIC SERVICE COMMISSION;

5    REQUIRING PUBLIC SERVICE COMMISSIONERS TO BE NONPARTISAN CANDIDATES; REQUIRING THE

6    ENERGY AND TELECOMMUNICATIONS INTERIM COMMITTEE TO REVIEW THE COMMISSION DISTRICTS

7    AND MAKE RECOMMENDATIONS TO REVISE THE SIZE AND COMPOSITION OF THE COMMISSION;

8    REVISING THE PROCESS FOR ESTABLISHING PUBLIC SERVICE COMMISSION SALARIES; REVISING THE

9    PROCESS FOR FILLING PUBLIC SERVICE COMMISSION VACANCIES; AMENDING SECTIONS 2-16-405,

10   5-5-230, 13-12-207, 13-14-111, 13-35-231, 13-37-216, 69-1-105, AND 69-1-106, MCA; AND PROVIDING AN

11   IMMEDIATE EFFECTIVE DATE."

12

13   BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:

14

15   NEW SECTION. **Section 1. Energy and telecommunications interim committee -- redistricting for**

16   **public service commission.** (1) (a) In the 2021-2022 interim, using the county population figures for each federal

17   population census, the energy and telecommunications interim committee provided for in 5-5-230 shall review

18   the public service commission districts provided for in 69-1-104 and recommend changes to the legislature to

19   revise the commission from five districts to three districts.

20        (b)  Beginning in 2023, in each interim following the release of county population figures for each federal

21   population census, the energy and telecommunications interim committee provided for in 5-5-230 shall review

22   the public service commission districts provided for in 69-1-104.

23        (2)  In developing a plan for revising public service commission districts, the committee shall:

24        (a)  comply with the requirements of [section 2];

25        (b)  complete its work before September 15 of the year preceding a legislative session; and

26        (c)  submit its recommendations to the legislature in the form of draft legislation or in the form of a report

27   if draft legislation is not needed and changes to the districts are unnecessary.

28        (3)   The committee may consult with the public service commission and with the districting and

29   apportionment commission provided for in Title 5, chapter 1, part 1, in preparing the plan.

30        (4) (a) Before the committee submits a public service commission redistricting plan to the legislature, it



Defendant's Trial
Exhibit 28 Page 025

SOS 0027

1   shall hold at least one public hearing on the plan at the state capitol.

2       (b)  The committee may hold other hearings as it considers necessary.

3

4       <u>NEW SECTION.</u>  **Section 2.  Redistricting criteria.** (1) In the development of public service commission

5   districts, a plan must provide for three public service commission districts, with one commissioner elected from

6   each district, distributed as follows:

7       (a)  The districts must be as equal as practicable based on population.

8       (b)  District boundaries must coincide with the boundaries of counties of the state.

9       (c)  The districts must be contiguous, meaning that the district must be in one piece.

10       (2) A district may not be drawn for the purpose of favoring a political party or an incumbent public service

11   commissioner. The following data or information may not be considered in the development of a plan:

12       (a)  addresses of incumbent public service commissioners;

13       (b)  political affiliations of registered voters;

14       (c)  partisan political voter lists; and

15       (d)  previous election results unless required as a remedy by a court.

16

17       <u>NEW SECTION.</u>  **Section 3.  Salaries for public service commissioners.** Before June 30 of each

18   even-numbered year, the department of administration shall conduct a salary survey of public service

19   commissioners in other states in which public service commissioners do not have professional qualifications. The

20   department shall include the salary for the Montana commissioners in determining the average salary for the

21   officials who do not have professional qualifications. If the average salary is greater than or less than the salary

22   for the commissioner in Montana, then beginning July 1 of the year following the year in which the survey is

23   conducted, the average salary is the new salary for the commissioner.

24

25       <u>NEW SECTION.</u>  **Section 4. Nonpartisan election of public service commissioners.** (1)  A public

26   service commissioner must file and be elected on the nonpartisan ballot in accordance with Title 13, chapter 14.

27       (2)  Section 13-35-231, prohibiting political party contributions to judicial officers and public service

28   commissioners, applies to candidates for the public service commission.

29

30       **Section 5.**  Section 2-16-405, MCA, is amended to read:



*Authorized Print Version - SB 246*

**Defendant's Trial**
**Exhibit 28** Page 026

SOS 0028

1    **"2-16-405.  Salaries of certain elected state officials.** (1) The salaries paid to the following elected

2    officials are determined as provided in subsection (2):

3        (a)  governor;

4        (b)  lieutenant governor;

5        (c)  attorney general;

6        (d)  state auditor;

7        (e)  superintendent of public instruction;

8        ~~(f)  public service commission presiding officer;~~

9        ~~(g)  public service commissioners, other than presiding officer;~~

10       ~~(h)~~(f)  secretary of state;

11       ~~(i)~~(g)  clerk of the supreme court.

12       (2) Before June 30 of each even-numbered year, the department of administration shall conduct a salary

13   survey of executive branch officials with similar titles to the Montana officials listed in subsection (1) for the states

14   of North Dakota, South Dakota, Wyoming, and Idaho. The department shall include the salary for the Montana

15   official in determining the average salary for the officials with similar titles. If the average salary is greater than

16   the salary for the official in Montana, then beginning July 1 of the year following the year in which the survey is

17   conducted, the average salary is the new salary for the official."

18

19       **Section 6.**  Section 5-5-230, MCA, is amended to read:

20       **"5-5-230.  Energy and telecommunications interim committee.** The energy and telecommunications

21   interim committee:

22       (1)  has administrative rule review, draft legislation review, program evaluation, and monitoring functions

23   for the department of public service regulation and the public service commission; and

24       (2)  is responsible for recommending public service commission districts and redistricting in accordance

25   with [sections 1 and 2]."

26

27       **Section 7.**  Section 13-12-207, MCA, is amended to read:

28       **"13-12-207.  Order of placement.** (1) The order on the ballot for state and federal offices must be as

29   follows:

30       (a)  If the election is in a year in which a president of the United States is to be elected, in spaces



*Authorized Print Version – SB 246*

**Defendant's Trial Exhibit 28 Page 027**

SOS 0029

1    separated from the balance of the party tickets by a line must be the names and spaces for voting for candidates

2    for president and vice president. The names of candidates for president and vice president for each political party

3    must be grouped together.

4          (b)  United States senator;

5          (c)  United States representative;

6          (d)  governor and lieutenant governor;

7          (e)  secretary of state;

8          (f)  attorney general;

9          (g)  state auditor;

10          (h)  state superintendent of public instruction;

11          (i)  public service commissioners;

12          (j)(i)  clerk of the supreme court;

13          (k)(j)  chief justice of the supreme court;

14          (l)(k)  justices of the supreme court;

15          (m)(l)  district court judges;

16          (m)  public service commissioners;

17          (n)  state senators;

18          (o)  members of the Montana house of representatives.

19          (2)  The following order of placement must be observed for county offices:

20          (a)  clerk of the district court;

21          (b)  county commissioner;

22          (c)  county clerk and recorder;

23          (d)  sheriff;

24          (e)  coroner;

25          (f)  county attorney;

26          (g)  county superintendent of schools;

27          (h)  county auditor;

28          (i)  public administrator;

29          (j)  county assessor;

30          (k)  county treasurer;



*Authorized Print Version - SB 246*

Defendant's Trial Exhibit 28 Page 028

SOS 0030

1    (l)  surveyor;

2    (m)  justice of the peace.

3    (3)  The secretary of state shall designate the order for placement on the ballot of any offices not on the

4    above lists, except that the election administrator shall designate the order of placement for municipal, charter,

5    or consolidated local government offices and district offices when the district is part of only one county.

6    (4)  Constitutional amendments must be placed before statewide referendum and initiative measures.

7    Ballot issues for a county, municipality, school district, or other political subdivision must follow statewide

8    measures in the order designated by the election administrator.

9    (5)  If any offices are not to be elected they may not be listed, but the order of the offices to be filled must

10   be maintained.

11   (6)  If there is a short-term and a long-term election for the same office, the long-term office must precede

12   the short-term."

13

14   **Section 8.**  Section 13-14-111, MCA, is amended to read:

15   **"13-14-111.  Application of general laws.** Except as otherwise provided in this chapter, candidates for

16   nonpartisan offices, including judicial offices <u>and the public service commission</u>, must be nominated and elected

17   according to the provisions of this title."

18

19   **Section 9.**  Section 13-35-231, MCA, is amended to read:

20   **"13-35-231.  Unlawful for political party to contribute to judicial <u>or public service commission</u>**

21   **candidate.** A political party may not contribute to a judicial candidate <u>or to a candidate for the public service</u>

22   <u>commission</u>."

23

24   **Section 10.**  Section 13-37-216, MCA, is amended to read:

25   **"13-37-216. Limitations on contributions -- adjustment.** (1) (a) Subject to adjustment as provided for

26   in subsection (3) and subject to 13-35-227 and 13-37-219, aggregate contributions for each election in a

27   campaign by a political committee or by an individual, other than the candidate, to a candidate are limited as

28   follows:

29   (i)  for candidates filed jointly for the office of governor and lieutenant governor, not to exceed $500;

30   (ii) for a candidate to be elected for state office in a statewide election, other than the candidates for



- 5 -                   *Authorized Print Version - SB 246*

**Defendant's Trial**
**Exhibit 28 Page 029**

SOS 0031

1   governor and lieutenant governor, not to exceed $250;

2          (iii) for a candidate for any other public office, not to exceed $130.

3          (b)  A contribution to a candidate includes contributions made to any political committee organized on

4   the candidate's behalf. A political committee that is not independent of the candidate is considered to be

5   organized on the candidate's behalf.

6          (2)  All political committees except those of political party organizations are subject to the provisions of

7   subsection (1). Political party organizations may form political committees that are subject to the following

8   aggregate limitations, adjusted as provided for in subsection (3) and subject to 13-37-219, from all political party

9   committees:

10         (a)  for candidates filed jointly for the offices of governor and lieutenant governor, not to exceed $18,000;

11         (b)  for a candidate to be elected for state office in a statewide election, other than the candidates for

12  governor and lieutenant governor, not to exceed $6,500;

13         ~~(c)  for a candidate for public service commissioner, not to exceed $2,600;~~

14         ~~(d)~~(c)  for a candidate for the state senate, not to exceed $1,050;

15         ~~(e)~~(d)  for a candidate for any other public office, not to exceed $650.

16         (3)  (a) The commissioner shall adjust the limitations in subsections (1) and (2) by multiplying each limit

17  by an inflation factor, which is determined by dividing the consumer price index for June of the year prior to the

18  year in which a general election is held by the consumer price index for June 2002.

19         (b)  The resulting figure must be rounded up or down to the nearest:

20         (i)  $10 increment for the limits established in subsection (1); and

21         (ii) $50 increment for the limits established in subsection (2).

22         (c)  The commissioner shall publish the revised limitations as a rule.

23         (4)  A candidate may not accept any contributions, including in-kind contributions, in excess of the limits

24  in this section.

25         (5)  For purposes of this section, "election" means the general election or a primary election that involves

26  two or more candidates for the same nomination. If there is not a contested primary, there is only one election

27  to which the contribution limits apply. If there is a contested primary, then there are two elections to which the

28  contribution limits apply."

29

30         **Section 11.**  Section 69-1-105, MCA, is amended to read:



**Defendant's Trial
Exhibit 28** Page 030

SOS 0032

1      **"69-1-105.  Term of office -- term limits.** (1) A term is for a period of 4 years. A commissioner when

2 elected shall qualify ~~at the time and in the manner provided by law for other state officers~~ as provided in [section

3 4] and ~~shall~~ take office on the first Monday of January after the election.

4      (2)  A commissioner shall serve until a successor is elected and qualified.

5      (3)  The secretary of state or other authorized official may not certify a candidate's nomination or election

6 to the public service commission or print or cause to be printed on any ballot the name of a candidate for the

7 public service commission if, at the end of the current term of that office, the candidate will have served in that

8 office or, had the candidate not resigned or been recalled, would have served in that office for 8 or more years

9 in a 16-year period.

10      (4)  When computing the time served for the purposes of subsection (3), the provisions of subsection (3)

11 do not apply to time served in terms that ended during or prior to January 1995."

12

13      **Section 12.**  Section 69-1-106, MCA, is amended to read:

14      **"69-1-106.  Vacancies.** (1) Any vacancy occurring in the commission must be filled by appointment by

15 the governor as provided in this section. The appointee shall hold office until the next general election and until

16 a successor is elected and qualified. At the biennial election following the occurrence of any vacancy in the

17 commission, there must be elected one member to fill out the unexpired term for which the vacancy exists.

18      (2)  ~~(a) When a vacancy occurs, if the former incumbent represented a party eligible for primary election~~

19 ~~under 13-10-601, the person appointed by the governor must be a member of the same political party and must~~

20 ~~be selected by the governor as provided in subsections (3) and (4).~~

21      ~~(b) If the former incumbent was an independent or was originally nominated from a party that does not~~

22 ~~meet the requirements of 13-10-601, the~~ The governor shall appoint an individual to the vacant position within

23 45 days of receiving notification from the secretary of state of the vacancy.

24      (3)  Within 7 days of being notified of a vacancy as described in 2-16-501, the secretary of state shall

25 notify the governor ~~and, if the former incumbent represented a party eligible for primary election under 13-10-601,~~

26 ~~the state party that was represented by the former incumbent~~.

27      ~~(4) (a) Upon receipt of a notification of a vacancy, the state party central committee notified pursuant to~~

28 ~~subsection (3) has 30 days to forward to the governor a list of three prospective appointees, each of whom must~~

29 ~~be a resident of the district represented by the former incumbent.~~

30      ~~(b) If the governor does not select an appointee from the list forwarded pursuant to subsection (4)(a)~~



*Authorized Print Version – SB 246*

**Defendant's Trial Exhibit 28 Page 031**

SOS 0033

1   ~~within 15 days, the central committee shall, within 15 days, forward a second list of three prospective appointees,~~

2   ~~each of whom must be a resident of the district represented by the former incumbent. The second list may not~~

3   ~~contain a name submitted on the first list. Within 15 days of receipt of the second list, the governor shall select~~

4   ~~an appointee from either list."~~

5

6   <u>NEW SECTION.</u>  **Section 13.  Transition.** (1) (a) For the purposes of the 2020 election, the three public

7   service commission seats up for election shall meet the nonpartisan requirements of [section 4].

8          (b)  For the purposes of the 2022 election, the remaining two public service commission seats up for

9   election shall meet the nonpartisan requirements of [section 4].

10         (2)  The terms of office of all current commissioners continue until expiration of their term.

11

12  <u>NEW SECTION.</u>  **Section 14.  Notification to tribal governments.** The secretary of state shall send

13  a copy of [this act] to each tribal government located on the seven Montana reservations and to the Little Shell

14  Chippewa tribe.

15

16  <u>NEW SECTION.</u>  **Section 15.  Codification instruction.** [Sections 1 through 4] are intended to be

17  codified as an integral part of Title 69, chapter 1, part 1, and the provisions of Title 69, chapter 1, part 1, apply

18  to [sections 1 through 4].

19

20  <u>NEW SECTION.</u>  **Section 16.  Saving clause.** [This act] does not affect rights and duties that matured,

21  penalties that were incurred, or proceedings that were begun before [the effective date of this act].

22

23  <u>NEW SECTION.</u>  **Section 17.  Severability.** If a part of [this act] is invalid, all valid parts that are

24  severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications,

25  the part remains in effect in all valid applications that are severable from the invalid applications.

26

27  <u>NEW SECTION.</u>  **Section 18.  Effective date.** [This act] is effective on passage and approval.

28                                                      - END -



Defendant's Trial
Exhibit 28 Page 032

SOS 0034

1     SENATE BILL NO. 309

2     INTRODUCED BY S. MALEK

3

4     A BILL FOR AN ACT ENTITLED: "AN ACT GENERALLY REVISING THE ESTABLISHMENT OF PUBLIC

5     SERVICE COMMISSION DISTRICTS; REQUIRING THE ENERGY AND TELECOMMUNICATIONS INTERIM

6     COMMITTEE TO REVIEW THE COMMISSION DISTRICTS AND MAKE RECOMMENDATIONS TO REVISE

7     THE SIZE AND COMPOSITION OF THE COMMISSION; AMENDING SECTION 5-5-230, MCA; AND

8     PROVIDING AN IMMEDIATE EFFECTIVE DATE."

9

10    BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:

11

12    <u>NEW SECTION.</u> **Section 1.  Energy and telecommunications interim committee -- redistricting for**

13    **public service commission.** (1) (a) In the 2021-2022 interim, using the county population figures for each federal

14    population census, the energy and telecommunications interim committee provided for in 5-5-230 shall review

15    the public service commission districts provided for in 69-1-104 and recommend changes to the legislature to

16    revise the commission from five districts to three districts.

17          (b)  Beginning in 2023, in each interim following the release of county population figures for each federal

18    population census, the energy and telecommunications interim committee shall review the public service

19    commission districts provided for in 69-1-104.

20          (2)  In developing a plan for revising public service commission districts, the committee shall:

21          (a)  comply with the requirements of [section 2];

22          (b)  complete its work before September 15 of the year preceding a legislative session; and

23          (c)  submit its recommendations to the legislature in the form of draft legislation or in the form of a report

24    if draft legislation is not needed and changes to the districts are unnecessary.

25          (3)   The committee may consult with the public service commission and with the districting and

26    apportionment commission provided for in Title 5, chapter 1, part 1, in preparing the plan.

27          (4) (a) Before the committee submits a public service commission redistricting plan to the legislature, it

28    shall hold at least one public hearing on the plan at the state capitol.

29          (b)  The committee may hold other hearings as it considers necessary.

30



Defendant's Trial
Exhibit 28 Page 033

SOS 0035

1     <u>NEW SECTION.</u> **Section 2. Redistricting criteria.** (1) In the development of public service commission

2    districts, a plan must provide for three public service commission districts, with one commissioner elected from

3    each district, distributed as follows:

4     (a)  The districts must be as equal as practicable based on population.

5     (b)  District boundaries must coincide with the boundaries of counties of the state.

6     (c)  The districts must be contiguous, meaning that the district must be in one piece.

7     (d) The districts must contemplate the number of utility customers versus the number of cooperative utility

8    customers.

9     (2) A district may not be drawn for the purpose of favoring a political party or an incumbent public service

10   commissioner. The following data or information may not be considered in the development of a plan:

11     (a)  addresses of incumbent public service commissioners;

12     (b)  political affiliations of registered voters;

13     (c)  partisan political voter lists; and

14     (d)  previous election results unless required as a remedy by a court.

15

16   **Section 3.**  Section 5-5-230, MCA, is amended to read:

17   **"5-5-230.  Energy and telecommunications interim committee.** The energy and telecommunications

18   interim committee<u>:</u>

19    <u>(1)</u> has administrative rule review, draft legislation review, program evaluation, and monitoring functions

20   for the department of public service regulation and the public service commission<u>; and</u>

21    <u>(2) is responsible for recommending public service commission districts and redistricting in accordance</u>

22   <u>with [sections 1 and 2]</u>."

23

24   <u>NEW SECTION.</u>  **Section 4.  Transition.** The terms of office of all current commissioners continue until

25   expiration of their term.

26

27   <u>NEW SECTION.</u>  **Section 5.  Notification to tribal governments.** The secretary of state shall send a

28   copy of [this act] to each tribal government located on the seven Montana reservations and to the Little Shell

29   Chippewa tribe.

30



*Authorized Print Version – SB 309*

**Defendant's Trial**
**Exhibit 28** Page 034

SOS 0036

1        <u>NEW SECTION.</u>  **Section 6.  Codification instruction.** [Sections 1 and 2] are intended to be codified

2  as an integral part of Title 69, chapter 1, part 1, and the provisions of Title 69, chapter 1, part 1, apply to [sections

3  1 and 2].

4

5        <u>NEW SECTION.</u>  **Section 7.  Effective date.** [This act] is effective on passage and approval.

6                                   - END -



     - 3 -     *Authorized Print Version - SB 309*

**Defendant's Trial**
**Exhibit 28** Page 035

SOS 0037