IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| BOB BROWN, HAILEY SINOFF, and DONALD SEIFERT,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State,<br><br>Defendant. | CV 21–92–H–PJW–DWM–BMM<br><br><br>OPINION &<br>ORDER |

This case derives from a challenge to the apportionment of electoral districts for Montana's Public Service Commission ("the Commission"). The current electoral map for the Commission was adopted in 2003 and has not been updated since. Plaintiffs Bob Brown, Hailey Sinoff, and Donald Seifert (collectively "Plaintiffs")[1] sued Secretary of State Christi Jacobsen in her official capacity, seeking to enjoin her from certifying candidates for Districts 1 and 5 for the upcoming 2022 elections, a declaration that the current districts under Mont. Code Ann. § 69–1–104 violate the Fourteenth Amendment, and relief in the form of a new electoral map. Following the grant of a preliminary injunction prohibiting the

---

[1] Brown is a resident of District 5 based on the current map, while Sinoff and Seifert are residents of District 3. (Doc. 1 at ¶¶ 13–15.)

1

certification of candidates for Districts 1 and 5, the parties simultaneously moved for summary judgment.  Those motions were taken under submission, and a bench trial was conducted on March 4, 2022.  Both the parties chose not to call witnesses but were afforded the opportunity to do so; instead, they stipulated to the evidence each offered.  Based on the exhibits presented in conjunction with the summary judgment briefing and the stipulated evidence presented at the trial, the current district map is unconstitutional, and Jacobsen is permanently enjoined from certifying candidates under it.  Accordingly, a new map is imposed, under which Jacobsen will certify candidates for the Commission for the 2022 election cycle and the court-ordered adoption of the state's proposed redistricting will control the establishment of the district map until the Montana legislature acts differently.

**BACKGROUND**

## I.    Factual Background

The Commission is organized as an entity under the executive branch.  *See* Mont. Code Ann. § 2–15–2602.  It "adopt[s] such rules of practice and procedure for the filing, investigation, and hearing of petitions or applications to increase or decrease rates and charges of railroads, motor carriers, and public utilities as the commission finds necessary or appropriate to enable it to reach a final decision in an orderly manner."  *Id.* § 69–2–101.  It is empowered to "(a) adopt reasonable and proper rules relative to all inspections, tests, audits, and investigations; (b) adopt

2

and publish reasonable and proper rules to govern its proceedings; and (c) regulate the mode and manner of all investigations and hearings of public utilities and other parties before it." *Id.* § 69–3–103(2).  It consists of five members, "who shall be qualified electors of the district from which they are elected, with each such member elected from a separate district of the state." *Id.* § 69–1–103.

As depicted below, the current districts were drawn in 2003:



(Doc. 43-1); Mont. Code Ann. § 69–1–104.  Districts for the Commission, unlike those for the legislature, are not required to be redistricted on any definite timeline. *See* Mont. Const. art. V, § 14.  Even so, failed efforts were made between 2003 and the present to alter the existing map.  At least some of these efforts attempted to satisfy the constitutional mandate of voter parity to the extent feasible.  In 2013, Montana Senate Bill 153 proposed a map with reapportioned Commission districts based on the 2010 Census data.  S.B. 153, 63rd Leg., Reg. Sess. (Mont. 2013).

3

The bill failed.  In 2017, Senate Bill 210 was introduced, which sought to amend §§ 69–1–104 and 69–1–104 so that commissioners for the Commission would be appointed, rather than popularly elected.  S.B. 210, 65th Leg. Reg. Sess. (Mont. 2017).  Senate Bill 210 did not, however, make any changes to the current districts.  *See id.*  It also failed.  In 2019, Senate Bill 246 and Senate Bill 309 both proposed redistricting of the Commission's districts, specifically providing that the energy and telecommunications interim committee would "recommend changes to the legislature to revise the commission from five districts to three districts" and identifying specific "redistricting criteria."  S.B. 246, S.B. 309, 66th Leg., Reg. Sess. (Mont. 2019).  Both bills failed.  In 2021, Senate Bill 160 was introduced to change the method of selection of commissioners from one of election to one of appointment.  S.B. 160, 67th Leg. Reg. Sess. (Mont. 2021).  That bill also failed.

The record includes evidence from the 2020 Census,[2] which is relevant to the calculation of the current Commission district's respective deviation from the ideal population utilizing the formula from *Evenwel v. Abbott*, 578 U.S. 54, 59–60 (2016).  Based on that calculation, the ideal population for each district in Montana would be 216,845 persons.  (Doc. 41 at 6.)  This figure is achieved by dividing Montana's total 2020 population of 1,084,225, (*id.* at 5), by the number of districts,

---

[2] The parties have stipulated to the accuracy of the 2020 Census data.  (Doc. 41 at 5–6.)

4

or five.  *See Evenwel*, 578 U.S. at 59.  Relying on the 2020 Census data, the

population of the smallest district, District 1, downwardly deviates approximately

14% from the ideal population while the population of the largest district, District

3, upwardly deviates approximately 10%.  (Doc. 41 at 6.)  Under the *Evenwel*

formula, the maximum population deviation based on the current districts is

roughly 24%.  *See* 578 U.S. at 60; (*see also* Doc. 41 at 6).  These figures mean the

current district map violates the requirement of one person, one vote under the

Fourteenth Amendment to the federal constitution.

## II.    Procedural Background

In December 2021, Plaintiffs brought the present suit, alleging that the

Commission districts are malapportioned.  (Doc. 1.)  Plaintiffs invoked

appointment of a three-judge panel pursuant to 28 U.S.C. § 2284(a) to resolve their

claims.  (*See generally id.*)  The Chief Judge of the Ninth Circuit accordingly

appointed the current panel.  (Doc. 3.)

Plaintiffs then filed a motion for a temporary restraining order and/or a

preliminary injunction, seeking to enjoin the candidate certification process in

Districts 1 and 5, which are scheduled to hold elections in 2022.  (Doc. 5 at 2.)

Plaintiffs' request for a temporary restraining order was granted, and Jacobsen was

temporarily restrained from implementing the candidate certification process in

Districts 1 and 5.  (Doc. 7 at 9.)  Following a January 7, 2022 hearing, Plaintiffs'

request for a preliminary injunction was granted, and Jacobsen was enjoined from certifying candidates for commissioner in Districts 1 and 5. The case was then set on an expedited trial schedule given the March 14, 2022 candidate filing deadline. (*See* Doc. 16.)

Plaintiffs and Jacobsen filed simultaneous motions for summary judgment. (Docs. 21, 24.) During the summary judgment briefing stage, Plaintiffs filed a "Notice of Nonobjection Regarding [the] Applicability of 22 [sic] U.S.C. § 2284." (Doc. 30.) In response to an argument from Jacobsen that the three-judge panel was improvidently appointed, Plaintiffs "affirmatively consent[ed] to further adjudication by a single district court judge" without conceding the Commission was *not* a "statewide legislative body" so as to remove this case from the purview of § 2284. (Doc. 30 at 2.) The motions for summary judgment, in addition to Plaintiffs' notice, were taken under submission for the March 4, 2022 bench trial.

While the March 4 bench trial presented the parties with the opportunity to call witnesses and introduce evidence beyond the summary judgment record, neither party called any witnesses. The parties stipulated to the admission of Plaintiffs' Proposed Map 1 ("Map 1"), Plaintiffs' Proposed Map 2 ("Map 2"), Plaintiffs' Proposed Map 3 ("Map 3"), and Jacobsen's Proposed Map ("Map 4"). (Docs. 43-2, 43-3, 43-4, 43-9.) The trial consisted of argument about the significance and meaning of the stipulated evidence.

## LEGAL STANDARDS

Summary judgement is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  On cross-motions for summary judgment, it is the court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether the evidence demonstrates a genuine issue of material fact." *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).  Each motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (quotation marks omitted).

However, at the summary judgment stage, courts must determine only "whether there is a genuine dispute for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On motions for summary judgment, the court "does not engage in credibility determinations or weigh evidence." *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021).  Accordingly, because both parties submitted expert reports that necessarily required us to make a credibility determination, (*see* Docs. 43-6, 43-12), a bench trial was necessary to permit us to weigh the credibility of the parties' respective experts—a task made more difficult in the absence of witness testimony to clarify the significance of the reports and evidence.

## ANALYSIS

Jacobsen advances numerous procedural arguments that she alleges bar us from reaching the merits of this case. According to Jacobsen, the three-judge panel was improvidently appointed under 28 U.S.C. § 2284(a), Plaintiffs' claims are not justiciable because they are either untimely or unripe, and Plaintiffs lack standing. None of these arguments is persuasive.

On the merits, both parties agree that the current Commission districts deviate beyond the presumptively constitutional threshold of a 10% maximum deviation based on the 2020 Census data. What the parties disagree on is the nature of the injury and its proper remedy. According to Plaintiffs, the injury is a violation of the electorate's constitutional rights, and the proper remedy is the imposition of a court-ordered map identifying new districts in anticipation of the 2022 elections. According to Jacobsen—if we reach the merits—the electorate's alleged constitutional injury is comparably less severe than the injury to separation of powers principles that would result from any judicial remedy, and the proper result is to allow the 2022 elections to proceed on the current unconstitutional map to allow the Montana legislature to address the problem at the upcoming 2023 legislative session. The tension between a constitutional violation and the

principles of federalism and the doctrine of separation of powers presents a Hobson's choice for the court.

Reluctantly, the answer here is to narrowly impose a federal court order to reapportion state electoral districts until the Montana legislature acts.  Because the current Commission districts impermissibly violate the one person, one vote principle of the Fourteenth Amendment, the districts are unconstitutional. Recognizing the narrow time constraints posed by the March 14, 2022 candidate filing deadline and seeking to avoid the disenfranchisement of all voters presently expecting to vote in the 2022 elections, imposition of a new Commission map is appropriate.  This remedy is not permanent, however, and remains subject to the Montana legislature's power to draw and implement its own constitutional map.

## I.    28 U.S.C. § 2284(a)

Jacobsen represented at the March 4 trial that she would not seek an appeal based on the propriety, or alleged lack thereof, of the three-judge panel. The Supreme Court's decision in *Shapiro v. McManus*, 577 U.S. 39, 43–44 (2015), strongly suggests that § 2284(a) is jurisdictional; thus, regardless of Jacobsen's intentions for appeal, because jurisdiction is a prerequisite to adjudication, we must consider whether the three-judge panel was properly appointed in this case.

Under 28 U.S.C. § 2284(a):

A district court of three judges shall be convened when otherwise required by  Act  of  Congress,  or  when  an  action  is  filed  challenging  the

constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

The statute was amended in 1975, and this amendment "eliminate[d] the three-judge courts in cases seeking to enjoin the enforcement of State or Federal laws on the grounds that they are unconstitutional, except in reapportionment cases." S. Rep. No. 94-204, at 1–2 (1975). The legislative history from the amendment emphasizes that the three-judge panel requirement was specifically and intentionally retained for cases involving the reapportionment of any statewide legislative body. *Id.* This requirement was preserved for such cases because "these issues are of such importance that they ought to be heard by a three-judge court and, in any event, they have never constituted a large number of cases." *Id.* at 9. The legislative history of § 2284 and federal case law reveal that there are two distinct, conjunctive elements to "statewide legislative body": (1) the impacts of the body's decisions must be statewide, and (2) the body must be "legislative" in function.

As to the first element, the legislative history of the 1975 amendment to § 2284(a) clarifies that "[w]here such a body exercises its powers over the entire State, this section requires that three judges hear cases challenging apportionment of its membership." S. Rep. No. 94-204, at 9. By contrast, "[a]pportionment of a body that deals only with matters of local concern and [is] representative of a county, district, or city, would not require three judges, even though the body

10

derives its power from a State statute." *Id.*  A state legislature is the textbook definition of "a body [that] exercises its powers over the entire State," and so it follows that cases challenging the apportionment of districts to that body initially be heard by a three-judge panel.  *See* S. Rep. No. 94-204, at 9.  On the other hand, a three-judge panel would not be convened to hear the sort of constitutional challenge raised in *Hadley v. Junior College District of Metropolitan Kansas City, Missouri*, 397 U.S. 50 (1970).  S. Rep. 94-204, at 9.  In *Hadley*, the Board of Trustees of a school district was the governmental body at issue, and its jurisdiction extended only to the district in which the Board sat.  *See* 397 U.S. at 51–52.  The governmental body at issue in *Hadley* was not "statewide," and therefore the challenge to its apportionment did not require a three-judge panel. *See* S. Rep. No. 94-204, at 9.

On the second element, the legislative history indicates that Congress specifically intended to incorporate and react to federal case law.  The history of the 1975 amendment to § 2284(a) states that the use of the term "statewide legislative body" arose out of an intent to apply the constitutional principles outlined in *Reynolds v. Sims*, 377 U.S. 533 (1964), to "elected bodies which exercise 'general governmental powers over the entire area served by the body.'" S. Rep. No. 94-204, at 9.  In *Reynolds*, a three-judge panel was convened based on the plaintiffs' challenge to Alabama's state legislative electoral districts under the

Fourteenth Amendment. 377 U.S. at 541. Ultimately, the Supreme Court applied the one person, one vote principle of the Equal Protection Clause to the apportionment of state legislatures. *Id.* at 568. Following *Reynolds*, the Court clarified that the Fourteenth Amendment's one person, one vote principle also applied to the electoral districts for local government officers that served entire geographical areas, including districts for county commissioner, *Avery v. Midland Cnty.,* 390 U.S. 474, 485–86 (1968), and districts for the election of trustees to a school district board, *Hadley*, 397 U.S. at 58.

*Avery* is a helpful foil for this case. There, a Texas taxpayer challenged the election of the Midland County Commissioners Court from single-member districts, alleging that the unequal population of the districts contravened the one person, one vote principle of the Fourteenth Amendment. *Avery*, 390 U.S. at 476. The defendants in *Avery* argued that the Commissioners Court's functions were not "sufficiently legislative" to implicate the one person, one vote principle. *Id.* at 482. The Supreme Court rejected that argument. The Court determined that the Commissioners Court's legislative functions had the power to "make a large number of decisions having a broad range of impacts on all citizens of the county," including, *inter alia*, setting tax rates, equalizing assessments, issuing bonds, and preparing and adopting a budget to allocate the county's funds. *Id.* at 483. The Court determined that even though the Commissioners Court served executive,

administrative, and judicial functions, that did not remove the Commissioners Court from the purview of the one person, one vote principle because the Commissioners Court performed fundamentally "legislative" functions. *Id.* Notably, like the Commission, the Commissioners Court is not organized under the "legislative" branch, but rather is classified under Article V of the Texas Constitution, which is titled "Judicial Department." Tex. Const. Art. 5, § 18. It is the state body's function, as opposed to its denomination, that impacts the invocation of § 2284.

Similarly, in *Hadley*, the Court held that the one person, one vote principle encompassed by the Fourteenth Amendment extended to the appointment of trustees of a junior college district. 397 U.S. at 52. In *Hadley*, the Court rejected the idea that it should "distinguish for apportionment purposes between elections for 'legislative' officials and those for 'administrative' officials[.]" *Id.* at 55. Consequently, the Court held, "as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election." *Id.* at 56.

The legislative history of the 1975 amendment to § 2284 is heavily informed by *Reynolds*, *Avery*, and *Hadley*. That history cites *Avery* and *Hadley* as examples

of cases where elected bodies exercised general governmental powers over the area in which those bodies served, suggesting at first blush that the bodies at issue in those cases would meet the definition of "any statewide legislative body."  But, as discussed above, the legislative history of the amendment to § 2284 clarifies that such a body must exercise its powers *over the entire State* to invoke the jurisdiction of a three-judge panel.  S. Rep. 94–204, at 6.  Thus, the history clarifies that it is because the bodies at issue in *Avery* and *Hadley* were not statewide, not because they were not "legislative," that jurisdiction would fail to vest in a three-judge panel.

Because the Commission satisfies both elements of a "statewide legislative body," the three-judge panel in this case was properly appointed.  On the first element, the Commission has the authority to exercise its powers over the entire state of Montana.  *See* Mont. Code Ann. § 69–1–102.  The Commission's authority is not limited to the local matters of a county, district, or city.  *Cf. Avery*, 390 U.S. at 476.  Indeed, even Jacobsen does not seem to contest the "statewide" reach of the Commission.  (*See* Doc. 24 at 4–8.)

On the second element, the State argues the Commission is an executive, not legislative, body under Montana law.  But despite its organization under the executive branch, the Commission is a "legislative body" as that term was intended by the 1975 amendment to § 2284.  Units of government frequently "cannot be

14

classified in the neat categories favored by civics texts," *Avery*, 390 U.S. at 482, and so the mere categorization of the Commission as "executive" under Montana law does not automatically render it outside the definition of a "legislative body" for purposes of § 2284(a).  In the context of local government, the Court in *Avery* emphasized that a body, such as the Commissioners Court, may be "assigned some tasks which would normally be thought of as 'legislative,' others typically assigned to 'executive' or 'administrative' departments, and still others which are judicial." 390 U.S. at 482.  Consequently, *Avery* indicates that the legislative function of a body need not be its sole purpose to implicate the necessity a three-judge panel under § 2284(a).  This is consistent with the broad intent espoused in the legislative history of the amendment to § 2284 that, whatever the body is called, it must "exercise 'general governmental powers over the entire area served by the body.'" S. Rep. 94-204, at 9.  This understanding is also consistent with the commonplace definition of "legislative power" that Jacobsen proffers in her summary judgment brief: "the power to make laws and to alter them; . . . [a] legislative body may delegate a portion of its lawmaking authority to agencies within the executive branch for purposes of rulemaking and regulation."  (Doc. 24 at 5 (quoting BLACK'S LAW DICTIONARY 449 (4th Pocket ed. 2011).)  Even though a governmental unit may be statutorily classified under the executive or judicial branch, where the legislature has delegated its "lawmaking authority" to that unit,

the unit is acting as a legislative body as that term is contemplated in § 2284.  *See Avery*, 390 U.S. at 482.

Here, the Commission "adopt[s] such rules of practice and procedure for the filing, investigation, and hearing of petitions or applications to increase or decrease rates and charges of railroads, motor carriers, and public utilities as the commission finds necessary or appropriate to enable it to reach a final decision in an orderly manner."  *Id.* § 69–2–101.  It is empowered to "adopt reasonable and proper rules relative to all inspections, tests, audits, and investigations; adopt and publish reasonable and proper rules to govern its proceedings; and regulate the mode and manner of all investigations and hearings of public utilities and other parties before it."  *Id.* § 69–3–103(2).  Given these functions, the Commission is embodied by the term "statewide legislative body" under § 2284(a), thereby triggering the mandatory three-judge panel upon Plaintiffs' initial request.  *See* § 2284(a), (b)(1).  Many of these functions overlap with the functions carried out by the Commissioners Court, *see Avery*, 390 U.S. at 483, and the legislative history's emphasis that the term "statewide legislative body" is meant to reflect "elected bodies which exercise 'general governmental powers'" further supports the conclusion that the Montana Public Service Commission is a "legislative body" for purposes of § 2284.  Accordingly, the three-judge panel has jurisdiction over this case.

## II.   Justiciability: Timing

Jacobsen reiterates two objections that were raised at the preliminary injunction stage and in her motion to dismiss: Plaintiffs' challenges are not justiciable because they are both too late—based on 2010 Census data—and too early—based on 2020 Census data.  These objections are rejected for the reasons previously stated.  (*See* Doc. 16 at 3–5.)

## III.   Standing

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  To establish standing, a plaintiff must demonstrate three things: (1) the plaintiff suffered an injury in fact that is (2) causally connected and fairly traceable to the challenged conduct and (3) likely to be redressed by a favorable decision in court.  *Id*.  Under the first prong, a plaintiff must demonstrate an injury that is both "concrete and particularized" as well as "actual or imminent."  *Id.* at 560.  Under the second prong, a plaintiff must show that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (alterations omitted).  Finally, under the third prong, a plaintiff must show that it is likely, not merely "speculative," that the injury will be redressed by a favorable decision from the court.  *Id.* at 561.

Here, the first prong of standing is satisfied because the current map for the Commission's districts creates a greater than 10% deviation from the ideal population, which is presumptively unconstitutional. *See Evenwel*, 578 U.S. at 60; (Doc. 41 at 6.). But Jacobsen disputes that Plaintiffs satisfy the second and third prongs of the standing inquiry. Jacobsen argues that Plaintiffs fail to demonstrate traceability because the Montana legislature, not Jacobsen, is the root of Plaintiffs' alleged injuries. (*See* Doc. 25 at 9, 11–14.) Jacobsen also argues that Plaintiffs fail to demonstrate that their injury is redressable because their requested relief exceeds the scope of Jacobsen's authority. (*Id.* at 14–16.) These arguments are unpersuasive.

## A.   Traceability

"The secretary of state is the chief election officer of [Montana], and it is the secretary of state's responsibility to obtain and maintain uniformity in the application, operation, and interpretation of the election laws . . . ." Mont. Code Ann. § 13–1–201.[3] The Supreme Court's decision in *Baker v. Carr* shows that the secretary of state is a proper defendant in actions brought by voters seeking to vindicate their Fourteenth Amendment rights. 369 U.S. 186, 204–06 (1962). In *Baker*, the plaintiffs were voters of various Tennessee counties who sued

---

[3] The statute excludes Chapters 35, 36, and 37 of the Montana Code Annotated, which do not bear on the issues in this case.

Tennessee state officials under the theory that the current electoral districts unconstitutionally diluted their votes in violation of one person, one vote. *Id.* at 204–05. The defendants included "the Tennessee Secretary of State, Attorney General, Coordinator of Elections, and members of the State Board of Elections." *Id.* at 205. The Court concluded that the *Baker* plaintiffs had standing. *Id.* at 206. *Old Person v. Cooney*, 230 F.3d 1113 (9th Cir. 2000), is also instructive. The plaintiffs in *Old Person*—Native American voters in Montana—sued the Montana Governor and Secretary of State, alleging that the redistricting plan for electoral districts for the State House of Representative and Senate violated the Fourteenth Amendment and the Voting Rights Act. *Id.* at 1117. Defendants there did not argue that the Secretary of State—or the Governor—was an improper party.

Here, Jacobsen argues that she is not the proper party because Plaintiffs' claim "imputes the conduct of a non-party, the Montana Legislature, onto the Secretary. . . But none of the alleged unlawful conduct resulting in a purported Fourteenth Amendment violation concerns the actions or omissions of the Secretary." (Doc. 25 at 12.) Jacobsen argues that the proper defendants are the State of Montana, the Montana legislature, (Doc. 32 at 10), or the Governor. But those parties are either immune from suit or likewise would be unable to implement Plaintiffs' requested relief.

The Secretary of State administers elections, which includes certifying candidate names for inclusion on ballots and certifying election results. *See* § 13–1–201. These activities overlap with the activities of the Secretary of State named as a defendant in *Baker*, against whom the Supreme Court determined those plaintiffs had standing to bring their Fourteenth Amendment claim. *See* 369 U.S. at 205 n.25. Thus, here, where Plaintiffs' prayer for relief specifically requests that Jacobsen be enjoined from implementing and administering candidate filings for elections upon the current Commission district map, (Doc. 1 at 16), that request directly aligns with Jacobsen's duties as the Secretary of State. It provides the necessary "causal link" to satisfy the second prong of the standing inquiry. Additionally, the other defendants named in *Baker* were so named because of Tennessee state statutes that are inapplicable here. *See* 369 U.S. at 205 n.25 (noting that the Attorney General is required to be named as a defendant by state statute and explaining that the remaining defendants are affiliated with the state board of elections). Moreover, despite Jacobsen's arguments to the contrary at the March 4 trial, there is not a meaningful distinction between the apparently acceptable naming of the Secretary of State as a defendant in *Old Person* and the naming of the Secretary of State as a defendant here. At the March 4 trial, Jacobsen emphasized that the Governor was also named as a defendant in *Old Person*, but he had not been named here; the omission of the Governor as a

defendant in the present case, however, does not sever the necessary causal link for standing purposes because it is the Secretary of State—not the Governor—who administers candidate filings based on electoral maps and administers elections based upon those maps.

Moreover, the Montana legislature could not be a party to this case because it is specifically immunized from suit by statute. *See* Mont. Code Ann. § 2–9–111(2) ("A governmental entity is immune from suit for a legislative act or omission by its legislative body. . . ."). Attempting to name the Montana legislature as a defendant for an alleged failure to act to redistrict the Commission's districts would have been futile. And, Jacobsen's allusion to the State of Montana as a party is problematic for several other reasons. First, the Eleventh Amendment generally bars suits against the state. Second, as Plaintiffs point out, a state officer may be sued for injunctive relief if the "office sufficiently connect[s] him with the duty of enforcement," *Ex parte Young*, 209 U.S. 123, 161 (1908). Jacobsen administers the filings by prospective candidates and enforces elections through her role as the Secretary of State, and so she may be sued in her official capacity.

Plaintiffs have shown that the alleged injury is "fairly traceable to the challenged action of [Jacobsen], and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

21

**B.      Redressability**

Jacobsen's argument on redressability is somewhat merged with her traceability argument and her arguments on the merits.  In her brief in support of summary judgment, Jacobsen argued that the alleged injury cannot be redressed by a favorable decision for Plaintiffs because Jacobsen lacks the authority to implement a new map.  (Doc. 25 at 14–16.)  In her response to Plaintiffs' summary judgment brief, Jacobsen raised an additional argument related to redressability: that Plaintiffs' requested relief cannot be granted because it goes "beyond pronouncing a constitutional judgment and extends into amending Montana law." (Doc. 32 at 12.)  According to Jacobsen, "What Plaintiffs really ask this Court to do [] is amend MCA § 69–1–104," as it is the statute that currently identifies which counties fall within each district.  (*Id.* at 14.)  Jacobsen's first argument fails for the reasons explained above.  Her second argument is unpersuasive because it conflates judicial remedy with judicial legislation.

It is plain that a court may not rewrite a statute.  *See United States v. Stevens*, 559 U.S. 460, 481 (2010).  But courts are empowered to strike down unconstitutional laws, and that action does not constitute judicial lawmaking.  *See Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 556 (2013).  Thus, we have the authority to declare unconstitutional § 69–1–104, which names the counties in each of the Commission's current districts, without resurrecting the specter of judicial

22

legislation that Jacobsen fears.  Additionally, as a practical matter, striking § 69–1–104 as unconstitutional and implementing a new Commission map cannot be rewriting the statute because there will be nothing to "rewrite."  The statute ceases to exist.  Consequently, because we may declare § 69–1–104 unconstitutional and implement a new Commission map—upon which the 2022 elections will be administered by Jacobsen in her role as Secretary of State—Plaintiffs satisfy the redressability prong of the standing inquiry.

## IV.   Fourteenth Amendment Violation

The Fourteenth Amendment guarantees every voter his "constitutional right to have his vote counted with substantially the same weight as that of any other voter."  *Hadley*, 397 U.S. at 53.  The guarantee is aspirational to the extent that "[s]tates must draw congressional districts with populations as close to perfect equality as possible."  *Evenwel*, 578 U.S. at 59.  "But, when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives."  *Id.* Such traditional districting objectives include preservation of "the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness."  *Id.*  Again, "[w]here the maximum population deviation between the largest and smallest district is less than 10% . . . a state or local

legislative map presumptively complies with the one-person, one-vote rule." *Id*. at 60.

Here, as noted above, under the *Evenwel* formula, the maximum population deviation of the Commission districts is roughly 24%, which exceeds the presumptively reasonable 10% deviation. *See* 578 U.S. at 60. Jacobsen does not dispute that the deviation exceeds that floor, but instead argues that Plaintiffs' challenge is not ripe because it is based on the 2020 Census data, and we should therefore abstain from declaring the Commission's districts unconstitutional until after the 2023 legislative session. But Jacobsen's timeliness argument ultimately goes to the question of remedy, and no evidence in the summary judgment record or introduced at trial rebuts the presumption of unconstitutionality. In the absence of evidence to rebut that presumption, the current Commission districts are unconstitutional, and the map as it is expressed in § 69–1–104 is unconstitutional.

## V.   Remedy

The Supreme Court has "repeatedly emphasized that legislative reapportionment is primarily a matter for legislative consideration and determination." *Connor v. Finch*, 431 U.S. 407, 414 (1977) (quotation marks omitted). The Supreme Court has also continued to emphasize that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539

(1978) (collecting cases).  But where a state legislature has failed to "reconcile traditional state policies within the constitutionally mandated framework of substantial population equality . . . a federal court is left with the unwelcome obligation of performing in the legislature's stead." *Connor*, 431 U.S. at 415.

"When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise*, 437 U.S. at 540.  "[B]ut when those with legislative responsibilities do not respond, or the imminence of a statewide election makes it impracticable to do so, it becomes the 'unwelcome obligation' of the federal court to devise and impose a reapportionment plan pending later legislative action." *Id.* (citation omitted).

When courts undertake the task of reapportionment, the result of their efforts is held to a higher standard than the standard applied to legislative plans.  *See Connor*, 431 U.S. at 414.  Such three-judge federal district courts engaging in reapportionment are held to a higher standard "in two important respects: Unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than de minimis

variation."[4]  *Id.* at 414 (alterations and quotation marks omitted).  Thus, three-judge courts engaged in reapportionment must grapple with the "hard remedial problems in minimizing friction between their remedies and legitimate state policies."  *Id.*  In addition, while any reapportioned plan must comply with the Voting Rights Act, *see, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Abrams v. Johnson*, 521 U.S. 74 (1997), the vote dilution and vote deprivation concerns typically implicated by the Voting Rights Act are not implicated in this case.  (*See* Doc. 22 at 31–32; *id.* at 32 n.5; *see also* Doc. 32 at 24.)

Because this case neither implicates concerns associated with multimember districts nor generates issues related to the Voting Rights Act, the main challenge here is adhering to the stricter standard imposed on federal district courts engaged in redistricting while simultaneously adhering to recognized and legitimate state policies.  That challenge is somewhat exacerbated by the parties' slightly different accounts of what the relevant Montana state policy is—and how much deference is owed to such policy—and the challenge is made greater still by the absence of

---

[4] While "de minimis" is not defined in *Connor*, it is commonly defined as "trifling; negligible," or "so insignificant that a court may overlook it in deciding an issue or case."  *De minimis*, BLACK'S LAW DICTIONARY (11th ed. 2019).  But *Connor* pointed to values over 10% maximum population deviation as not "de minimis," albeit in the context of redistricting by a legislature.  431 U.S. at 418. Accordingly, because we are held to a higher standard in redistricting than the legislature would be, "de minimis" must mean something below 10%, and the closer the value comes to zero the better, but the exact value is unclear.

witnesses who may have testified to legislative standards or state policy and the reasons for such guidelines.  Nevertheless, for the reasons explained below, we implement a version of Jacobsen's submitted Map 4 that is consistent with the heightened standard for redistricting by a federal court and faithful to legitimate state policy as reflected in her proposed redistricting map with a single minor alteration to preserve the integrity of the Blackfeet Reservation.  In doing so, we recognize that Map 1, proposed by Plaintiffs, represents another viable option for redistricting; however, principles of federalism, comity, and the separation of powers compel us to implement a modified version of Map 4 despite that Map 1 also comports with the requirements of the Constitution and substantially adheres to the state's policies and preferences.

### A.    Relevant State Policy

Courts should adhere to "the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795 (1973).  On this point, Jacobsen argues that § 69–1–104 includes the following requirements to which we must adhere: each district must (1) be compact and contiguous, (2) represent a community of interest, and (3) use county lines as the district boundary.  (Doc. 32 at 23.)  In support of the final criterion,

Jacobsen notes that "[e]ach subsequent redistricting attempt likewise adhered to the existing policy of following county lines." (*Id.*)  Related to the second criterion, "communities of interest," is defined by the Legislative Redistricting Criteria Considerations (2021): "This could be an urban neighborhood or a rural area.  It might be an area where people have similar jobs or lifestyles.  It might be an Indian reservation."  (Doc. 33-1 at 10.)  In her summary judgment materials, Jacobsen defines a "community of interest" as "a community with shared geography, socioeconomic status, and economic activity."  (Doc. 32 at 27.)

Plaintiffs' articulation of the relevant state policies is largely consistent with Jacobsen's criteria.  The point on which Plaintiffs disagree, however, is the required adherence to county lines.  Rather, Plaintiffs argue that we must "preserve political boundaries," which may mean keeping counties intact, but which may also mean "preserv[ing] cities, towns, counties, and federal reservations."  (Doc. 22 at 33 (citing 2020 Mont. Districting & Apportionment Comm'n, *Criteria & Goals for State Leg. Districts*).)

The parties' differences compel the resolution of two issues: first, whether it is state policy that Commission district boundaries be drawn along county lines, and second, whether the agreed-upon criterion that communities of interest be kept intact requires the preservation of Indian reservations.  On the first question, Jacobsen argues that the historic practice of drawing Commission districts along

28

county lines indicates that such a practice is state policy.  But, as Plaintiffs point out, the Commission's districts have been redrawn only once in their nearly 50-year history.  Consequently, it is difficult to say that defining the Commission's districts by county is a "state policy."  Jacobsen also argues that § 69–1–104, which lists the districts by county, further demonstrates a state policy of drawing Commission districts atop county lines.  While there is no evidence in the summary judgment record, nor any evidence from the trial, that indicates that county lines were intended to reflect the boundaries for commission districts rather than stand-in as mere proxies for such boundaries, Plaintiffs agreed at the March 4 trial that county boundaries could be adhered to without compromising the constitutional integrity of a new Commission map.

On the second question, Plaintiffs recognize that any prospective map could not simultaneously adhere to county lines and keep the Flathead Reservation intact. (Doc. 34 at 16.)  This poses a dilemma given that county lines are currently consistent with the Commission district boundaries and, at the same time, federal reservations are "communities of interest" and state policy seeks to keep such communities intact.  At the March 4 trial, Jacobsen represented that the State prioritized county lines over maintaining Indian reservations.  Given that federal district courts engaged in redistricting must adhere to the "policies and *preferences*" of the State so long as they are consistent with the court's

constitutional obligations, *White*, 412 U.S. at 795 (emphasis added), a map that follows county lines should be implemented over a map that deviates from such lines to maintain the Flathead Reservation.  But, at the same time, it is possible here to implement a map that follows county lines and maintains nearly all Indian reservations.  Because this approach strikes the best balance between adhering to state policy and preferences while complying with the requirements of the Constitution, this map is implemented.  While Plaintiffs' proposed Maps 1, 2, and 3 provide a significantly lower maximum population deviation than Map 4, that factor alone does not overcome state policy and preference so long as Map 4 is presumptively constitutional.

**B.    Deference**

The Supreme Court's emphasis on the "friction" inherent in reapportionment recognizes the tension created by the pull of the separation of powers and federalism and the push to comport with federal equal protection principles.  To alleviate some of the strain on the separation of powers, Jacobsen argues that we must totally defer to state policies, which means adopting Jacobsen's proposed map because it disrupts the current Commission map "as minimally as possible."  Jacobsen relies on *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (per curiam), for this argument, pointing to the policy that we must not "intrude upon state policy any more than necessary."  But Jacobsen's reading takes *Upham* a bridge too far;

faithfully read, *Upham* does indeed require a federal district court engaging in reapportionment to adhere to state policy, but Jacobsen conflates the prohibition of intruding on state policy as little as possible with a requirement to change existing state maps as little as possible. That approach is not what *Upham* requires.

*Upham* stated in full, "In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" 456 U.S. at 41–42 (quoting *White*, 412 U.S. at 794–95). In *White*, the Supreme Court held that the three-judge district court panel erred in choosing one proposed plan when a different proposed plan "adhered to the desires of the state legislature while attempting to achieve population equality among districts." 412 U.S. at 795. The rejected plan "achieved the goal of population equality to a greater extent" than the adopted plan, and the Court noted that the district court failed to state any reason for adopting one plan over the rejected plan. *Id.* at 796–97.

With this context, *Upham* stands for precisely what it says:

> Whenever a district court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of reconciling the requirements of the Constitution with the goals of state political policy. An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect.

456 U.S. at 43 (citation and quotation marks omitted).  Thus, consistent with Jacobsen's position, established state policies and preferences are owed deference.  However, contrary to her position, we may modify a "state plan" to bring it into compliance with the Constitution, but the modification should be tempered by the goals of state policy and preference.  Applied here, we defer to the state's suggested redistricting criteria—which are consistent with the traditional districting criteria recognized in federal case law—but make one modification to the remedy proposed by Jacobsen to satisfy the heightened standard imposed upon federal courts in the redistricting context.  The heightened standard requires no more than de minimis variation in population equality, and our modification to Map 4 adheres to state policy while simultaneously reducing the maximum population deviation among districts.

### C.   Comparison of Proposed Maps

As a preliminary matter, Maps 2 and 3 are rejected because they do not maintain communities of interest, do not maintain county lines, and do not maintain total consistency among voters who would otherwise expect to vote in the 2022 elections for the Commission.  Consequently, we are left to choose between Map 1, which Plaintiffs submitted, and Map 4, which Jacobsen submitted.  In redistricting cases, the Supreme Court has indicated that one task of a federal district court engaged in such redistricting is to adequately explain its choice of one

proposed map over an alternative proposed map. *See White*, 412 U.S. at 796–97.

Accordingly, we consider Maps 1 and 4 in turn.

Map 1 has a maximum population deviation of 1.8%. (Doc. 32-4 at 6.)

According to Defendant's expert, Map 1 would divide two of Montana's 56

counties.  (*Id.* at 5.)  It would separate the Evaro Precinct, which is home to 1,183

people, (*id.*) from the rest of Missoula County, which has a population of 117,922,

(Doc. 23-1 at 9).  Map 1 also would separate the Dixon Precinct, which has a

population of 514, and the Hot Spring Precinct, which has a population 1,146,

(Doc. 32-4 at 5), from the rest of Sanders County, which has a population of

12,400, (Doc. 23-1 at 9).  The division of 2 of Montana's 56 counties into separate

Commission districts certainly considers the adherence to county boundaries, and it

fails to follow county boundaries only in the two instances noted above.  All told,

Map 1 removes roughly 2,843 of Montana's more than 1,000,000 people from their

home county, or about three-tenths of one-tenth of Montana's population.  Map 1

also maintains all Indian reservations.

By comparison, Map 4, as proposed, results in a maximum population

deviation of 9.44%.  (Doc. 43-11 at 7.)  So, by a hair's breadth, the map Jacobsen

proposes comes under the presumptively constitutional 10% threshold.  Map 4

"makes three changes relative to the current Commission districts": Glacier County

moves from District 5 to 1, Musselshell County moves from District 3 to 1, and

Deer Lodge County moves from District 3 to 4.  (*Id.* at 6.)  All district boundaries adhere to county lines, but the Flathead Reservation and the Blackfeet Reservation are divided.  The Blackfeet Reservation—a community of interest—is divided to preserve Glacier County and Pondera County.  A review of the population of the Blackfeet Reservation and the counties that overlap it provides some evidence of the accompanying communities of interest.  Glacier County has a population of 13,778, where most of the residents of the Blackfeet Reservation live.  (Doc. 23-1 at 9.)  In other words, more than three-fourths of Glacier County's residents live on the Blackfeet Reservation.  Map 4 also splits the Flathead Reservation—a community of interest—to preserve Flathead County, Missoula County and Sanders County.  Arguably, the community encompassed by the Flathead Reservation boundaries shares more in common in terms of economic, environmental, and social bonds than the comparable communities encompassed in the surrounding county boundaries.

Comparing Map 1 against Map 4, it is the better map by many metrics: it has a "no more than de minimis" variation from perfect equality, the districts are relatively compact and congruous, and all currently eligible 2022 voters maintain their ability to vote in the upcoming election for the Commission.  And, while Map 1 does not perfectly adhere to county lines, it adheres to those lines in all but two instances, as described above.  The deviations away from the county lines are

34

based in an effort to maintain the significant community of interest on the Flathead Reservation.  If we were to draw an electoral map in the first instance, independent of relevant state policies and preferences, Map 1 arguably represents the best option.  But that is not the inquiry facing federal district courts tasked with reapportionment.

Map 4 checks many of the same boxes as Map 1: its districts are relatively compact and congruent, it largely maintains communities of interest, and all currently eligible 2022 voters maintain their ability to vote in the upcoming election for the Commission.  But, unlike Map 1, Map 4 completely adheres to county boundaries.  At the same time, however, Map 4 divides two communities of interest and results in a significantly higher maximum population deviation.  But the former defect can be remedied by making one small modification to Map 4, without disenfranchising any voter who currently expects to vote in the 2022 Commission elections, and this change also remedies the latter defect, as explained below.  Moreover, our modification of Map 4 strikes the best balance of the concerns articulated in *Upham*: recognizing state policies and preferences, upholding constitutional rights, and respecting principles of federalism.

### D.    Remedy

Seeking to defer to legitimate state policies and recognizing the heightened burden of "achiev[ing] the goal of population equality with little more than de

minimis variation," Map 4 is adopted almost in its entirety, save for one change. Pondera County is moved from District 5 to District 1. This results in a maximum population deviation of 6.72%[5] and maintains the Blackfeet Reservation as a community of interest. As Plaintiffs note, "the Flathead Indian Reservation extends into two high-population counties, Flathead County and Missoula County, making it impossible to avoid splitting either the Reservation or at least one county." (Doc. 34 at 16.) Thus, the modification to Map 4 reconciles the requirements of the Fourteenth Amendment's one person, one vote principle with the goals of Montana state policy. *See Upham*, 456 U.S. at 43. Understanding "de minimis" in this context to mean something below the presumptively reasonable 10% threshold imposed on legislative redistricting, *see Connor*, 431 U.S. at 418, our modification is consistent with the instruction for federal courts to incur no more than de minimis population variance and incorporate legitimate state policy. Moreover, all voters who planned to vote in the 2022 elections remain eligible to do so. Accordingly, in the absence of legislative action, the map for the 2022 Public Service Commission elections is set forth below:

---

[5] This figure comes from davesredistricting.org, which the parties agree generates accurate numeric values. (Doc. 41 at 9.)



It bears repeating that this map remains in effect only in the absence of legislative action.  The map does not interfere with the Governor or the Montana legislature's ability to call a special session and implement a different map, nor does it prevent the Montana legislature from creating a different constitutional map during the 2023 legislative session.

CONCLUSION

For the reasons set forth above, Plaintiffs' requested relief is granted. Accordingly,

IT IS ORDERED that Montana Code Annotated § 69–1–104 is DECLARED unconstitutional.

IT IS FURTHER ORDERED that Secretary Jacobsen is permanently enjoined from certifying candidates under the 2003 Commission map.

IT IS FURTHER ORDERED that Secretary Jacobsen will implement the above map, absent action by the Montana legislature, to certify candidates for Districts 1 and 5 for the 2022 elections.

IT IS FURTHER ORDERED the Clerk is directed to enter judgment consistent with this Order and close the case.  All pending motions are DENIED as moot.

DATED this 8th day of March, 2022. 11:55 a.m.


Donald W. Molloy, District Judge
United States District Court


 /s/ Paul J. Watford
Paul J. Watford, Circuit Judge
Ninth Circuit Court of Appeals


Brian M. Morris, Chief Judge
United States District Court

Morris, Chief Judge, CONCURRING,

I join in the entirety of the Court's Opinion and Order with one exception.

I would have adopted Plaintiffs' Map 1 as the preferred remedy, as it better reflects state policy as expressed in the actions and statements of the Montana Districting and Apportionment Commission and the Montana Legislature. *See White v. Weiser*, 412 U.S. 783, 795 (1973) (stating that courts should apply "the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution."). First, the 1.8% population deviation provided by Plaintiffs' Map 1 better complies with the state policy of minimizing population deviation. (*See* Doc. 23-3 at 3 (2020 Districting and Apportionment Commission's mandatory criteria that maximum population deviation not exceed +/- 1%); Doc. 23-2 at 3 (2010 Montana Districting and Apportionment Commission's mandatory criteria that maximum population deviation not exceed +/- 3%); Doc. 32-5 at 3 (statement of Senator Fred Thomas, sponsor of Montana Senate Bill 153 to adopt a new Commission map and Defendant's expert in this case, explaining in a hearing on the failed bill that the proposed preferred option "has the smallest deviation by population.").) Second, Plaintiffs' Map 1 comports with the requirement to consider communities of interest as it keeps intact the boundaries of

Montana's seven Indian reservations.  (*See* Doc. 23-3 at 4 (2020 Montana Districting and Apportionment Commission's statement that in its discretionary criteria that it will consider Indian reservations as communities of interest); Doc. 23-2 at 4 (2010 Montana Districting and Apportionment Commission's statement that it will seek to preserve, where possible, Indian reservations as communities of interest).)  Third, Plaintiffs' Map 1 considers the importance of county boundaries as it keeps intact 53 of Montana's 56 counties, encompassing 99.74% of Montana's 1,084,225 residents.  (*See* Doc. 23-3 at 4 (2020 Montana Districting and Apportionment Commission's statement in its discretionary criteria that it "will consider" political boundaries, including cities, counties, and Indian reservations as communities of interest); Doc. 23-2 at 4 (2010 Montana Districting and Apportionment Commission's statement that it will attempt, where possible, to follow lines of political units including counties, cities, school districts, and Indian reservations).)  Finally, Plaintiffs' Map 1 presents five compact and contiguous districts. (*See* Doc. 32-4 at 4.)  I would be willing, pursuant to *Upham*, 456 U.S. 37 (1982), to defer to Defendant's Map 4 if it had been a product of the deliberations of the Montana Legislature rather than a product of Defendant's expert witness obtained for this litigation.

Brian Morris, Chief District Judge
United States District Court